**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 15-24363-CIV-WILLIAMS**

MARJAM SUPPLY COMPANY OF FLORIDA,
LLC, and MARJAM SUPPLY COMPANY,

      Plaintiffs/Counter-Defendants

vs.

PLITEQ, INC. and PAUL DOWNEY,

      Defendants/Counter-Plaintiffs

_____/

## ORDER

    **THIS MATTER** is before the Court on (i) Defendant Pliteq Inc's sealed motion for summary judgment (DE 162; Defendant's statement of material facts, DE 163) to which Plaintiffs filed a response (DE 181; Plaintiffs' responsive facts, DE 181-1), and Pliteq filed a reply (DE 190); and (ii) Plaintiffs' motion for partial summary judgment (DE 170; Plaintiffs' statement of material facts, DE 171), to which Defendants filed a response (DE 186; Defendants' responsive facts, DE 187), and Plaintiffs filed a reply (DE 193).  For the reasons set forth below, Defendants' motion for summary judgment (DE 162) is **GRANTED IN PART AND DENIED IN PART** and Plaintiffs' motion for partial summary judgment (DE 170) is **GRANTED IN PART AND DENIED IN PART**.

I.    **BACKGROUND**

This case involves an exclusive distribution agreement[1] of rubber acoustical underlayment products, specifically "flat rubber, resilient, reduced sound transmission mat[s] which [are] utilized directly beneath hard surface floor finishes and over concrete and wood construction, in order to provide sound attenuation control in multi-family housing, high-rise and commercial buildings." (DE 1 ¶ 12).  Plaintiffs Marjam Supply Company of Florida and Marjam Supply Company are affiliated Florida and New York corporations that supply and distribute building materials; Counter-Defendant, James Metcalf, is the company product manager (collectively, "Marjam").   (DE 1 ¶¶ 5-6). Defendant Pliteq, Inc. ("Pliteq") is a Canadian corporation that supplies rubber acoustical underlayment products under its own label.[2] (DE 1 ¶¶ 7-8).  Pliteq sources most of these products from Kraiburg, a rubber manufacturer based in Germany, and to a lesser extent from Ultimate RB, a rubber recycler and manufacturer incorporated in Delaware with its principal place of business in Missouri ("URB").  (DE 47 at 6; DE 164, Exhibit 2).

From 2013 to 2015, Marjam purchased $1.6 million worth of Pliteq's "GenieMat RST" brand rubber mats, primarily to supply partners involved in the construction of high-rise apartment and condominium projects in South Florida.  (DE 1 ¶¶ 17, 18).  One such project was a high-rise residential condominium project in Miami known as the "Met 3 Project."  (DE 1 ¶ 18).  The real estate developer spearheading the Met 3 Project, ZOM Living ("ZOM"), intended to use the GenieMat RST12 mats to provide sound insulation

---

[1] The Parties did not sign a written contract, but they concede that they generally abided by the terms of a term sheet memorialized in an email from Michael Bergam to James Metcalf of March 18, 2014. (DE 181-5).

[2]  Pliteq's President and Chief Executive Officer is Paul Downey.  (DE 1 ¶ 9).

for the occupants of each of the building's condominium units.  However, after Marjam delivered some of the GenieMat RST12 mats, ZOM's acoustical engineers tested them and found that their Apparent Impact Insulation Class (AIIC) ratings were lower than expected, meaning that the sound attenuation capability of the mats was below the level ZOM required. (DE 181-1 ¶ 6).  Marjam argues that, as a result, ZOM cancelled the order, returned the underperforming GenieMat RST12 mats to Marjam, and turned to Marjam's competitor to purchase a different brand of mats that met ZOM's needs.  (DE 1 ¶ 22; DE 181-1 ¶ 7-8).  Marjam argues that ZOM's cancellation of the order, resulted "in the loss to Marjam of a 256,000 square feet order of GenieMat and a corresponding loss $87,000 in profits."  (DE  181-1 ¶ 8).  After this litigation began, Marjam advised that it had lost track of all the Pliteq mats including those that were the subject of this litigation and that Marjam had previously represented were being maintained in their inventory. (DE 164 at 32, 73).  Subsequently, when James Metcalf, Marjam's litigation manager, was asked again about the mats he testified that "some of the product that was in question was actually sold after the date," but he could not identify the exact product that was sold, who it was sold to, or when it was sold. (DE 164 at 32).

In the summer of 2015, certain disputes arose between the parties.  (DE 218 at 9). According to Pliteq, Pliteq learned that Marjam was violating the distribution agreement by selling products from Pliteq's competitor, Ecore. (DE 163 ¶ 9-10).  Additionally, Pliteq claims that Marjam had failed to pay Pliteq in advance of orders, as had been agreed to, in order to obtain a discount.  (DE 163 ¶ 11).  By contrast, Marjam claims that there was only one "isolated and unauthorized" sale of Ecore product and that the only reason Marjam did not pay in advance was because Downey and Metcalf had agreed that Marjam

"would make periodic payments at an interval." (DE 181-1 at 3). The Parties agree that Pliteq stopped shipping product to Marjam on July 10, 2015. (DE 218 at 9). In August 2015, counsel for Marjam sent a demand letter to Pliteq claiming that Pliteq was purposefully mislabeling the GenieMats that it sold to Marjam. (DE 181-12 at 3). Metcalf then forwarded that letter to, at least, a representative of Suffolk Construction and a representative of Moss Development stating that Marjam had "ceased selling Geniemat products by Pliteq due to recent information about <u>illegal activity</u>." (DE 163 ¶ 21; DE 164 at 139; DE 181-1 at 5).

On November 24, 2015, Marjam brought eight causes of action against Marjam: Count 1 alleges that Pliteq violated Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.24; Count 2 alleges that Pliteq violated the Lanham Act's prohibition on false and misleading advertising, 15 U.S.C. § 1125(a)(1); Count 3 for breach of express warranties; Count 4 for breach of implied warranty of merchantability; Count 5 for breach of implied warranty of fitness for a particular purpose; Count 6 for common law fraud; Count 7 for breach of contract; and Count 8 alleging that Pliteq was part of a civil conspiracy to defraud Marjam.[3] (DE 1). On the date the complaint was filed, Marjam sent an email to some of Marjam's and Pliteq's business partners, attaching the complaint, and stating that Marjam was "extremely concerned about current and future liability." (DE 153 at 285).

Pliteq responded by bringing counterclaims against Marjam and Metcalf for (1) tortious interference with contracts; (2) tortious interference with potential business; (3)

---

[3] Marjam also asserted claims against URB and Paul Downey, but the Court dismissed those claims on URB's motion to dismiss and Downey's motion for summary judgment, respectively.

violation of section 43(a) of the Lanham Act; (4) common law unfair competition; (5) breach of contract and (6) copyright infringement. Pliteq's counterclaims are based on (i) the statements that Marjam made to third parties after the business relationship with Pliteq had ended, and (ii) a copy of the GenieMat brochure, which is an exact replica of a section of Pliteq's brochure with certain annotations related to competing products supplied by MAPEI, a Marjam customer. Pliteq contends that Marjam created this brochure and it infringes on their copyright.

## II.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under this standard, "[o]nly disputes over facts that might affect the outcome of the suit under the governing [substantive] law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And any such dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the Court considers the evidence in the record, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). The Court "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the non-movant." *Rioux v. City of Atlanta*, 520 F.3d 1269, 1274 (11th Cir. 2008) (quotation marks and citations omitted). At the summary judgment stage, the Court's task is not to

"weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

For issues for which the movant would bear the burden of proof at trial, the party seeking summary judgment "must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence…that would entitle it to a directed verdict if not controverted at trial. In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party. If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the non-moving party, in response, come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115-16 (11th Cir. 1993)(emphasis in original).

Moreover, when a motion for summary judgment is presented to the Court, it opens the entire record for consideration, and the Court may enter judgment in favor of the nonmoving party on any grounds apparent in the record, even where there is no formal cross-motion. *See Burton v. City of Belle Glade*, 178 F.3d 1175, 1204 (11th Cir. 1999).

## III.   DISCUSSION

Pliteq argues that it is entitled to summary judgment on all Marjam's claims because Marjam has failed to establish causation and damages with respect to each one. Marjam moves for summary judgment with respect to Pliteq's claims for (i) tortious interference with contract, (ii) Lanham Act violations, (iii) unfair competition, and (iv) copyright infringement.

6

### A.    Pliteq's Motion for Summary Judgment

Marjam has abandoned its $50,000 claim for actual damages related to unsold Pliteq inventory and its $320,000 claim for actual damages, which it had argued, was "measured by the imputed differences in the relative prices applicable to the varying misrepresented thicknesses of the GenieMat RST products it has purchased from Pliteq." (DE 1 ¶ 31).  Therefore, the Court reviews Pliteq's motion for summary judgment and Marjam's causes of action only to the extent they advance Marjam's sole remaining damages claim for $87,000 in lost profits related to ZOM's cancellation of GenieMat orders for the Met 3 project.

The Parties have three main areas of factual dispute.  First, the Parties do not agree on whether the mats sold to Marjam were sourced from URB or Pliteq's German manufacturer Kraiburg.  Downey testified that Marjam never received any URB product, and that the mats sold to Marjam were sourced from Kraiburg.  (DE 163 ¶ 68).  He stated that Pliteq marks all invoices for product originating in URB with a "U" after the product's name, and none of the invoices sent to Marjam were marked with a "U".[4]  (DE 163 ¶ 69). In response, Marjam offers testimony from Marjam's product manager, Metcalf, who testified that he learned from John Freidkes, a Pliteq employee at the time, that Marjam did in fact receive mats sourced from URB.  (DE 219-10 at 25).  Marjam alleges that this is corroborated by the fact that Marjam's payment terms were FOB New York and FOB, New Jersey.  (DE 181-1 at 11).  Because Pliteq sold most URB products in the

---

[4] In its Reply to Marjam's Response in Opposition to Summary Judgment, Pliteq attaches three invoices addressed to "Excellence in Stone" regarding sales to that business, which contain a "U" after the product name.  Pliteq asserts that, per that designation, those mats were sourced from URB.  (DE 190-1 at 20-22).

"Northeast," Marjam contends that the fact that their mats were shipped from those locations must mean that those mats were sourced from URB. (DE 181-1 at 11).

Second, the Parties do not agree on whether an additional purchase order was or even could have been made for the Met 3 project. Pliteq asserts the only reason Marjam did not sell GenieMat to the Met 3 project in July of 2015 is "**because Pliteq terminated the distributorship agreement and cut off Marjam's supply**," and, in any event, there is no evidence that Marjam ever ordered or took delivery of the additional mats that are the basis of Marjam's claims. (DE 162 at 13). Although Marjam agrees that Pliteq stopped shipping product on July 10, 2015, Marjam disputes that Pliteq terminated the agreement before Marjam made the verbal order for additional mats, and states that they never received a notice of termination of the distribution agreement. Marjam contends that Metcalf himself made a verbal purchase order for the additional mats that would be used for Met 3. (DE 219-10 at 25,110). Additionally, Marjam offers invoices and emails showing that Marjam was supplying GenieMat RST 12 to Met 3 up until the point where the mats were tested and deemed by ZOM to be inadequate. (DE 181-1 at 10-11).

Third, the Parties dispute whether Pliteq's "Data Sheets" and "Product Specifications" contained false or misleading information. Pliteq argues that because all acoustical products have certain tolerances and Pliteq's GenieMat products "are expressly within the stated tolerances in the Product Guide" there is no misrepresentation of fact. (DE 162 at 14). Indeed, Pliteq claims that "the specification sheets for each GenieMat product lists the thickness as 'nominal'" to account for the accepted variances in the product. *Id.* On the other hand, Marjam argues that the "Data Sheets" produced by Pliteq in support of its motion are from 2016, and, instead, the "Data Sheets" and

"Product Specifications" given to Marjam in 2014, did not specify that the measurements were "nominal."[5]   (DE 181-1 at 10).   Specifically, Marjam asserts that Pliteq's "Data Sheets" and "Product Specifications" indicated that the GenieMat RST12 had a thickness of 12 mm and an AIIC rating of 53, but documents produced during discovery and testing conducted at the Met 3 project show that the GenieMat RST12 sold to Marjam actually measured less than 12mm and had an AIIC rating of only 47.   (DE 1 ¶ 21; DE 181-1 at 13, 16).  As a result, Marjam claims that ZOM cancelled additional purchase orders causing Marjam a loss of $87,000 in lost profits.  The Court addresses Pliteq's motion in light of the factual disputes discussed above.

### 1.  FDUPTA Claim

To state a FDUTPA claim, plaintiff must allege: (1) a deceptive act or unfair trade practice; (2) causation; and (3) actual damages. *Dolphin LLC v. WCI Communities, Inc.*, 715 F.3d 1243 (11th Cir. 2013).   A deceptive act or unfair practice may be found when "there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment."  *Economakis v. Butler & Hosch, P.A.*, No. 2:13-CV-832-FTM-38DN, 2014 WL 820623, at *2 (M.D. Fla. Mar. 3, 2014).  Importantly, "FDUTPA offers two types of remedies: equitable relief in the form or declaratory or injunctive relief pursuant to Fla. Stat. 501.211(1) or actual damages pursuant to Fla. Stat. 501.211(2)."  *Eclipse Med., Inc. v. Am. Hydro-Surgical Instruments,*

---

[5] The Data Sheets and Product Specifications referred to by the Parties were contained in Pliteq's brochure, which was provided to Marjam in 2014.  It should be noted that the brochure relied upon by Marjam in the Complaint does contain the "nominal value" language.  However, the "nominal value" language is only found on the last page of the document, below the Acoustical Testing Standards information, and does not appear on the first page where the "Product Specifications" are listed. (DE 1, Exhibit B).

*Inc.*, 262 F. Supp. 2d 1334, 1357 (S.D. Fla. 1999), *aff'd sub nom. Eclipse Med., Inc. v. Am. Hydro-Surgical*, 235 F.3d 1344 (11th Cir. 2000).

Here, Marjam has abandoned its claims for actual damages and its remaining damages claims are for lost profits arising out of ZOM's cancellation of an order relating to the Met 3 project. However, Florida courts "specifically reject the recovery of consequential damages under FDUPTA." *Id.* (finding that actual damages under FDUPTA is a term of art defined as "the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered ..."). They also do not allow recovery of punitive damages under the statute. *Rollins, Inc. v. Heller*, 454 So.2d 580, 585-86 (Fla. 3rd DCA 1984) ("A claim for punitive damages is outside the scope of chapter 501 and FDUPTA.").

In addition, although Marjam asserts a claim for injunctive relief, Marjam does not have Article III standing to assert such a claim.[6] Indeed, "[a]lthough the FDUTPA allows a plaintiff to pursue injunctive relief even where the individual plaintiff will not benefit from an injunction, it cannot supplant Constitutional standing requirements. Article III of the Constitution requires that a plaintiff seeking injunctive relief allege a threat of future harm." *Dapeer v. Neutrogena Corp.*, 95 F. Supp. 3d 1366, 1373 (S.D. Fla. 2015); *see also O'Shea v. Littleton*, 414 U.S. 488, 495–96, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects.").

---

[6] The Court can consider the question of standing *sua sponte*. "As the Supreme Court made clear in *United States v. Hays* ... [t]he federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of [the jurisdictional] doctrines." *Bischoff v. Osceola Cty., Fla.*, 222 F.3d 874, 877–78 (11th Cir. 2000) (internal citations omitted).

Marjam's claims for lost profits are for past injury. Marjam has not alleged, argued or produced any evidence showing a threat of future harm. To the contrary, Marjam admits that the distribution agreement was terminated (DE 181-1 at 13) and that Pliteq's current data sheets and product specifications (1) list the thicknesses of the mats in nominal value, and (2) state the standard tolerances for each mat (DE 181-1 at 9-10, 12). Accordingly, because Marjam does not seek actual damages and has no standing to seek injunctive relief, Marjam may not maintain a claim under FDUPTA.

### 2. Lanham Act Claim

"To succeed on a false advertising claim under § 43(a)(1)(B) of the Lanham Act, a plaintiff must establish that (1) the advertisements of the opposing party were false or misleading; (2) the advertisements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) the movant has been—or is likely to be—injured as a result of the false advertising." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). Additionally, a plaintiff must have statutory standing to bring a Lanham Act claim. *See Lexmark Intern., Inc., v. Static Control Components Inc.*, 134 S.Ct. 1377, 1387 (2014) (finding that the Court is required to determine whether Congress authorized the plaintiff to sue under the Lanham Act). The Court finds that Marjam does not have standing to pursue this claim.

A Lanham Act false advertising claim arises when "[a]ny person who, on or in connection with any goods ... uses in commerce any ... false or misleading description of fact, or false or misleading representation of fact, which ... in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his

or her or another person's goods[.]" 15 U.S.C. § 1125(a).  The test for deciding whether

a plaintiff has statutory standing[7] under the Lanham Act requires the courts to determine

whether the plaintiff's interests "fall within the zone of interests protected by the law

invoked" and whether the injuries suffered by plaintiff were "proximately caused by

violations of the statute." *Id.* at 1388, 1390.  The Court explained the scope of the "zone

of interests" as follows:

> [T]o come within the zone of interests in a suit for false advertising
> under § 1125(a), a plaintiff must allege an injury to a commercial
> interest in reputation or sales.  A consumer who is hoodwinked into
> purchasing a disappointing product may well have an injury-in-fact
> cognizable under Article III, but he cannot invoke the protection of
> the Lanham Act—a conclusion reached by every Circuit to consider
> the question.  ***Even a business misled by a supplier into
> purchasing an inferior product is, like consumers generally, not
> under the Act's aegis.***

*Id.* at 1390 (citations omitted) (emphasis added).

This follows from "the Act's goal of protect [ing] persons engaged in [commerce

within the control of Congress] against unfair competition." *Id.* at 1389.  Thus, while the

Supreme Court has found that in some instances non-competitors may have standing,

"the cause of action is for competitors, not consumers." *POM Wonderful LLC v. Coca-

Cola Co.*, 134 S.Ct. 2228, 2234 (2014).  Indeed, in other cases similar to this one, where

a supplier has misled a business partner, the courts have found the plaintiffs in those

cases to lack standing. *See The Knit With v. Knitting Fever, Inc.*, 625 Fed. Appx. 27 (10th

Cir. 2015) ("yarn retailer who alleges to have been misled by its supplier into purchasing

---

[7] In the past, courts have referred to this test as one for "prudential standing," but the
Supreme Court in *Lexmark* rejected this characterization and instead found that the
relevant inquiry is not whether standing is "prudential" but rather, whether "this particular
class of persons has a right to sue under the substantive statute." *Lexmark*, 134. S.Ct.
at 1387.

mislabeled yarn, is not within the zone of interests protected by the Lanham Act."); *Nature's Products, Inc. v. Natrol, Inc.*, 990 F. Supp.2d 1307 (S.D. Fla. 2013) (finding that seller of healthcare products could not bring false advertisement claims against its own manufacturer).

On this record, Marjam cannot demonstrate that it has suffered the type of injury protected by the Lanham Act.  This is not the typical false advertisement case, where a competitor makes false or misleading statements to induce consumers to switch allegiance from one company to the other.  It is also not a case where a non-competitor suffered injuries resulting from disparaging comments about its product.  Instead, this is precisely the type of case that the Supreme Court has ruled is not covered by the Lanham Act: "a business misled by a supplier into purchasing an inferior product."  *Lexmark*, 134 S.Ct. at 1390.  Accordingly, Marjam lacks standing to bring a Lanham Act false advertising claim.

### 3.  Common Law Fraud Claim

Marjam argues that its common law fraud claim is meritorious because Pliteq made a false representation of fact, Marjam relied on that representation, and in turn suffered $87,000 in damages for lost profits.  (DE 181 at 20).  The Court, however, finds that Marjam's common law fraud claim is barred by the economic loss doctrine.

In a similar case, Judge Moreno explained the economic loss doctrine as follows:

> "[T]he economic loss rule is a judicially created doctrine that sets forth the circumstances under which a tort action is prohibited if the only damages suffered are economic losses." *Tiara Condo. Ass'n v. Marsh & McLennan Cos. Inc.*, 110 So.3d 399, 401 (Fla.2013).  The Florida Supreme Court has defined economic loss as "damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profit—without any claim of personal injury or damage to other property." *Id.* (internal quotation marks

> omitted).  Florida's Supreme Court has explained that "[t]he rule has
> its roots in the products liability arena, and was primarily intended to
> limit actions in the products liability context." *Id*. Specifically, the court
> explained the economic loss rule is "the fundamental boundary
> between contract law, which is designed to enforce the expectancy
> interests of the parties, and tort law, which imposes a duty of
> reasonable care and thereby encourages citizens to avoid causing
> injury physical harm to others." *Id* … Florida's Supreme Court
> expressly limited the application of the economic loss rule to the
> products liability context. (internal quotation marks omitted).

*In re Takata Airbag Products Liability Litigation*, 193 F.Supp.3d 1324, 1338 (S.D. Fla.

2016).  "The doctrine is commonly applied to negligence claims, but clearly extends to

bar claims for common law fraud … in the absence of conduct "independent" of the

contractual relationship." *Waters v. Int'l Precious Metals Corp.*, 172 F.R.D. 479, 499 (S.D.

Fla. 1996).  The economic loss doctrine is applicable where, as here, the tort claim

accompanies breach of warranties claims.  *See Aprigliano v. American Honda Motor Co.,

Inc.*, 979 F. Supp. 2d 1331, 1336 (S.D. Fla. 2013) (finding that fraud in the inducement

was barred because "damage to a product itself is most naturally understood as a

warranty claim.  Such damage means simply that the product has not met the customer's

expectations, or, in other words, that the customer has insufficient product value.").

In this case, the only damages allegedly sustained by Marjam are economic losses

related to the lost sales for the Met 3 project.  Further, Marjam's cause of action for fraud

relies on the exact allegations contained in its breach of warranties claims—namely, that

the mats received were thinner than represented and underperforming.  As a result,

Marjam's common law fraud claim is barred by the economic loss doctrine.  *See e.g.,

HTC Leleu Family Trust v. Piper Aircraft, Inc.*, No. 1:12-cv-21118-KMM, 2012 WL

4982633, at *4 (S.D. Fla. Oct. 17, 2012) (finding fraud related claims were barred where

the only damages alleged were purely economic losses and the allegations in the

14

complaint in support of those claims all related to the question of "whether [d]efendant breached the agreement by providing a defective [product].").

    4.  <u>Breach of Contract and Breach of Warranties Claim</u>

Counts 3, 4, 6 and 7 of the Complaint are for breach of express warranty, breach of implied warranty of merchantability, breach of implied warranty of fitness for a particular purpose and breach of contract.  A cause of action for breach of warranties requires a showing of 1) facts in respect to the sale of the goods, 2) identification of the types of warranties created, 3) facts in respect to the creation of the particular warranty, 4) facts in respect to the breach of warranty, 5) notice to seller of breach and 6) the injuries sustained by the buyer as a result of the breach. *CC-Aventura, Inc. v. Wentz Co., LLC,* 2009 WL 2136527 (S.D. Fla. 2009).  Specifically, "[a]n express warranty is generally considered to arise only where the seller asserts a fact of which the buyer is ignorant prior to the beginning of the transaction and on which the buyer justifiably relies as part of the basis of the bargain," *Thursby v. Reynolds Metals Co.*, 466 So.2d 245, 250 (Fla. 1st DCA 1984) (internal citations and quotations omitted); "[a] cause of action for breach of implied warranty of merchantability requires allegations that (1) the plaintiff was a foreseeable user of the product, (2) the product was used in the intended manner at the time of the injury, (3) the product was defective when transferred from the warrantor, and (4) the defect caused the injury," *Jovine v. Abbott Labs.*, 795 F. Supp. 2d 1331, 1340 (S.D. Fla. 2011); and, to succeed on a claim for breach of warranty for a particular purpose "[a] plaintiff must prove that the defendant, at the time the sale was made, knew of a particular purpose for which the goods were going to be used and that the plaintiff relied upon the defendant's skill and judgment when purchasing said product." *Pavletic v. Bertram Yacht,*

*Inc.*, No. 11–60484–CIV, 2011 WL 3475394, at *7 (S.D. Fla. Aug. 9, 2011).  Additionally, to establish a breach of contract under Florida law, a Plaintiff must show "(1) a valid contract; (2) a material breach; and (3) damages." *See Beck v. Lazard Freres & Co., LLC*, 175 F.3d 913, 914 (11th Cir. 1999).

Marjam's claims for breach of warranties and breach of contract are based on the same set of allegations.  Essentially, Marjam claims that Pliteq breached the contract and warranties by supplying product that failed to "conform to the specifications contained in or on the product labels, brochures and specification sheets."  (DE 181 at 20).  Pliteq does not take issue with the elements of each cause of action individually.  Rather, Pliteq moves for summary judgment, arguing that Marjam has not offered evidence that the product used at Met contained any misrepresentations and, that in any, event Marjam cannot prove damages.  Specifically, Pliteq argues that (1) Marjam has not offered credible evidence to rebut Downey's assertion that Pliteq never sold any URB mats to Marjam, (2) there is no evidence in the record that Marjam ever made an order for additional mats for the Met 3 project and (3) the product specifications listed the thicknesses of the mats in nominal value, so there was no misrepresentation of fact and therefore, no breach of warranties or contract.

Marjam responds that Metcalf's testimony confirms that at least some URB mats were sold to Marjam and that Metcalf himself made a verbal purchase order for the additional mats that would be used for Met 3. (DE 219-10 at 25,110).  While Pliteq claims that Marjam could not have ordered the mats because Pliteq terminated the agreement, there is a factual dispute as to whether the purchase order was made before termination. Indeed, it is unclear from the record when the agreement was actually terminated.

Additionally, Marjam asserts that the data sheets received from Pliteq before litigation did not specify that dimensions were "nominal only"[8] (DE 181 at 17) and supports that assertion by attaching a product specification sheet for the GenieMat RST02 which describes the mat as being 2mm (1/8") thick (DE 181-16).[9] Moreover, the Court notes that Marjam's claims are based not only on the thickness of the mats but also on their STC and AIIC ratings (DE 1 ¶ 18-22), and as reflected by an expert firm that tested the mats used at Met 3, the AIIC ratings were several points below expected. (DE 181-1 at 6; DE 181-26). Thus, the Court finds that genuine issues of fact remain for the jury and summary judgment is not warranted on the breach of contract and breach of warranties claims.

**B.      Marjam's motion for partial summary judgment**

       1.   Lanham Act Claim

Marjam claims that summary judgment is warranted on Pliteq's Lanham Act claim because Pliteq cannot establish that the alleged false statements were made "in commercial advertisement or promotion" as required by the statute.[10] Specifically, Marjam claims that the representations at issue, were not made "for the purpose of

---

[8] As previously stated, Pliteq is right that the brochure does contain the "nominal value" language. However, because that language is not included in the portion listing the product specifications, there is an issue of fact as to whether the brochure contains false or misleading statements. (DE 1, Exhibit B).

[9] While the Court acknowledges that this is information about a separate acoustical product not at issue in this case, it is a document generated during the time relevant to the issues at bar, and may be germane.

[10] Unlike Marjam, Pliteq does have statutory standing to pursue this claim because, at the time Pliteq suffered the alleged injury, Marjam and Pliteq were competitors. Pliteq's claims arise from communications between Metcalf and third parties starting in August 2015. Marjam concedes that, at least, by July 24, 2015, Pliteq and Marjam had become competitors and Marjam had begun selling Ecore products. (DE 181-1 at 7, 15).

influencing customers to buy defendant's goods or services."   (DE 170 at 14).

Additionally, Marjam asserts that Pliteq's Lanham Act claim fails because Pliteq has failed

to offer any evidence that the alleged false statements were actually made, or if they were

made, that they were false.  (DE 170 at 15-16)

"To succeed on a false advertising claim under § 43(a)(1)(B) of the Lanham Act, a

plaintiff must establish that (1) the advertisements of the opposing party were false or

misleading; (2) the advertisements deceived, or had the capacity to deceive, consumers;

(3) the deception had a material effect on purchasing decisions; (4) the misrepresented

product or service affects interstate commerce; and (5) the movant has been—or is likely

to be—injured as a result of the false advertising."  *Hickson Corp. v. N. Crossarm Co.*,

357 F.3d 1256, 1260 (11th Cir. 2004).  Importantly, the "Lanham Act prohibits only those

false or misleading statements that occur in the context of 'commercial advertising or

promotion.'"  *Futuristic Fences, Inc. v. Illusion Fence Corp.*, 558 F. Supp. 2d 1270, 1278-

79 (S.D. Fla. 2008).   The Eleventh Circuit has adopted the following test to determine

whether representations constitute commercial advertising or promotion:

> "In order for representations to constitute commercial advertising or
> promotion under Section [1125(a) ], they must be: (1) commercial
> speech; (2) by a defendant who is in commercial competition with
> plaintiff; (3) for the purpose of influencing consumers to buy
> defendant's goods or services. While the representations need not
> be made in a "classic advertising campaign," but may consist instead
> of more informal types of "promotion," the representations (4) must
> be disseminated sufficiently to the relevant purchasing public to
> constitute "advertising" or "promotion" within that industry."

*Suntree Technologies, Inc. v. Ecosense Intern., Inc.*, 693 F.3d 1338, 1349 (11th Cir.

2012), citing *Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*, 859 F. Supp.

1521 (S.D.N.Y.1994).

Pliteq has offered evidence to show that Marjam approached numerous businesses, some of which are established customers of Pliteq, and made several representations to them including that (i) "Marjam Supply has ceased selling Geniemat products by Pliteq due to recent information about <u>illegal activity</u>" (DE 188-6 at 78-79), (ii) Marjam had hired an acoustical engineer to prove that the results of a test conducted by Pliteq on the mats "were fabricated" (DE 188-6 at 87) and (iii) the alleged illegal activity "[has] lead [sic] to distributors 'dropping' out of the [GeneMat] line" (DE 186 at 9). Additionally, Pliteq points to correspondences between Metcalf and Downey where Metcalf states that Marjam "would spend an inordinate amount of time … [to] … recapture everything … making sure that I was capturing the business … in a very aggressive way …" (DE 186 at 9) and that as a competitor "[Marjam] will [sic] extreme and unpleasant" (DE 163 ¶ 15).

The statements made by Metcalf to Downey, read together with the statements made by Metcalf to third parties, including Pliteq customers, create an issue of fact as to whether they were made "for the purpose of influencing consumers to buy defendant's goods or services." While Marjam is correct in pointing out that "recapturing" business is what competitors do, that argument misses the mark. The issue is whether Marjam used unfair competition methods to get a business advantage, such as making false or misleading statements about Pliteq's products. Pliteq has offered enough evidence to create an issue of fact in that respect. Additionally, the cases cited by Marjam do not support its position. In two of the cases cited by Marjam, the statements in question were contained in cease-and-desist letters sent from counsel. *Futuristic Fences*, 558 F. Supp. 2d at 1278-79; *Avery Dennison Corp. v. Acco Brands, Inc.*, No. CV99-1877DT(MCX),

2000 WL 986995 (C.D. Cal. Feb. 22, 2000).  The courts there found that those statements were not commercial because they were sent by attorneys, not as a marketing and sales tool, but to protect plaintiffs' rights which plaintiffs in those cases believed were being infringed by the recipients of those statements.  *Futuristic Fences,* 558 F. Supp. 2d at 281; *Avery Dennison Corp.*, 2000 WL 986995 at *7-8.

In *Cascade Yarns, Inc. v. Knitting Fever, Inc.*, No. 2:10-CV-861 RSM, 2014 WL 11881033, at *2 (W.D. Wash. Apr. 14, 2014), the court found that the statements at issue were not commercial because "the explicit purpose of the letter was to help Cascade customers disgorge themselves of Cascade products due to dissatisfaction with revealed labeling issues."  Central to the court's finding was the fact that the defendant made the statements while offering its existing customers the ability to return the product for a refund.  In that context, the court found that the statements "did much more than propose a commercial transaction and thus exceed[ed] the bounds of commercial speech."  *Id.* at 2.  Here, Marjam's alleged false statements were not made by counsel and were not made in the context of preempting potential liability.  In fact, Marjam's contention that it was worried about potential liability is contradicted by Marjam's own admission that it continued to sell Pliteq's products even after it learned of the alleged mislabeling issues.

Finally, whether the statements were false or misleading is an issue of fact.  As previously stated, Marjam's contention that Pliteq mislabeled the mats is genuinely disputed by Pliteq in claiming that the product specifications only provided nominal value

and were within the accepted tolerances.[11]  Accordingly, Pliteq's counterclaim for Lanham Act violations is a matter for the trier of fact.

### 2.  Unfair Competition Claim

"To a state a claim for unfair competition under Florida common law a party must plead (1) deceptive or fraudulent conduct of a competitor and (2) likelihood of consumer confusion.  The Florida common law of unfair competition is an umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters."  *Third Party Verification, Inc. v. Signaturelink, Inc.*, 492 F. Supp. 2d 1314, 1324 (M.D. Fla. 2007) (internal citations omitted).  Unfair competition under Florida law can include business interference and misrepresentation.  *See Alphamed Pharmaceuticals Corp. v. Arriva Pharmaceuticals, Inc.*, 432 F. Supp. 2d 1319, 1353 (S.D. Fla. 2006).

Marjam argues that Pliteq's unfair competition claim fails for the same reasons it argued that Pliteq's Lanham Act claim failed.  As previously discussed, however, Pliteq has offered enough evidence to create an issue of material fact with respect to whether Marjam made false or misleading statements to gain a competitive advantage.  Thus, Marjam's motion for summary judgment is denied as to this claim.

### 3.  Copyright Infringement Claim

Pliteq brings a claim for copyright infringement alleging that Marjam copied and annotated a GenieMat RST brochure for use with MAPEI, a competitor whose product was supplied by Marjam.  (DE ¶¶ 96 -104).  Marjam moves for summary judgment arguing

---

[11] Additionally, the Court notes that a determination of whether the actual labels for the mats in question contained misleading or false information has become all but impossible due to Marjam's untraceable disposal of those mats.

that (i) the claim fails for the same reason Marjam alleges the Lanham Act and unfair competition claims fail, and (ii) the claim fails because Pliteq has failed to offer any credible evidence that Marjam was the author of the allegedly infringing brochure.

"To establish a claim of copyright infringement, [plaintiffs] must prove (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1541 (11th Cir. 1996). "To prove actionable copying, the plaintiff must first establish, as a factual matter, that the alleged infringer actually used the copyrighted material to create his own work. Proof of copying may be shown either by direct evidence of the copying or, in the absence of such evidence, [c]opying as a factual matter typically may be inferred from proof of access to the copyrighted work and 'probative similarity." *Id.* Marjam does not dispute Pliteq's ownership of a valid copyright, but it argues that Pliteq has not offered credible evidence that Marjam authored the infringing work.

The Court finds that Pliteq has not offered sufficient evidence to create an issue of fact on its copyright claim. Pliteq's only argument is that the infringing product must have come from Marjam because Marjam was a distributor for MAPEI products. However, Pliteq has not offered an affidavit, an email, or anything but conjecture to show that Marjam created or distributed the infringing work. On the other hand, Marjam points to MAPEI's website which shows that MAPEI has at least 26 other distributors in Florida, and anyone of them could have created the infringing work. (DE 194-6 at 4). "We have said repeatedly that speculation about a fact or result is insufficient to survive summary judgment. An inference based on speculation and conjecture is not reasonable." *Cordell Consultants, Inc. Money Purchase Plan v. Abbott*, No. 11-80416-CIV, 2015 WL

11539507, at *4 (S.D. Fla. Nov. 9, 2015), *aff'd sub nom. Cordell Consultant, Inc. Money Purchase Plan & Tr. v. Abbott*, 682 F. App'x 867 (11th Cir. 2017).   Because Pliteq's copyright infringement claim is based on nothing but speculation, this claim cannot be maintained.

### 4. Tortious Interference with Contract Claim

In its counterclaims, Pliteq brings one count for tortious interference with contract and one count for tortious interference with potential business.   (DE 21 ¶¶ 51-65). Because the standard for both torts is very similar, courts in this district often merge the standards to explain the elements required to establish a claim for each tort.  *See Burger King Corp. v. Ashland Equities, Inc.*, 161 F. Supp. 2d 1331, 1336 (S.D. Fla. 2001) ("In order to properly plead a claim for tortious interference with a contractual or business relationship under Florida law, Defendants must assert the existence of a business relationship, not necessarily evidenced by an enforceable contract, under which Defendants have legal rights.").  However, these are different torts and each one carries its own standard.

"To state a claim for tortious interference with a contractual relationship under Florida law, a plaintiff must allege: (1) the existence of an enforceable contract, (2) the defendant's knowledge of that contract, (3) an intentional and unjustified interference by the defendant with the plaintiff's rights under the contract, and (4) resulting damages.  To state a claim for tortious interference with a business relationship under Florida law, a plaintiff must allege: (1) the existence a business relationship, (2) the defendant's knowledge of that relationship, (3) an intentional and unjustified interference with the relationship, and (4) injury resulting from the breach of the relationship."  *Ace Pro Sound*

*& Recording, LLC v. Albertson*, 512 F. Supp. 2d 1259, 1268 (S.D. Fla. 2007); *see also*

*Mattocks v. Black Entertainment Television LLC*, 43 F. Supp. 3d 1311, 1318 (S.D. Fla.

2014). If, for example, a contract is unenforceable, "then an element of a tortious

interference [with contract] claim is absent." *Mariscotti v. Merco Group At Akoya, Inc.*,

917 So.2d 890, 892 (Fla. 3d DCA 2005).

Marjam contends that Pliteq's claim fails because Downey could not identify a

contract that Marjam interfered with, and Pliteq responds by identifying business

relationships with whom Marjam allegedly did interfere. However, the evidence offered

by Pliteq supports a claim for tortious interference with business relationships and not for

tortious interference with contract.[12] As pointed out by Marjam, during his deposition,

Downey himself was unable to identify any enforceable contracts between Pliteq and the

businesses that allegedly stopped using Pliteq's products due to Marjam's

representations. (DE 172-30 at 2-3). For these reasons, Pliteq has failed to offer enough

evidence to defeat summary judgment on this issue.

## IV.  CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

(1)    Pliteq's Motion for Summary Judgment (DE 162) is **GRANTED IN PART**

**AND DENIED IN PART.** Pliteq's motion is **GRANTED** as to Counts I, II, VI and VIII and

**DENIED** as to Counts III, IV, V and VII.

(2)    Marjam's Motion for Partial Summary Judgment (DE 170) is **GRANTED IN**

**PART AND DENIED IN PART**. Marjam's motion is **GRANTED** as to Counts I and VI

and **DENIED** as to Counts III and IV, of Pliteq's Counterclaims.

---

[12] Marjam has not moved for summary judgment on Pliteq's counterclaim for tortious
interference with business.

24

**DONE AND ORDERED** in chambers in Miami, Florida, this ___ day of April, 2018.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE