UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 15-CV-24363-WILLIAMS/SIMONTON

MARJAM SUPPLY COMPANY OF
FLORIDA, LLC and MARJAM
SUPPLY COMPANY,

     **Plaintiffs,**

vs.

PLITEQ, INC., ULTIMATE RB, INC.
and PAUL DOWNEY,

     **Defendants.**     **ORAL ARGUMENT REQUESTED**
_____/

## MARJAM'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR FEES

   Plaintiffs, **Marjam Supply Company of Florida, LLC** and **Marjam Supply Company** (collectively "**Marjam**"), by and through their counsel of record, hereby submit their response in opposition to the Motion for Attorneys' Fees filed by Defendants Pliteq, Inc. ("**Pliteq**") and Paul Downey ("**Downey**"; collectively, "**Defendants**") (the "**Fee Motion**"; DE 317). Further to their Response in Opposition, Marjam states as follows:

## INTRODUCTION

   The Fee Motion must be denied in its entirety, because Defendants do not qualify for an award of statutory fees. As explained in detail below, Defendants have failed to meet their burden to establish that either (a) this case is "exceptional" under the Lanham Act, or (b) the equitable factors under FDUTPA weigh in their favor. To the contrary, notwithstanding the aspersions they cast upon Marjam, it was Defendants who engaged in vexatious, hide-the-ball litigation tactics, and who knowingly pressed patently frivolous claims to verdict.

   In any event, this Court should not exercise its discretion to force Marjam to foot Defendants' demonstrably excessive and unjustifiable litigation bill. While it was Defendants' prerogative in the first instance to overstaff their case with 29 attorneys and paralegals across 3 different law firms, no reasonable, paying client would pay $2.1 million to recover $310,000 in

compensatory damages.  Even a cursory review of the Defendants' voluminous Fee Motion reveals that they paid for duplicative, excessive, unnecessary, and otherwise non-compensable legal work.  If the Court were to shift any fees, applicable law, confirmed by the opinion of Marjam's seasoned attorney's fees expert, would limit an award to a fraction of the lodestar amount sought.   For the reasons that follow, the Fee Motion must be denied.

**BACKGROUND FACTS DEMONSTRATING THAT
(A) MARJAM BROUGHT AND PROSECUTED CLAIMS IN GOOD-FAITH WHILE
(B) PLITEQ ENGAGED IN UNREASONABLE LITIGATION, PRESSED FRIVOLOUS
CLAIMS TO VERDICT, AND NEEDLESSLY INFLATED ITS OWN LEGAL BILLS**

> a.  **Marjam's Based Its Claims In This Action upon Information Supplied by Third Parties – Including Current and Former Pliteq Representatives – Both Before and in the Course of Its Pre-Litigation Investigation**

On March 18, 2014 –more than 20 months before this action and while Marjam was negotiating with Pliteq to become its distributor  – Ray Horan, an intermediary familiar with Pliteq's product line, advised Marjam, among other things, that Pliteq's acoustical insulation products were manufactured in Ohio. [1]  (DE 292, PTE 2 at p. 4)  Thereafter, Marjam began distributing Pliteq products to its long-standing customers, including to Suffolk Construction in connection with its project in Miami, Florida known as "Met 3". (DE 292, PTE 7, 114) [2]

In the spring of 2015, Pliteq representatives advised Marjam that the general contractor at Met 3 determined that Pliteq product had failed to perform and for that reason discontinued their use of Pliteq material on Met 3 (one basis of Marjam's damage claim).  Emails produced in discovery confirm that Pliteq's principal and CEO, Downey, was aware of this fact by no later than April 2015. (DE, 292, PTE 122, 123; DE 169-172, Exs. 3-6) [3]

Subsequently, the business relationship between Marjam and Pliteq collapsed in mutual acrimony, and Marjam was left with surplus Pliteq product (another basis for Marjam's damage claims).  Concerned by what happened at Met 3, Marjam conducted an independent investigation of possible claims against Pliteq and learned, among other things, that Pliteq's competitor, Ecore, had been mounting a legal challenge to Pliteq's unlawful business practices.  During an in-

---

[1] Discovery subsequently confirmed that URB has facilities in Ohio. *See, e.g.*, DE 292, PTE 33.
[2] Discovery belatedly produced by Pliteq confirmed that URB had, in fact, delivered Pliteq products to Miami. (Ex. "A" hereto)
[3] Discovery revealed that acoustical engineers engaged by Pliteq itself confirmed through testing that Pliteq's products failed to perform as advertised. (DE 292, PTE 29, 36 and 37)

person meeting with Ecore's principal, Art Dodge, Marjam not only was given **documentary evidence** that Pliteq's products were consistently thinner than advertised (DE294, DTE 148, Ex. A thereto), it met with a former URB employee – Kent Berheide - who confirmed to Marjam, **face to face**, URB regularly had complied with Pliteq's directives to manufacturer  products thinner than labeled and represented.

      **b.  When Responding to the Allegations in Marjam's Pre-Litigation Demand letter, Pliteq Neither Denied the Basic Facts that (a) URB Manufactured Pliteq Products Sold to Marjam and (b) Pliteq Directed URB to Cut Those Products Thinner Than Labeled.**

On August 19, 2015, Marjam sent a demand letter to Pliteq (a) seeking damages for surplus product which Pliteq refused to take back and indemnification for product Marjam had already sold to its customers, and (b) confronting Pliteq with the information Marjam had gained during its investigation ("**Demand Letter**"). (DE 294, DTE33)  Marjam specifically advised that it "has learned that Pliteq intentionally and knowingly **ordered [its] Products from URB … for shipment to Marjam** with specific instructions to mislabel them as to thickness, an unlawful request with which URB complied and implemented," and that "testing performed by acoustical engineers" confirmed that Pliteq product failed to perform as advertised on the Met 3 project.[4] (DE 292, PTE (DE 292, PTE 29, 36 and 37)).  Notwithstanding Pliteq's *post hoc* rationale for directing URB to cut its product thinner than labeled, raised for the first time at the end of discovery (*infra*), emails obtained in discovery <u>confirmed</u> that Defendants not only directed URB to cut products thinner than labeled, they directed URB to adhere labels that did not match the product thickness ordered and cut (*See, e.g.*, DE 292, PTE 42, 47, 55, 57, 58, 70).

On September 3, 2015, Pliteq issued a response to Marjam's Demand Letter ("**Response Letter**"), in which it purported to disabuse Marjam of "several factual and legal inaccuracies" contained therein. (DE 294, DTE 39)  Notably absent from the list of inaccuracies, however, was any suggestion that Marjam was incorrect in believing that (a) Pliteq directed URB to cut its material thinner than labeled (again, a fact born out in emails), (b) URB had manufactured the products Marjam sold to its customers, or (c) the Pliteq product installed at Met 3 failed to perform as advertised. (DE 292, PTE 29, 36, 37, 122, 123)

---

[4] Marjam was aware of the testing, but had not seen any test data, because of its involvement as the supplier on Met 3.  Discovery confirmed that Pliteq actually maintained copies of the reports containing those very same test results.

**c.  Defendants Affirmatively Alleged in Their Counterclaim that Pliteq Products Sold to Marjam were Manufactured by URB "for Several Years."**

On November 24, 2015, Marjam filed its Complaint, alleging the same <u>undisputed</u> facts asserted in its Demand Letter. (DE 1)  Similar to Pliteq's Response Letter, Defendants asserted several defenses in its Answer (DE 21), none of which suggested that Marjam never received products manufactured by URB, and thus lacked standing to assert claims against Pliteq.  To the contrary, in advancing their own counterclaims – for which *Defendants* bore not only the burden of proof , but also the burden of conducting a reasonable fact inquiry before filing its pleading – Defendants averred, without qualification, that "**For several years Pliteq has been providing Marjam with rubber acoustical underlayment products manufactured by Ultimate RB, Inc.** ("URB")."  (DE 21, Counterclaim ¶11)

**d.  Defendants' Did Not Indicate in Their Rule 26(A) Disclosures That They Might Defend Against Marjam's Claims on the Ground that URB Never Manufactured Product Supplied to Marjam – An Omission Which Would Have Changed the Direction and Scope of the Legal Work Done by All the Parties.**

Pursuant to Rule 26(a), Defendants were required, "without awaiting a discovery request," to, among other things, identify "each individual likely to have discoverable information--*along with the subjects of that information*--that [Defendants] *may* **use to support [their]** claims or **defenses** …."  FRCP 26.   Notwithstanding this obligation, and with full knowledge that Marjam's claims hinged upon the theretofore undisputed facts that URB manufactured the products sold through Marjam, Defendants failed to disclose that either the identity of the manufacturer or the machine settings used by that manufacturer would be subjects Defendants might use to support their defense of Marjam's claims.[5]  (Ex. "B" hereto)

**e.  Despite Defendants' Obfuscatory and Vexation Litigation Tactics, Discovery Confirmed Marjam's Pre-Litigation Investigation**

**(1) Until Document Produced by URB Forced Their Hand, Defendants Withheld Emails Documenting Pliteq's Directions to URB to Cut Pliteq's Product Thinner Than Labeled**

Marjam served document demands on February 1, 2017, requesting, among other things:

---

[5] It defies credulity that Pliteq's principal, Downey, would not have known whether Marjam received product cut by URB.  In any event, "[a] party is not excused from making its disclosures because it has not fully investigated the case." FRCP 26.

22. All **communications with URB relating to**, concerning and/or evidencing **labeling** for the GenieMat RST line of Products during the Relevant Period. [6]

23. All **communications with URB relating to thickness and/or variance in thickness** of the GenieMat RST line of Products during the Relevant Period.

These requests were narrowly targeted toward obtaining correspondence directly relevant to Marjam's claims, yet Defendants withheld from Marjam *numerous* responsive emails exchanged between Pliteq and URB, waiting until *after* URB produced several thousand pages of documents in June 2017 that confirmed the information obtained by Marjam pre-litigation, *to wit*, that Defendants not only deliberately and regularly directed URB to manufacture its GenieMat products at thicknesses <u>less</u> than what the product was represented, advertised as, and purported to measure, Defendants also instructed URB to affix misleading labels, created by Pliteq, thereon. [7]

The emails produced by URB left nothing to the imagination. For example, when URB questioned Pliteq as to whether Pliteq actually intended for URB to cut product at a size thinner than labeled, Pliteq unambiguously confirmed its intent. [8] One particular series of emails exchanged between Laura Lim – a Pliteq customer service rep that handled product orders made by customers (like Marjam) to Pliteq, as well as orders made by Pliteq to its manufacturers (such as URB) – and Gloria Goudy, a URB customer service rep responsible for, among other things, product orders that Pliteq placed with URB, and who had regular communication with Pliteq to facilitate Pliteq's GenieMat orders – is instructive. In an email dated June 2, 2015, Lim (of Pliteq) directed Goudy (of URB) to cut an order of GenieMat product at 11mm, yet supplied to Goudy a Pliteq label that expressly stated the product was 12 mm. *See* DE 292, PTE 55. For the court's convenience, relevant excerpts of that email, along with the Pliteq purchase order and Pliteq label that were attached thereto, are reproduce below (*see id.*):

---

[6] Defined as "January 1, 2013 through the date of Defendants' responses hereto."

[7] For example, emails and purchase orders generated by Pliteq confirm that it directed URB to cut products labeled and purporting to measure: (i) 2mm thick as thin as 1.5mm (DE 292, PTE 42, 46); and (ii) 6mm thick (labeled GenieMat RST0<u>6</u>) as thin as 5mm (DE 292, PTE 47).

[8] *See* DE 292, PTE 55, 57, 58, 70.

*EMAIL: Lim to Goudy, dated 6/2/2015 (i.e., while Marjam was still distributing Pliteq)*



*ATTACHMENT: "PO 738 Revised.pdf"*



*ATTACHMENT: "Pliteq_RST12mm.pdf"*

Meanwhile, Marjam was, at all relevant times, operating under the good-faith belief that it had been buying and reselling material from Pliteq at sizes that matched the descriptions and representations made by Pliteq.[9]

---

[9] Thus, for example, when Marjam purchased GenieMat RST12, it understood that what it was buying was GenieMat with a thickness of 12-millimeters, as reflected in its purchase orders to Pliteq. (DE 292, PTE 43)  This was consistent with Pliteq's invoicing to Marjam:  GenieMat RST12, for example, is described as a 12mm product.  (DE 294, DTE 101)

6

Discovery also confirmed that Pliteq had a profit incentive to cut its products thin. As demonstrated by documents produced by URB – and not from Defendants – Pliteq's cost to manufacture GenieMat increased with every incremental increase in millimeter thickness. *See e.g.* (DE 292, PTE 44)[10] Thus, by directing URB to manufacture GenieMat "thin," then selling at "thicker product" prices, Defendants artificially cut costs, then charged more for less.

Discovery also confirmed that Defendants affirmatively attempted to conceal their unlawful "shaving" after Marjam called them out. For example, on August 28, 2015 – just days *after* Marjam's pre-litigation Demand Letter – Pliteq sent an "URGENT" email to URB, instructing it <u>not</u> to include on its labels any information pertaining to, among other things, thickness of the product produced, which according to the response from URB, was information that had appeared on URB's labels for years. As noted in Pliteq's email to URB, the inclusion of that information, including product thickness, is "very bad for us." (DE 292, PTE 87 – 90)

### (2) Pliteq Stymies Marjam's Ability to Depose the Pliteq Employee Who Authored Emails Directing URB to Cut Products Thinner than Labeled.

To confirm Pliteq's ordering process and authenticate its "shaving" emails, Marjam had to depose Laura Lim – the Pliteq employee who authored the emails and submitted the purchase orders. In light of the damaging content of those documents, it is not surprising that Pliteq refused to produce Lim voluntarily, forcing Marjam to incur thousands of dollars in unnecessary fees to obtain letters rogatory from this Court and to engage local counsel in Canada to obtain an order enforcing the letters rogatory there.[11] In fact, this Court was involved in that process, and noted, during a discovery hearing on August 24, 2017:

> I am very concerned about Ms. Lim's unavailability, your [i.e., Pliteq'] inability to convince her to voluntarily sit for a deposition if you tried, the circumstances of her retirement, the fact that some people at your company [i.e., Pliteq] apparently think that she still works there. I don't know the nature of her consultancy arrangement, if she is a consultant with you still. And so I find that the whole sequence something that needs to be explored. So if Judge Williams were to ask me, I would certainly recommend that discovery be extended for that purpose.

---

[10] For example, Pliteq's cost was $.88 per square foot for 11mm GenieMat, and $.96 per square foot for 12mm GenieMat. *Id.*

[11] Pliteq refused to produce her for a deposition voluntarily in Miami (or at any other location convenient for her), claiming it did not "control her."

When Lim ultimately was deposed in Canada, and Marjam's counsel asked her whether "anyone from Pliteq ask[ed] her to appear voluntarily for [her] deposition," Lim responded "*No.*" *See* Ex. "C" hereto.

> **f.   Defendants Fails to Supplement Their Discovery Disclosures, And "Run Out the Clock" on Discovery Before Raising Novel Defenses Through the Testimony of Defendant Downey, Who Asserted Facts that <u>Directly</u> <u>Contradicted</u> Allegations in Defendants' Counterclaims.**

There can be no serious doubt that since before this litigation commenced, Defendant Downey – as CEO of Defendant Pliteq – knew whether Pliteq had, for any reason, directed URB to cut Pliteq products thinner than labelled (documents confirmed it did), and also whether Marjam had received product manufactured by URB (documents confirmed that Pliteq directed URB to send product directly to Miami).  It also is fair to assume that before filing Defendants' counterclaim, their counsel had conducted a reasonable investigation under the circumstances, and determined that there to be a factual basis – from information supplied by the client or otherwise – to support the affirmative allegation that Pliteq had been providing Marjam with products manufactured by URB "[f]or several years." (DE 21, Counterclaim ¶11).

Yet, on August 21, 2017 – just a few days before the extended discovery end date in this case, and not coincidently after Pliteq had no choice but to produce the documents confirming its "shaving" directions to URB – Defendants asserted for the first time in this litigation 2 entirely new theories to defend against Marjam's claims: (i) that although Pliteq admittedly directed URB to cut its products thinner than labeled, it did so to account for URB's "machine settings,"[12] – a fact which Downey purportedly determined himself based upon his alleged personal inspection of URB's machines;[13] and (ii) in any event, however thin URB might have cut Pliteq's product was immaterial because Marjam never received product manufactured by URB.

None of these new "facts" appeared anywhere in Pliteq's discovery disclosures or responses.  In fact, they squarely contradicted Defendants' own allegation in their Counterclaims, i.e., that Marjam had been supplied with Pliteq product manufactured by URB

---

[12] Defendant raised their "machine-settings" defense conveniently after URB's representatives – who are in Ohio – were deposed more than a month earlier.

[13] An assertion which Downey knew that Marjam could no longer investigate with URB, as the depositions of URB's representatives already had been taken, and discovery had closed.

"*for years*." Again, Downey conveniently proffered this novel, self-serving theory just days before the close of the already extended discovery end date.

Ironically, documents submitted in support of Defendants Fee Motion strongly suggest that Downey flatly manufactured these new "facts," inspired by Defendants' counsel's preparation for the depositions of URB's former founder and vice president (Fanning) and its customer service manager (Goudy). In a time entry for July 13, 2017 – a month after URB produced the "shaving" emails, and 3 days after Defendants produced corresponding documents for the first time – Defendants' counsel indicated that he "**Review[ed] submissions filed in connection with Ultimate RB's motion to dismiss based on personal jurisdiction; [and began] developing strategy regarding lack of effect of sales of products at issue in Florida**."

If, on July 13, 2017, Defendants' counsel had reason to believe – contrary to Defendants' allegation that Marjam had been supplied with product manufactured by URB "years" - that Marjam had never received products manufactured by URB, counsel would have had an obligation to amend Defendants' disclosures to reflect that same might be the subject of information in Downey's possession, upon which Defendants may rely in their defense; yet counsel did not, despite the fact that Downey's deposition would take place the following month.

More important, by August 2017, Defendants' had paid their counsel more than $1 million dollars in legal fees to litigate claims predicated in the first instance on the theretofore undisputed facts that (a) Pliteq directed URB to manufacture product thinner than labeled (which it did) and (b) Marjam had received product manufactured by URB for years. In light of Downey's August 2017 testimony, either: (a) Defendants deliberately delayed producing information that would have materially altered the scope of this litigation; (b) Defendants' counsel failed (1) to conduct a reasonable investigation of facts uniquely in Defendants possession before responding to Marjam's Demand Letter and filing Defendants' counterclaims and/or (2) to timely supplement or revise Defendants' disclosures; or (c) Downey – a party to this action – lied. Either way, Marjam should not be forced to pay Defendants' legal fees.

### g. After Discovery Closed, Defendants Submitted to the Court Invoices <u>Never</u> Produced, Ostensibly in Support of Downey's Incredible Deposition Testimony.

The parties' respective motions for summary judgment were fully briefed by February 2018. In their reply to Marjam's opposition to Defendants' Renewed Motion for Summary Judgment, Defendants submitted documents never-before produced, which purportedly confirmed that Marjam had never been supplied with Pliteq product manufactured by URB. (DE

190, Ex. 1, Downey Decl., Exhibit E thereto).  Thus, once again, Defendants withheld responsive discovery containing information which, if really supporting Downey's testimony, could have, with timely disclosure, saved much, if not all, of the $2.1 million in fees Defendants seek.

###### h. At Trial, Defendants Voluntarily Cut Their Own Damage Claims In <u>Half</u> – Only to Then Have the Jury Award a Fraction Thereof – Based, In Part, Upon a Patently Frivolous Claim

During discovery, Defendants asserted that Marjam allegedly had interfered tortiously with Pliteq's prospective economic advantage in connection with numerous projects, the lost profits for which their expert calculated to be $3.569 million.  Then, for the first time at trial, Defendants unilaterally limited their proofs to claims for lost profits relating to only 3 projects, cutting the actual compensatory damages sought to $1.683 million.[14]  Of that amount, the jury only awarded $310,000 in compensatory damages – a mere 18% of the amount sought.

Fundamentally, Pliteq knowingly presented <u>false</u> testimony to the jury with respect to one of the 3 projects, known as 100 Las Olas.  With respect to that project, Pliteq claimed, albeit falsely, that it had suffered in excess of $630,000 in lost profits, despite the fact that through the date of trial, no underlayment products - whether Pliteq's or otherwise - had been selected, rejected or purchased in connection with the project.  In short, Pliteq lost nothing.  Marjam, learned of the critical facts bearing on Pliteq's false claims with respect to 100 Las Olas during trial from the general contractor's project manager, Diana Manning Yankee, who was ready, willing and able to testify, and was present in the courthouse to do so, but was prevented from taking the stand by the District Court (Marjam is appealing) . (DE 309 and Ex. J thereto)

###### i. Defendants' Overstaffing and Overbilling in This Case

The invoices submitted in support of Defendants' Fee Motion evidence a great deal of duplication, excessiveness and simple overreaching.  Defendants paid 29 lawyers and/or other timekeepers, at rates ranging as high ***$795*** per hour to litigate this case.  Virtually every task in this litigation – from drafting and reviewing correspondence; to propounding and responding to paper discovery; to preparing for *and attending* depositions and court appearances; to drafting, reviewing and revising motion papers; to preparing for and appearing at trial – was staffed by

---

[14] Thus, it became clear at trial that Defendants had only alleged interference with a large number of projects in the hope of multiplying Marjam's discovery and trial costs. Furthermore, it was unreasonable for Defendants to have paid an expert to calculate lost profits they never intended to pursue.

multiple attorneys and support staff .  By way of example only, 3 different attorneys at the Brinks firm charge Defendants for reading and responding to Marjam's Demand Letter.  All of the three (3) firms engaged in improper "block billing," often with impenetrably vague descriptions of the work allegedly performed, rendering it impossible to determine with a reasonable degree of certainty whether the time spent on individual tasks was reasonable, or even justified in the first instance.

After detailed and painstaking reviews by both its trial counsel and attorney's fees expert, Marjam has flagged numerous time entries in the billing records submitted in support of Defendants' Fee Motion, which should be reduced or completely excised from the lodestar amount Defendants seek.  For the Court's convenience, counsel has identified these entries with annotations and/or color highlights made directly on the billing records themselves.  *See* Exs. "D" - "F" hereto. The following is a non-exhaustive list offensive items, by general category:

1. Overstaffing of attorneys at depositions, court proceedings and trial;

2. Time preparing for depositions never taken and witnesses not called at trial;

3. Time on unsuccessful motion practice (e.g., spoliation/sanctions against Marjam);

4. Excessive time spent on unsuccessful mediation (almost 120 entries);

5. Entries related to "linguist expert" completely unrelated to action;

6. Time devoted to tasks resulting from hide-the-ball discovery tactics (e.g., letters rogatory/Laura Lim in Canada);

7. Time spent to re-designate documents improperly cloaked as AEO (initially 90% of documents produced by Brinks Gilson were AEO);

8. Document management duplication by Brinks Gilson and Coffey Burlington;

9. Nebulous/vague/duplicative entries relating to attorney conferences, meetings, strategy, next steps, emails, calls, etc.;

10. Non-Compensable time spent on *pro hac vice* motions and related entries;

11. Time spent in connection with non-compensable trial consultants (Gervelino);

12. Time spent on litigation not pursued (e.g., order to show cause never filed);

13. Discrete, non-compensable claims/causes of action (e.g. tortious interference, copyright, breach of contract, breach of warranty);

14. Duplicative/excessive work

Based upon the legal principles and precedent set forth below, as well as the opinion of Marjam's attorney's fee expert (Ex. "G" hereto), even if Defendants were able to meet the heavy burden of establishing an entitlement to fees (which they do not, *see infra*), the lodestar amount should not exceed **$768,750**.

## ARGUMENT

## I.   THE FEE APPLICATION SHOULD BE STAYED PENDING APPEAL

For the reasons set forth in Marjam's Motion for a Stay of a Fee Award pending Appeal, the Court should dismiss the Fee Application as pre-mature.  (DE 319, 326)

## II.   THE FEE APPLICATION SHOULD BE DENIED IN ITS ENTIRETY

### A.   Defendants Do Not Qualify for Any Statutory Fee Award

#### (i)   Defendants Cannot Meet Their Heavy Evidentiary Burden to Establish That This is An "Extraordinary" Case under the Lanham Act.

Defendants cannot qualify for a Lanham Act fee award if they fail meet the heavy evidentiary burden - distinct from the merits of their underlying claims and defenses - of establishing by a "preponderance of the evidence" that this case is an "exceptional" case.  *Plant Food Systems, Inc.,  v. Agrosource, Inc.,* 2017 WL 4155356, at *7 (S.D. Fla. July 19, 2017), report and recommendation adopted sub nom. *Plant Food Sys., Inc. v. AgroSource, Inc.*, 2017 WL 4155354 (S.D. Fla. Sept. 19, 2017) (emphasis added). "A case will not qualify as exceptional under the Lanham Act merely because one side has zealously pursued or defended its claim." *Tobinick v. Novella*, 884 F.3d 1110, 1119 (11th Cir. 2018).  Furthermore, "'[e]very case will have a loser' and the fact that a party made losing arguments is not grounds for finding a case exceptional; to do so, the prevailing party 'must show that [their case] stands out from others.'"  *See Buccellati Holding Italia SPA v. Laura Buccellati LLC*, 2015 WL 11202358, at *4 (S.D. Fla. Mar. 10, 2015) (internal cites omitted).   Specifically, Defendants must establish that this case "stands out from others with respect to" either (a) "the substantive strength of [the] part[ies]' litigating position[s] (considering both the governing law and the facts of the case)" or (b) the "manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014).   "Considering the totality of the circumstances," as this Court must, Defendants have failed to establish that this case is "exceptional" under either criterion. *See id.*

**(1)  Marjam's Litigation Position Was "Substantively Strong"  Before and During This Action**

In determining the "substantive strength" of Marjam's litigation position, the test is not whether it lost on its claims, but rather whether its "overall case was at least colorable," and not "baseless." *See Florida Int'l Univ. Bd. of Trustees v. Florida Nat'l Univ., Inc.*, 2017 WL 3610583, at *4 (S.D. Fla. Aug. 11, 2017) (internal cite omitted) ("**[W]here there is a colorable claim, fees for the defendant are not warranted**.")  As set forth in detail, Marjam had objective reasons to believe, both before and throughout this litigation, that: (i) Pliteq directed URB to cut product thinner than labeled; (ii) the Pliteq product that Marjam sold to its customers had been manufactured by URB; (iii) professional testing established that Pliteq's product failed to attenuate noise on the Met 3 job in Miami; and (iv) Marjam lost sales of Pliteq product at Met 3 job because of that failure. Documents produced and testimony adduced in discovery confirmed that *each* of these elements to Marjam's claim were at least colorable, even if they ultimately did not convince a majority of the jurors.  *See e.g. Florida Van Rentals, Inc. v. Auto Mobility Sales, Inc.*, 2015 WL 4887550, at *3 (M.D. Fla. Aug. 17, 2015) (although Court ultimately found Plaintiffs lacked protectable rights in asserted trademarks," case found not to be "exceptional" because "it was not objectively unreasonable or frivolous for Plaintiffs to attempt to enforce their purported rights in these marks").  *See also Gray v. Novell, Inc.*, 2010 WL 2593608, at *4 (M.D.Fla. Feb.22, 2010) (finding case not "exceptional" case because "the basis of the plaintiff's Lanham Act claims ... has not been shown to be groundless").  To assert, as Defendants do, that Marjam "failed to recognize the weakness of its own Lanham Act claim" is absurd double-talk in light of the record.

By contrast, Defendants brought claims they objectively knew were patently frivolous when they sought damages at trial for lost profits in connection with a project – 100 Las Olas – where no contract had yet been awarded at the time of trial, let alone "lost" by Pliteq. (DE 309 and Ex. J thereto)

Defendants' attempts to paint Marjam's claims as objectively "weak" are conclusory and unavailing.  That the District Court dismissed Marjam's Lanham Act claim on standing grounds in no way means Marjam should have known its claims were "weak".  Defendants conveniently fail to advise that it was the District Court which had raised the standing issue, and it did so *sua sponte*, and only on summary judgment. Had Marjam's position been so objectively "weak" on that point, query as to why Defendants' army of attorneys failed to seek dismissal on standing

13

grounds – particularly considering that Brinks Gilson's time records confirm that they had explored that very issue on several occasions.  *See e.g.* entries 2/10/16, 3/7/16, 7/14/17, 7/28/17.

Defendants similarly misconstrue the record when they assert that Marjam "amend[ed] its breach of contract claim" "after the close of its case-in-chief" because the claim as pled was "contradicted by the established facts." Defendants provide no examples to support that conclusory statement; Marjam simply and properly moved to conform its breach of contract claims to the proofs at trial – a common place procedure. By contrast, Defendants permitted Marjam to litigate its entire case based upon, among other things, *the allegations in Defendants' own pleading that Pliteq had supplied Marjam with products manufactured by URB "for years"* –Defendants' own words, not Marjam's – yet literally contradicted their own pleadings with Downey's diametrically opposite testimony.  Thus, to assert that "at no point in the case could Marjam offer any evidence that it actually received any URB manufactured product" or that Marjam "deliberately and stubbornly disregarded the uniform, uncontradicted evidence that it never had received any product from URB" is the height of disingenuousness, to put it politely. If "evidence" about the source of product was "uncontradicted," it is solely because Defendants manufactured that evidence at or after the close of discovery - both in Downey's incredible testimony, and in documents produced for the first time months after discovery closed during dispositive motion practice – when Marjam's opportunity to develop facts conforming to those previously plead by  Defendants had evaporated.  Finally, the mere fact that Defendants were able to convince a jury to award punitive damages – from which Marjam is appealing – have no bearing on the "substantive strength" of Marjam's claims or defenses for purposes of determining "exceptionality."  *See e.g. Adidas Am., Inc. v. Payless Shoesource, Inc.*, 2009 WL 302246, at *1 (D.Or. Feb. 9, 2009) (district court exercises discretion not to award attorneys' fees despite award of punitive damages in trademark infringement case), cited with approval by *PODS Enterprises, LLC v. U-Haul Int'l, Inc.*, 126 F. Supp. 3d 1263, 1291 (M.D. Fla. 2015).

### (2) When Viewing the Totality of the Circumstances, If Any Party Litigated Their Claims and Defenses in an "Unreasonable Manner," It Was Defendants, Not Marjam

As Defendants correctly point out, this Court previously has listed the factors Courts typically consider when determining whether parties have litigated unreasonably for purposes of determining exceptionality.  *See Florida Int'l Univ. Bd. of Trustees v. Florida Nat'l Univ., Inc.*, 2017 WL 3610583, at *4 (S.D. Fla. Aug. 11, 2017).  As demonstrated in the facts section of this

response in opposition, when viewing the "totality of the circumstances," Defendants fail to meet their evidentiary burden to prove that any of these favors weigh in their favor.

Contrary to Defendants' assertion, Marjam did, in fact, "conduct[] an adequate pre-filing investigation [and] exercise[d] due diligence before filing suit." *Id.* Marjam did not simply rely upon its own intuition; it met with individuals and obtained documentary evidence from people very likely to have knowledge of relevant facts, i.e., Art Dodge (who was already in litigation with Pliteq) and Kent Berheide, who previously worked for URB as a production supervisor and who was intimately familiar with the manufacture of materials, and who confirmed that URB regularly had complied with Pliteq's directives to manufacturer products thinner than labeled and represented.  For Defendants to state that Marjam failed to "conduct[] *any* pre-filing investigation," then also concede that Marjam "relied" on information provided by third parties, is both disingenuous and self-contradictory.  Furthermore, the sufficiency of Marjam's pre-filing investigation was vindicated through discovery, which *confirmed* that Pliteq did, in fact, direct URB to cut its product thinner than labeled.  By contrast, Defendants filed a counterclaim asserting that Marjam had been supplied with product manufactured by URB "for years," only to contradict that pleading with the testimony of a party defendant, who could have and should have been consulted before the counterclaim was filed.  As to whether a party "should have known its claim was meritless and/or lacked substantive strength" (*id.*), Marjam has proffered ample facts establishing (a) its belief that its claims were meritorious and had substantive strength, and (b) that Pliteq had to have known that it was pursuing and prevailed upon a patently frivolous claim (100 Las Olas). In light of those same facts, the evidence establishes that if any party proceeded in bad faith, it was Defendants, not Marjam, who proceeded in "bad faith." *Id.*

Finally, Marjam did not engage in "litigation misconduct." *Id.*  However, even if this Court were to find otherwise, Defendants' own conduct, as demonstrated above, cuts against finding this case to be "exceptional."  "In determining whether a case is exceptional, '[t]he equitable force of bad conduct of the losing party may be diminished depending on the conduct of the winning party.'" *See Buccellati Holding Italia SPA*, 2015 WL 11202358, at *4 (internal cites omitted) (refusing to find case exceptional "because all parties contributed to litigating this action in an unreasonable manner").  Courts will not find a case to be "exceptional merely because both parties engaged in mutual combat." *Id.* at *5, *quoting AFD China Intellectual Prop. Law (USA) Office, Inc. v. AFD China Intellectual Property Law Office*, 2014 WL 7331032, at *5

(D. Or. Dec. 19, 2014).   As demonstrated above, Defendants (a) knowingly withheld relevant documents confirming its incriminating directions to cut material thinner than labeled – and to change labeling practices after Marjam issued its Demand Letter; (b) forced Marjam to jump through procedural hoops in Miami and Canada to depose a witness over which Defendants exercised sufficient control (i.e., Laura Lim); (c) manufactured last-minute defenses at the end of discovery; and (d) submitted documents not produced in discovery in support of dispositive motion practice. [15] *See e.g. Powell v. The Home Depot, U.S.A., Inc.*, 2010 WL 4116488, at *32 (S.D. Fla. Sept. 14, 2010), report and recommendation adopted, 2010 WL 4102933 (S.D. Fla. Oct. 18, 2010) (finding repeated "efforts" to "hide the ball" during discovery "amount to an abuse of the discovery process, and were undertaken in an attempt to oppress and harass").

While Marjam has admitted to selling Pliteq products after its claims arose, those products were sold by lower-level sales people *without* management's knowledge, and the District Court declined to impose any sanctions against Marjam or issue any adverse inference at trial.   In any event, Courts have declined to find "exceptionality" in cases under much worse facts.   *See e.g. Florida Van Rentals, Inc.*, 2015 WL 4887550, at *3 (finding Plaintiffs' and counsel's actions "not so unreasonable as to warrant a finding of exceptionality," despite their having "violated a number of the Court's orders by failing to timely respond to discovery requests and failing to appear at a hearing," and being "sanctioned for such conduct," because "there is no evidence that the delays caused any actual prejudice to [Defendant]'s rights.")

### (ii) Defendants Do Not Qualify for Fees Under FDUTPA

To qualify for a fee award under FDUTPA, Defendants bear the burden of establishing several equitable factors, most of which mirror those required under the Lanham Act.   *See Chow v. Chak Yam Chau*, 640 F. App'x 834, 838-39 (11th Cir. 2015) (setting forth factors).   To the extent the factors overlap, Marjam already has established that Defendants have failed to meet their burden.   *See e.g. id.* ("the merits of the [parties] respective positions" in litigation; "whether

---

[15]   By way of further example of Defendants' improper litigation tactics, Defendants initially produced approximately 90% of its document discovery under an AEO designation, in order to hamper Marjam's ability assist its counsel in the litigation.  The improperly designated documents included, among others, emails to which Marjam was a party!  It was not until Marjam sought Court intervention that Pliteq relented, and in stages re-designated a substantial number of documents to remove the AEO designation.   Not only did such conduct by Pliteq unreasonably multiply the proceedings, Defendants audaciously now seeks the considerable fees incurred for time spent re-designating documents.

the claim brought was not in subjective bad faith by frivolous, unreasonable, groundless"; and "whether the defense raised a defense mainly to frustrate or stall")·  Furthermore, neither the "scope" nor "the history of the litigation" (*id.*) warrants an award of fees against Marjam; all of the claims were straight forward, and the case went from Complaint to trial in 2 ½ years. Finally, "an award of fees" against Marjam would not – indeed should not – "deter others from acting in similar circumstance" (*id.*), because parties never should be deterred from pursuing non-frivolous claims, even if the parties ultimately lose.

### B.  Defendants Have Not Established That They Merit The Court's Discretion

Even if Defendants were able to point to evidence relevant to the factors relating to statutory fee awards, such awards are not automatic under either the Lanham Act or FDUTPA, but rather depend on the Court excising its discretion on Defendants' behalf. *See e.g. Dieter v. B & H Industries of Southwest Florida Inc.,* 880 F.2d 322, 329 (11th Cir.1989) ("Even if the trial court finds that the circumstances of the case are, in fact, exceptional, the decision whether to award attorney's fees [under the Lanham Act] is still discretionary.") *and N. Am. Clearing, Inc. v. Brokerage Computer Sys., Inc.,* 395 Fed. Appx. 563, 565 (11th Cir. 2010) ("Like prevailing parties under the Lanham Act, the prevailing party in an action under the FDUTPA may, according to the court's discretion, recover his reasonable attorney's fees.")  As Courts in this Circuit have recognized, "an attorney's fee award is still the exception to the American Rule and should be reserved only for *rare circumstances*." *See Plant Food Systems, Inc.,* 2017 WL 4155356 at *4 (emphasis added).   Viewing the totality of the circumstances, including and especially Defendants' discovery conduct, contradiction of their position that Marjam received URB product, and pursuit of patently frivolous claims, this Court should decline to exercise its discretion in Defendants' favor.

### C.  The Fees And Costs Sought Are Excessive

#### 1. The Lodestar Sought by Defendants Must Be Reduced

Notwithstanding Marjam's detailed opposition to Defendants' Fee Application, it is Defendants who bear the burden of establishing entitlement to the Lodestar they seek.

> The "**fee applicant bears the burden of establishing entitlement and documenting the appropriate hours and hourly rates.**" That burden includes "**supplying the court with specific and detailed evidence from which the court can determine the reasonable hourly rate**. Further, fee counsel should have maintained records to **show the time spent on the different claims**, and **the general subject matter of the time expenditures**

**ought to be set out with sufficient particularity** so that the district court can assess the time claimed for each activity.... **A well-prepared fee petition also would include a summary, grouping the time entries by the nature of the activity or stage of the case**."

*Pronman v. Styles*, 2016 WL 3661940, at *2 (S.D. Fla. Mar. 15, 2016), *report and recommendation approved,* 2016 WL 3636867 (S.D. Fla. Apr. 6, 2016), *aff'd,* 676 Fed. Appx. 846 (11th Cir. 2017) (citations omitted; emphasis added).  Where reductions of the lodestar are warranted, the Eleventh Circuit permits "across-the-board percentage cuts to the number of hours claimed" in voluminous fee applications such as the one at bar.  *See Alhassid v. Bank of Am., N.A.*, 688 Fed. Appx. 753, 758 (11th Cir. 2017).

As demonstrated below, Defendants have not met their burden to establish entitlement to the lodestar sought. Marjam has conducted a detailed, searching review of the invoices submitted in support of Defendants' Fee Motion and has identified the specific entries that require either a reduction or wholesale elimination of time from the lodestar, based upon the legal principals set forth below and the opinion of Marjam's attorney's fees expert.

### 2. The Hourly Rates Were Excessive for Purposes of Determining the Lodestar

"[W]hen determining the hourly fee, th[e Court] must 'step[ ] into the shoes of the reasonable, paying client, who wishes to pay the least amount necessary to litigate the case effectively.'" *Procaps S.A. v. Patheon Inc.*, 2017 WL 3536917, at *32 (S.D. Fla. Aug. 17, 2017) (internal citations omitted).  As explained by Marjam's fee expert, and for the reasons set forth in his declaration, the blended billing rate used by Defendants is excessive and must be reduced.

### 3. All Billing Entries Relating to Work Performed by Timekeepers For Whom No Qualifications Are Provided Must Be Eliminated from the Lodestar

Local Rule 7.3(a)(5), requires, in relevant part, that Defendants provide "the identity, experience, and *qualifications* for each timekeeper for whom fees are sought." L.R. 7.3(a)(5)(A).  Although Defendants seek reimbursement for work performed by 29 individuals, Defendants fail to set forth the qualifications of each timekeeper. Accordingly, any time related to tasks performed by those individuals must be eliminated from the Fee Motion.  *See e.g. Rubenstein v. Florida Bar*, 2015 WL 1470633, at *5 (S.D. Fla. Mar. 31, 2015), report and recommendation adopted, 2015 WL 11216722 (S.D. Fla. Apr. 22, 2015) (finding Coffey Burlington's failure to "provide the background and experience" of all time-keepers to be "grounds for a reduction in the requested fees").

#### 4.   Redacted Time Entries Must Be Eliminated from the Lodestar

The Groisman Invoices contain numerous redactions that make it impossible to determine what work was done, let alone whether time spent was reasonable.  Accordingly, all of that time must be eliminated from the lodestar. *See e.g., Travelers Home & Marine Ins. Co. v. Calhoun*, 2014 WL 1328968, at *9 (M.D. Fla. Apr. 2, 2014) (eliminating time for redacted entries).

#### 5.   Counsel's Use of Improper "Block Billing" and Vague Time Entries Warrants a Reduction of the Lodestar

Defendants failed to "**include a summary, grouping the time entries by the nature of the activity or stage of the case**" (*see Pronman*, at *2), making it very difficult to assess whether the time spent on specific litigation tasks was reasonable.  Further complicating matters were Defendants' counsel's use of improper "block billing."

> Block billed time entries "lump together all the tasks performed by an attorney on a given day without breaking out the time spent on each task," and make "it difficult, if not impossible, to calculate with any precision the number of hours an attorney devoted to a particular task."  Block billing also prevents a court from cleanly dividing time spent on compensable and non-compensable tasks.  If a fee request contains improper block billing, courts may either reduce the requested hours or eliminate block billed entries altogether.

*Miller's Ale House, Inc. v. Boynton Carolina Ale House, LLC*,  2011 WL 13108095, at *3 (S.D. Fla. Apr. 7, 2011), *report and recommendation adopted*, 2011 WL 13108071 (S.D. Fla. Sept. 19, 2011) (internal citations omitted).  Furthermore, "[i]n a request for attorney's fees, 'the general subject matter of the time expenditures ought to be set out with sufficient particularity so that the district court can assess the time claimed for each activity.'"  *Id.* at *4 (quoting *Norman v. Hous. Auth. of City of Montgomery*, 836 F.2d 1292, 1303 (11th Cir. 1988).

Marjam's counsel has annotated numerous instances in Defendants' invoices where Defendants' use of block billing and/or vague entries makes it difficult, if not impossible, to calculate with precision the time spent on tasks.  Marjam's fee expert has recommended an across the board reduction of 25% to account for this deficiency.  *See e.g. Powell v. Carey Intern., Inc.,* 547 F. Supp. 2d 1281, 1295-96 (S.D. Fla. 2008) (deficiencies in counsel's time records, including block billing, justified a percentage reduction to counsel's lodestar hours).

#### 6.   The Lodestar Must Be Reduced for Redundant and Excessive Entries

> Courts are not authorized to be generous with the money of others, and it is as much the duty of courts to see that excessive fees and expenses are not awarded as it is to see that an adequate amount is awarded."  Hours that are "'excessive, redundant, or otherwise unnecessary' " should be pruned from a fee application.

*Miller's Ale House, Inc.*, 2011 WL 13108095, at *7 (citations omitted).  Marjam's counsel has annotated Defendants' invoices to indicate entries containing redundant and excessive fees.

### 7.  Defendants' Limited Success Warrants Further Reduction of the Lodestar

"[I]t is appropriate to alter the lodestar to reflect attorney success or the lack thereof. A comparison of damages sought to the damages received is an appropriate measurement of the relative success of litigation." *Yellow Pages Photos, Inc. v. Ziplocal, LP*, 846 F.3d 1159, 1164 (11th Cir. 2017) (citations omitted).  Here, Defendants did <u>not</u> achieve excellent monetary results, inasmuch as they recovered only 8.7% of the compensatory damages calculated by their expert, and only 18% of the compensatory damages sought at trial. *Compare with Erkins v. Bryan*, 785 F.2d 1538, 1545 (11th Cir. 1986) ("Plaintiffs certainly did not obtain excellent monetary results here as only 10% of the amount sought was actually obtained.")  Accordingly, "it is appropriate to alter the lodestar." *See Yellow Pages Photos, Inc., supra.*

### C.  The Court Cannot Award Any Costs Beyond those Sought in the Bill of Costs

While Defendants might be entitled to recover costs under the Lanham Act, the Lanham Act does not permit them to recover any costs beyond those enumerated in 28 U.S.C. § 1920. *See Jackson v. Grupo Indus. Hotelero, S.A.,* 2010 WL 750301, at *5 (S.D. Fla. Mar. 3, 2010) ("[B]ecause 15 U.S.C. § 1117(a) does not specify which costs are recoverable, the Court is "bound by the limitations set out in 28 U.S.C. §§ 1821 and 1920.'") (quoting *Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 445 (1987); *accord CarMax Auto Superstores, Inc. v. StarMax Fin., Inc.*, 192 F. Supp. 3d 1279, 1286 (M.D. Fla. 2016).  Inasmuch as Marjam already has addressed which costs must be elimated from Defendants' Bill of Costs, Marjam incorporates those positions by reference herein.  (DE 311)  Defendants attempt to circumvent this prohibition, and to collect $156,825.29 in fees paid to their damages expert, but claiming those fees as costs under FDUTPA. However, those costs are not available to Defendants, even under FDUTPA, because (a) the expert opined solely upon damages for Defendants' affirmative claims; (b) Defendants did not assert any FDUTPA claims. *Cf.* <u>Alhassid</u>, 688 Fed. Appx. at 757 (fees not recoverable where "attorney's services clearly were not related in any way to establishing or defending" FDUTPA claim).

### CONCLUSION

For all of the foregoing reasons, and based upon the authorities cited, Defendants' Fee Motion should be denied in its entirety.

**Dated: August 27, 2018**

Respectfully submitted,
LEVINE KELLOGG LEHMAN
SCHNEIDER + GROSSMAN LLP
Counsel for Plaintiffs,

By: /s/ Stephanie Reed Traband, Esq.
     Stephanie Reed Traband, Esq.
     201 South Biscayne Boulevard
     22nd Floor, Miami Center
     Miami, Florida 33131
     Florida Bar No: 0158471
     srt@lklsg.com; lv@lklsg.com

     and

     Lawrence J. Sharon, Esq.
     Lebensfeld Sharon & Schwartz P.C.
     140 Broad Street
     Red Bank, New Jersey 07701
     Telephone no. 732-530-4600
     Fax no.  732-530-4601
     Lawrence.sharon@lsandspc.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 27, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing is being served this day on all counsel/parties of record either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel who are not authorized to receive electronic Notices of Electronic Filing on the Service List.

By: /s/ Stephanie Reed Traband, Esq.
     Stephanie Reed Traband, Esq.

**SERVICE LIST**
Kevin C. Kaplan, FBN 933848
Coffey Burlington, P.L.
2601 South Bayshore Drive, PH 1
Miami, Florida 33133
Telephone: (305) 858-2900
Facsimile: (305) 858-5261
kkaplan@coffeyburlington.com

Gabriel Groisman, FBN 25644
Groisman, PLLC
3323 NE 163 St., Suite 508
N. Miami Beach, Florida 33160

Telephone: (305) 930-7979
gabriel@groismanlaw.com