# Exhibit G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 15-cv-24363-WILLIAMS/SIMONTON

MARJAM SUPPLY COMPANY OF
FLORIDA, LLC and MARJAM SUPPLY
COMPANY,

    Plaintiffs,

v.

PLITEQ, INC. and PAUL DOWNEY,

    Defendants,
_____/

PLITEQ, INC. and PAUL DOWNEY,

    Counter-Plaintiffs,

v.

MARJAM SUPPLY COMPANY OF FLORIDA,
LLC; MARJAM SUPPLY COMPANY;
AND JIM METCALF,

    Counter-Defendants.
_____/

## DECLARATION OF EXPERT GLEN H. WALDMAN REGARDING THE REASONABLENESS OF THE AMOUNT OF PLITEQ, INC. AND PAUL DOWNEY'S ATTORNEYS' FEES AND COSTS

My name is Glen H. Waldman. I am the co-managing partner of the law firm of Waldman Barnett, P.L. I have personal knowledge of the statements contained in this Declaration.

*Biographical Background*

1. I have been practicing law in Florida since January 1987. During that time, I have been fortunate to have been selected, on numerous occasions, as a top lawyer by the various publications that undertake to survey and print results both here in the State of Florida and

1

{00274157.DOCX }

nationally and internationally; including Chambers USA, U.S. News and World Report, Who's Who Legal-Litigation and Best Lawyers as well as numerous other less prestigious publications and groups. In addition, I am a member of the Daily Business Review Hall of Fame, based on past jury verdicts secured by my firm with me as lead counsel. I have at all times been a member in good standing with the Florida Bar and I am also AV-rated by Martindale-Hubbell. In addition to a J.D., I also hold an MBA from the University of Miami where I have been an adjunct professor for the past five (5) years teaching Business Law in addition to my full time duties as Co-Managing Partner of the Waldman Barnett firm, where our Coconut Grove based practice focuses on complex commercial litigation matters for both Plaintiffs and Defendants here in Florida, nationally and internationally in state and federal court and various arbitral fora.

2. I am proud to call myself a trial lawyer and am a member of ABOTA, the American Board of Trial Advocates. In fact, of the over 125 members of the Miami Chapter, I am one of less than 5 who have qualified for (based on the number of jury trials conducted to verdict as lead counsel) and been invited to be a member of this elite body who practices within the area of commercial or business litigation and not insurance defense or plaintiffs personal injury.

3. Over the course of my career I have been involved on numerous occasions in matters involving the collection of attorneys' fees at the conclusion of a case. As such, I have dealt with the issue of entitlement and quantum countless times. In addition, I have testified on issues related to quantum a handful of times in the past few years in certain select significant matters both in court and arbitral settings.

### *My Review of Materials*

4. Pursuant to Lebensfeld Sharon & Schwartz P.C.'s request, I have reviewed several significant portions of the very large file in this case, including, but not limited to, a number of the

operative pleadings, motions, and related filings, memoranda, certain transcripts, documents and other related important filings (including the fee statements[1], time billing detail, cost contained in the bills), and orders for the purpose of rendering certain opinions concerning the reasonableness of the amount of attorneys' fees and costs potentially awardable to Pliteq, Inc. ("Pliteq") and Paul Downey ("Downey") for the labor of their various law firms, attorneys and paralegals, should the court decide to award fees under either FDUTPA or the Lanham Act. I have also reviewed Marjam's Rule 7.3(b) analysis served on counsel for Pliteq, as well as an analysis undertaken by Marjam's counsel of the various bills, which I understand it will be filing with the court. If requested, I am happy to furnish a list of the documents reviewed.

5. In conjunction with the above and most specifically, I reviewed the exhibits attached to Pliteq and Downey's Motion and Memorandum for Attorneys' Fees (the "Fee Motion") in detail, as well as the Declaration of Harry R. Schafer, Esq. ("Mr. Schafer") in Support of Pliteq and Downey's Fee Motion to assess the rates and quantum of fees charged by opposing counsel in this rather straightforward, but hotly contested matter. In conjunction with this, to refresh and confirm my understanding, I have also reviewed the relevant current controlling case law governing certain aspects of this opinion, as more particularly discussed below.

*Relevant Standard*

6. I have reviewed the factors set forth in the Rules for Professional Conduct, Rule 4-1.5(b), as well as the relevant case law, including *Florida Patients Compensation Fund v. Rowe*, 472 So. 2d 1145 (Fla. 1985) and its progeny.

7. I have evaluated the following factors in developing my opinion of reasonable attorneys' fees, as stated below: (a) the time and labor required, the novelty, complexity, and

---

[1] No retainer agreements were provided as is required for review.

difficulty of the questions involved, and the skill required to perform the legal service properly; (b) the likelihood that the acceptance of particular employment will preclude other employment by the lawyer; (c) the fee, or rate of fee, customarily charged in the locality for legal services of a comparable or similar nature; (d) the significance of, or amount involved in, the subject matter of the representation, the responsibility involved in the representation, and the results obtained; (e) the time limitations imposed by the client or by the circumstances and, as between attorney and client, any additional or special time demands or requests of the attorney by the client; (f) the nature and length of the professional relationship with the client; (g) the experience, reputation, diligence, and ability of the lawyer or lawyers performing the service and the skill, expertise, or efficiency of effort reflected in the actual providing of such services; and (h) whether the fee is fixed or contingent, and, if fixed as to the amount or rate, then whether the client's ability to pay rested on any significant degree on the outcome of the representation on the work described therein.

8. As this court is well aware, under both of the theories pursuant to which Pliteq and Downey seek fees, the award is discretionary and not mandatory (and in the case of the Lanham Act requires "exceptional circumstances") based on the wording of the relevant portions of the statutes involved (*See*, Fla. Stat. §501.2105(3) and 15 U.S.C. §1117(a)).

*Mr. Schafer's Declaration in Support*

9. Before I address the actual fee request, I would like to focus on the Declaration of my counterpart expert Mr. Schafer, whose firm (Kenny Nachwalter) I know very well. There are a number of statements and conclusions contained within his Declaration, which are curious at best and not credible, at worst.

10. First, it is apparent that Mr. Schafer has undertaken no actual detailed analysis of

4

{00274157.DOCX }

the bills and, frankly, could not have to reach the conclusion he did, that 100% of the time billed and sought to date ($2,065,119.30)[2] is reasonable and should be awarded, if he had done so. This is especially clear in light of the Motion filed by his clients, authored by Kevin Kaplan of Coffey Burlington, which concedes that something less than 100% is appropriate, even if the court agrees with all the positions it has taken and seeks to recover an amount less than Mr. Schafer says it is entitled to receive ($2,050,019.30).

11. Second, in concert with the above there are at a minimum two glaring omissions from his Declaration:

a) As conceded by Mr. Kaplan in the Fee Motion, the fees for Pliteq's copyright infringement claim have no basis being considered, if there is to be an award of fees under either FDUPTA or the Lanham Act or both. As such, at a minimum, this should have been considered (as conceded by Pliteq) and adjusted appropriately, if a proper analysis had been undertaken.

b) Similarly, there is no question that the time involved in claims that do not provide for consideration of an award of attorney's fees, as properly pointed out in the Fee Motion, are also completely ignored by Mr. Schafer. If Pliteq's actual counsel can analyze this amount (see Fee Motion pages 15-16) and the undersigned without much difficulty was able to pull out a substantial number of hours and thousands of dollars that are attributable to Marjam's Breach of Warranty and Contract claims, then if Mr. Schafer was actually undertaking this analysis properly, he too should have been able to do so. While I believe the amount attributable to these clearly non-recoverable claims is in excess of the amount posited by Pliteq ($307,502.90),

---

[2] As indicated in the Motion filed by Pliteq and Downey, this amount is an interim sum and they intend to supplement it to ask for even more fees. The undersigned reserves the right to further opine after having an opportunity to analyze any additional fees sought by Pliteq and Downey.

5

{00274157.DOCX }

which is discussed in more detail below in paragraphs 18 and 21, nonetheless these amounts must be factored in as well.

12. Third, Mr Schafer posits in paragraph 49 of his Declaration that "you simply do not see Defendants turn the table like that very often", apparently referring to the fact that the defendant/counter plaintiff ultimately prevailed and secured a positive judgment. Not only is this not uncommon, but Mr. Schafer's efforts to state as such in order to seemingly buttress this "remarkable feat" and provide further justification to award 100% of all fees incurred, is even more circumspect in light of events earlier this year involving his firm and mine. At that time, my firm as defendant/counter plaintiff went to trial on the remaining counterclaims of our client, Privé Developers against the initial Plaintiff and subsequent counter defendant, Williams Island Property Owners' Association. Mr. Schafer's firm represented Williams Island at trial and, in fact, Mr. Schafer even sat in with me at one of the expert depositions in the case, as we were getting close to trial. The counter plaintiff, Privé Developers, after a seven (7) day jury trial was awarded $26 million (the amount we asked the jury to award) and, within weeks post-verdict, were paid in excess of $20 million to resolve the matter in full. While that result was extraordinary, the fact that a counter plaintiff prevailed is not and is certainly not a basis or a factor for consideration of the overreaching amount Mr. Schafer has asserted to be appropriate.

13. Fourth, in paragraph 18 of his Declaration, Mr. Schafer makes a passing comment to block billing and finds that there is sufficient specificity and does not provide a basis to discount the requested fees. Mr Schafer's conclusion is severely contradicted by the facts of the fee bills themselves and just as importantly, by the law as discussed by among many others, *Wachovia Bank v Tien*, 2015 WL 10911507 and *Lil' Joe Wein Music, Inc. v. Jackson*, 2008 WL 2688117. In these, as well as numerous other Southern District of Florida cases, the courts have found block

6

{00274157.DOCX }

billing not only to be a disfavored practice, but also found that the practice leads to a difficulty in establishing whether the amount of time on any one task is reasonable (something that Mr. Schafer clearly did not delve into). As such, almost without exception, the courts have, across the board, pared or discounted the fees sought in certain instances by as much as 30% (*See, e.g., Bujanowksi v. Kocontes*, 2009 WL 1564263). As such, as discussed below in paragraphs 18 and 21, it is appropriate for a discount to be applied to all the fees having anything to do with the potentially compensable claim owing to this repetitive practice throughout the billings from seasoned firms and lawyers who are seeking to be compensated at very high rates and certainly know better.

14. Finally, Mr Schafer also tries to brush under the rug the multiplicity of lawyers and overlap of firms in this matter. While certainly clients are entitled to staff matters with as many lawyers as they chose, they are not entitled to recover as a reasonable fee from the opposition these amounts just because they chose to have, in this instance over 29 attorneys and paralegals involved. This too is further treated in paragraphs 18 and 21 below.

<u>Other Issues</u>

15. As a general observation, which is important to the underlying critique of the amount sought by Pliteq and Downey for recovery, the fact that they were able to succeed at trial is laudable and certainly never easy. However, just because one prevails and is able to enjoy all that goes with winning a big trial, that does not, under any circumstance, equate to a right to a runaway fee award for essentially everything you did, because you won. Moreover, especially in a case like this where the fees are not awardable (if at all) under all claims made by both parties, but only on discrete claims, it is critical that the prevailing party not get caught up in the euphoria of the win and overreach. It is abundantly clear that is exactly what they have done here. Seeking fees for discrete entries that have nothing to do with the two claims, block entries that do not

7

{00274157.DOCX }

permit the ability to analyze what portion is related to the potentially recoverable claims, scores of internal conferences billed by multiple attorneys and staffing decisions (two (2) or three (3) lawyers at depositions and three (3) lawyers and a paralegal at trial), do NOT equate with what is a recoverable fee under the law and guidelines.

16. It is clear that Pliteq and Downey's lawyer made the internal decision to send multiple lawyers to virtually every deposition and sometimes three (3) lawyers, while this matter was certainly hotly contested, it frankly wasn't that complicated. There were basic claims made by Marjam, which it was not able to prove to the satisfaction of the court (relative to the counts disposed of on summary judgment) and to the jury on the remaining claims. Similarly, Pliteq had straightforward counterclaims. Likewise, the decision to send three (3) lawyers and a paralegal to trial, while it is absolutely within the purview of the client, is not merited from a reasonableness and compensability perspective. This is especially so when the sum total of witnesses called at trial was four (4).

17. Juxtaposing the above with the fees being sought, it is always helpful and somewhat instructive to review the fee rates and quantum of fees expended by the other side in the case. Numerous courts have found this to be a helpful bell weather in discerning an award of a reasonable fee. Here, the total amount of fees billed by Marjam's lawyers to its client through the conclusion of the trial was under $1 million dollars at a blended rate in the mid $300's. This is more in line with what I would expect it to be reasonable for a matter like this.

*Analysis of the Fee Bills*

18. A review of the bills from the three (3) law firms makes it abundantly clear that there are a number of issues that were litigated in this case or pursued which have absolutely nothing to do with either the Lanham Act claims or the FDUTPA claim. Time entries for these

claims should not be considered for purposes of determining a reasonable fee, where the potential award of fees is only for discrete claims. The type of matters that this encompasses is large and includes but is not limited to:

    a) research and related entries concerning show cause procedures which were not pursued;

    b) entries relating to document handling and treatment, which was duplicated by two law firms and included re-designation of documents from Attorney's Eyes Only to no such designation, when the documents should not have been so designated in the first place;

    c) likewise, redundancy in the organization and review of documents which appears to have been performed in the first instance at substantial cost by Brinks Gilson and then again by the Coffey Burlington firm once they appeared in the case (again, there is nothing wrong with two firms doing the same task, if the client is willing to pay for it, but that does not make it a reasonable taxable compensable task);

    d) entries related to the pursuit of spoliation and sanctions, which were not successful and have no direct relationship to either FDUTPA or the Lanham Act claims;

    e) specific entries involving research, conferences and pleadings that pertain to claims other than the potentially recoverable ones (when the entries are clear enough to discern such split of activity and time);

    f) general references to inter-office conferences, meetings, strategy, next steps, emails and calls, many of which were excessively billed by numerous attorneys, including at times the most senior attorneys, who had no direct involvement in the guts of the case either through discovery or at trial;

g) time incurred for preparation and organizing depositions that were never taken in the case (there were two (2) of them) as well as for witnesses not called at trial (there were five (5) of them);

h) time and expense related to a linguist expert that never was identified and who never issued a report or testified in the case; and

i) inefficiencies owing to the overlap between the Coffey Burlington and Brinks Gilson firms, and later between the Coffey Burlington and Groisman[3] firms, which were excessive and unnecessary and existed only because Pliteq and Downey elected to have more than one set of counsel. Mr. Schafer's position that they worked efficiently together (Par 34 of his Declaration) is simply belied by the overlapping entries.

19. Moreover, a review of the bills makes it abundantly clear that there was an excessive number of "cooks in the kitchen" on virtually every motion, at every deposition, and at trial. Again, it certainly is the prerogative of the firm in conjunction with its clients to staff matters however they agree upon, but that agreement does not translate into recoverable fees if the sums sought are not reasonable. Here, it is not reasonable to assess against the opposition the totality of the involvement and participation by this number of attorneys and professionals (totaling 29). Whether it involved responding to a letter, preparing discovery, motion practice including summary judgment, Daubert motions, motions in limine, attendance at depositions or trial, this case, while heavily fought, did not require nor is it compensable to have so many hands on each activity. Even with regards to mediation, which the undersigned does not take a position on whether it falls under the rubric of compensability or not, Pliteq and Downey's counsel had almost

---

[3] The fact that the Groisman firm redacted a number of portions of billing entries, was not helpful in assessing reasonabless. This is something that should be considered against the amounts sought by Groisman that volitionally redacted these entries.

{00274157.DOCX }

10

120 entries from various lawyers over the course of the two mediations. This is far too many and does not meet the standard or test of reasonable.

*Rates*

20. The rates of the attorneys who had tangential involvement in this matter which exceed $700 per hour are not reasonable in this jurisdiction. I do not believe that any rate over $600 per hour is appropriate to be compensated for commercial type matters in the Southern District of Florida based on the issues involved in this case, which were not highly specialized (which could engender such high rates). Similarly, to utilize as many lawyers as Pliteq and Downey did to staff, execute and litigate this matter, a blended rate of $435 per hour is also unreasonably high. Numerous tasks reasonably should have been undertaken by attorneys with rates in the low to mid $300's, or if not, which is the choice of Pliteq and Downey, they should not be compensated at such a high blended rate based on a review of the bills and the numerous unremarkable tasks that were undertaken as is the case in all commercial litigation matters.

*Conclusion*

21. As discussed above and detailed in the charts and analysis prepared by counsel for Marjam, which I have reviewed to assist in rendering my own opinion, in addition to my independent review of the bills, it is clear to me that the amount sought by Pliteq and Downey, as set forth both in the Declaration of Mr. Schafer and the Fee Motion (even though the latter seeks lesser sums and at least makes an effort to parse out certain aspects of the bills) is not reasonable. While the client may have been willing to pay these amounts and was fine with three (3) lawyers and a paralegal attending trial and multiple lawyers attending depositions, that arrangement is not something that, should the court award fees, Marjam should be responsible for under the governing law on reasonableness of fees. Moreover, owing to factors such as: the number of attorney's

conferences and communications; for which multiple parties billed (our practice, for example, is to only bill the client for one attorney in such an instance, unless it is an unusual circumstance); the distinct claims and entries which have nothing to do with the Lanham Act or FDUTPA; the fact that there is only a possibility for recovery for three (3) of the eight (8) claims brought by the two parties; what is a reasonable rate in this jurisdiction; and the numerous rabbit holes and non-reimbursable items that are included with the fees being sought, I believe that a fair amount to be awarded (before consideration of the block billing problem) would be at most $1,025,000. Thereafter, considering the problem with the block billing and the lack of clarity of numerous entries I believe a reduction of 25% would be appropriate which would bring the maximum amount (should the court determine awarding fees for both FDUTPA and the Lanham Act claims is appropriate), that could be awarded to $768,750. Finally, should the Court ultimately decide to award fees for only the FDUTPA claim, I believe a fair and reasonable amount under the *Rowe/Quanstrom* factors would be $300,000. Similarly, should the Court ultimately decide to award fees for only the Lanham Act claims, I believe a fair and reasonable amount would be $468,750 (the difference between the total award and the amount attributable to the FDUTPA claims).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
Glen H. Waldman
Dated: August 27, 2018