UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:15-cv-24363-WILLIAMS/BECERRA

MARJAM SUPPLY COMPANY OF
FLORIDA, LLC and MARJAM
SUPPLY COMPANY,

      Plaintiffs/Counter-Defendants,

v.

PLITEQ, INC. and PAUL DOWNEY,

      Defendants/Counter-Plaintiffs.

_____/

## REPORT AND RECOMMENDATION[1]
## ON MOTION FOR ATTORNEYS' FEES AND BILL OF COSTS

**THIS MATTER** is before the Court on Defendants/Counter-Plaintiffs Pliteq and Paul

Downey's (collectively, "Pliteq") Motions for Attorneys' Fees, ECF Nos. [317], [368], and Bill of

Costs, ECF Nos. [307], [308], [368].[2]  Plaintiffs/Counter-Defendants Marjam Supply Company of

---

[1] The Honorable Kathleen M. Williams, United States District Judge, referred this case to the undersigned for a report and recommendation on the matter.  ECF No. [361].

[2] Marjam filed a Motion to Stay Pliteq's Motion for Attorneys' Fees.  ECF No. [319].  However, the Court deferred Marjam's Motion to Stay, pending Marjam's response to Pliteq's Motion for Attorneys' Fees, ECF No. [317].  Marjam then filed a renewed motion to stay Pliteq's Motions for Attorneys' Fees and Bill of Costs, ECF No. [335].  On October 15, 2018, this Court granted Marjam's Motion to Stay Pliteq's Motions for Attorneys' Fees and Bill of Costs pending Marjam's Eleventh Circuit appeal.  ECF No. [341].  Thereafter, on July 10, 2020, Pliteq renewed its Motion for Attorneys' Fees and Costs, ECF No. [359], and, on July 23, 2020, the Court entered an order reinstating Pliteq's Motion for Bill of Costs, ECF Nos. [307], [308], and Pliteq's Motion for Attorneys' Fees, ECF No. [317].  Marjam then filed its Response to Pliteq' Motions for Attorneys' Fees and Bill of Costs.  ECF No. [364].  On August 20, 2020, Pliteq filed its Notice for Additional Attorneys' Fees and Costs, ECF No. [368], requesting: (1) $85,907.50 in additional attorneys' fees at the District Court level, (2) $127,937.50 in appellate fees, and (3) $19,508.13 in costs.  Marjam filed its Response in Opposition on August 30, 2020, ECF No. [370], realleging the arguments it made in its Response in Opposition, ECF No. [332].

Florida, LLC and Marjam Supply Company (collectively "Marjam") filed Responses to Pliteq's Motions for Attorneys' Fees and Bill of Costs, ECF Nos. [311], [332], [370].  On October 2, 2020, the parties presented oral argument on the pending matters.  ECF No. [373].  After due consideration of the briefing, the oral argument, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby **RECOMMENDED** that Pliteq's Motions, ECF Nos. [307], [308], [317], [368], be **GRANTED in part** and **DENIED in part**.  Pliteq should be awarded a total of **$ 1,452,430.22** in attorneys' fees and $36,710.67 in costs.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Marjam is one of the largest building materials suppliers in the United States.  ECF No. [1] ¶ 5.  Marjam sells acoustical ceiling systems, doors and frames, windows, roofing, insulation, and other building products to builders, contractors, architects, engineers, governmental bodies, and the public.  *Id.*  Pliteq is a supplier of rubber sound isolation products.  ECF No. [21] at 4.  Pliteq markets, advertises, and sells its products, including a product known as the GenieMat RST ("GenieMat"), throughout the United States.  *Id.*  Pliteq's GenieMat is a flat, resilient, reduced-sound transmission mat made from recycled rubber content.  *Id.* at 5.  The GenieMat is used in multi-family housing, high rises, or commercial buildings.  *Id.*

The case at hand is centered, in large part, around an exclusive distribution agreement between Marjam and Pliteq.  *Id.* at 23.  Pursuant to their agreement, Pliteq agreed to sell its products (i.e., GenieMats) at discount, provide referrals, and provide training and field visits to Marjam (hereinafter "Sales Agreement").  *Id.*  In turn, Marjam agreed to sell only GenieMats and not to promote or sell competitive products such as Ecore QT, Regupol, or Resilmount sound isolation clips.  *Id.*

Marjam alleged that from 2013 to 2015 it made several purchases of GenieMats from Pliteq, totaling $1.6 million.  ECF No. [1] at 5.  Although Pliteq's GenieMats were labeled with specifications regarding the thickness of the GenieMats, Marjam alleged that, in July 2015, Marjam purchased 256,000 square feet of GenieMats from Pliteq that did not meet the thickness specification.  *Id*.  Marjam claimed it delivered Pliteq's GenieMats to ZOM Living ("ZOM"), a developer constructing a high-rise residential condominium project known as the "Met 3 Project," *id*, and that ZOM tested the GenieMats and found that they fell below the Apparent Impact Insulation Class ("AIIC ratings").  ECF No. [181–1] ¶ 6.  As a result, ZOM cancelled the purchase order with Marjam.  ECF No. [1] at 6.  Marjam further alleged that Pliteq, with the assistance of Ultimate RB ("URB"),[3] intentionally mislabeled and advertised its GenieMats.  *Id.* at 7.

Pliteq denied that Marjam had purchased any GenieMats from Pliteq in July 2015, denied that Marjam had purchased any GenieMats from Pliteq for the Met 3 Project, and denied that Marjam even had GenieMats in stock to supply the Met 3 Project.  ECF No. [21] at 7–8.  Although Pliteq conceded that the GenieMats were advertised and represented by Pliteq as having a nominal thickness of 2 millimeters and 16 decibel reduction, Pliteq argued that any variance in thickness was well within the industry standard and due to normal machine production variation.  *Id.* at 9.

Pliteq contended that, in the summer of 2015, Marjam violated their Sales Agreement by promoting and/or selling competitive products, including Ecore products.  *Id.* at 24.  As a result, on July 10, 2015, Pliteq terminated the Sales Agreement.  *Id.*  Upon receiving Pliteq's notice of termination, Marjam's Product Manager, Jim Metcalf ("Metcalf"), immediately responded via email, stating "'if your (sic) drawing the line, rest assure (sic) my reaction will be swift and

---

[3] URB is a rubber recycler and manufacturer of recycled rubber underlayment for both residential and commercial application.  ECF No. [1] ¶ 10.  URB manufactures some of Pliteq's GenieMats. ECF No. [21] at 4.

inordinate…if <u>you</u> choose to make us an (sic) competitor, I assure you that as a competitor, we will (sic) extreme and unpleasant.'" *Id.* Thereafter, in August 2015, Marjam's counsel sent a demand letter to Pliteq claiming that Pliteq purposefully mislabeled the GenieMats that it sold to Marjam. ECF No. [181–12] at 3. Metcalf forwarded that demand letter to representatives of a construction company and a development company and added that Marjam had "ceased selling GenieMat products by Pliteq due to recent information about illegal activity." ECF Nos. [163] ¶ 21; [164] at 139; [181–1] at 5. Marjam claimed that it had hired an acoustical engineer to prove that the results of a test conducted by Pliteq on the GenieMats "were fabricated," ECF No. [188–6] at 87, and that Pliteq's alleged "illegal activity" had lead distributors to drop the GenieMat product, ECF No. [186] at 14–15.

On August 21, 2015, Metcalf again emailed Pliteq, stating that Pliteq had forced Metcalf ""to "resolve" this "my" way."" ECF No. [126] ¶ 16. Marjam continued to send emails to Pliteq's customers, one of which included a note stating, "'to keep you apprised—it appears litigation will ensue.'" ECF No. [21] ¶ 28. On December 17, 2015, a Marjam employee told one of Pliteq's customers that Pliteq no longer owned a patent covering GenieClips (one of Pliteq's products). *Id.* ¶ 30. Finally, on January 11, 2016, Metcalf sent an email to another Pliteq customer, attaching Marjam's Complaint, stating "'fyi, as I know your company has had some relationship with Pliteq and Ultimate RB…We are extremely concerned about current and future liability and (sic) seems to have lead distributors "dropping" out of the line.'" *Id.* ¶ 35.

### A. The Complaint and Counterclaims

Based on allegations summarized above, Marjam filed the instant Complaint that included claims for: (1) violation of Florida's Deceptive and Unfair Trade Practices Act (hereinafter "FDUTPA") (Count I); (2) violation of the Lanham Act (Count II); (3) breach of express warranty

4

(Count III); (4) breach of implied warranty of merchantability (Count IV); (5) breach of implied warranty of fitness for a particular purpose (Count V); (6) common law fraud (Count VI); (7) breach of contract (Count VII); and (8) civil conspiracy (Count VIII).  ECF No. [1] at 1–13. Marjam alleged that it suffered $457,040.00 in damages, including $320,000.00 in actual damages, measured by the higher price that Marjam paid for thinner GenieMats, $50,000.00 in actual for the unsaleable inventory of GenieMats, and $87,040.00 in damages for lost profits from the Met 3 Project.  *Id.* at 5–6, 8.

On February 29, 2016, Pliteq filed its Answer and Affirmative Defenses that denied Marjam's allegations and contained six counterclaims: (1) tortious interference with contracts (Counterclaim I); (2) tortious interference with business relations (Counterclaim II); (3) violation of the Lanham Act (Counterclaim III); (4) common law unfair competition (Counterclaim IV); (5) breach of contract (Counterclaim V); and (6) copyright infringement (Counterclaim VI).  ECF No. [21] at 28–33.

### B.  Pretrial Proceedings and Motions for Summary Judgment

For two years, the parties engaged in extensive discovery and other pretrial matters.  On January 5, 2018, Pliteq filed its Renewed Motion for Summary Judgment.  ECF No. [162].  Pliteq advanced several arguments in support of its argument that it was entitled to summary judgment on all of Marjam's claims.  First, Pliteq argued that Marjam's claims for damages should be dismissed because Marjam's claim, specifically the claim of $320,000.00 in actual damages, was not supported by the evidence.  ECF No. [162] at 12.  Pliteq contended that none of the GenieMats that Marjam sold were even measured, and Marjam received the full anticipated value of the GenieMats it sold to its customers.  *Id.*  Moreover, Pliteq argues that Marjam never received any URB products, thus invalidating Marjam's claim that Pliteq and URB intentionally engaged in

making the GenieMats thinner than labeled. *Id.* Indeed, Pliteq argued that Marjam received GenieMats manufactured by Kraiburg—a completely unrelated manufacturer from URB. *Id.*

Second, Pliteq argued that Marjam's claim for lost sales due to the Met 3 Project was also unfounded. *Id.* at 13. Pliteq argued that the only reason Marjam did not sell GenieMats to Met 3 was because Pliteq terminated the Sales Agreement, thus cutting off Marjam's supply to Pliteq's GenieMats. *Id.* As such, Pliteq argued that there was no evidence that Marjam took delivery of the 256,000 square feet of GenieMats for the Met 3 project. *Id.*

Finally, Pliteq argued that all of Marjam's claims essentially hinged on the allegation that Pliteq's GenieMats were improperly cut thinner than advertised. *Id.* at 13–14. However, Pliteq argued that its GenieMats were well within the stated tolerances in Pliteq's Product Guide. *Id.* at 14. Specifically, Pliteq contends that the GenieMats Product Guide was unambiguous and specifically states that the thickness may vary "+/-10%." *Id.* Indeed, Pliteq argues that its specification sheet for each GenieMat product even lists the thickness as "nominal" which means that the actual thickness of the product varies. *Id.*

Marjam filed its Motion for Partial Summary Judgment, ECF No. [170], arguing that Pliteq's Lanham Act claim (Counterclaim III) should fail because there was no evidence that Marjam disseminated any actionable statements "in commercial advertising or promotion." *Id.* at 13. Specifically, Marjam argued that its representations to Pliteq's customers did not constitute "commercial advertising or promotion" because its representations were not made for the purpose of influencing customers to not buy Pliteq's goods, but, instead, its representations were made to inform recipients of unlawful activity and to provide Pliteq the opportunity to cease the unlawful activity. *Id.* at 14–15. Moreover, Marjam argued that Pliteq's Lanham Act and unfair competition claims should also fail because there was no competent evidence that Marjam made any false or

misleading statements about Pliteq's products. *Id.* at 14–16.  Finally, Marjam argued that the tortious interference claim should also fail because there was no "contract or agreement with any developer, general contractor or flooring sub-contractor, let alone any contract or agreement of which Marjam had actual 'knowledge' or with which Marjam actually 'unjustifiably interfered.'" *Id.* at 18.

### C.  The Court's Order On Summary Judgment

On April 23, 2018, the Court, in partially granting Pliteq's Motion for Summary Judgment, ECF No. [162], dismissed Marjam's FDUTPA, Lanham Act, common law fraud and civil conspiracy claims, leaving only the breach of warranty (Counts III, IV and V) and breach of contract (Count VII) claims for trial.  ECF No. [247] at 24.  As a preliminary matter, the Court noted that, in response to summary judgment, Marjam had abandoned its claim for actual damages of $320,000.00 for overpaying for Pliteq's thinner than specified GenieMats and had abandoned its claim for $50,000.00 for the unsold GenieMats. *Id.* at 7.  As such, the only issue remaining was Marjam's claim of $87,040.00 for lost profits related to ZOM's cancellation of the GenieMat order for the Met 3 Project. *Id.*

The Court dismissed the FDUTPA claim finding that the only damages at issue, consequential damages, were not available under the statute. *Id.* at 10.  The Court also found that any claim for punitive damages was equally unavailable under the statute, and that Marjam had no standing to assert its claim for injunctive relief given that it could not allege any threat of future harm. *Id.*

The Court then dismissed Marjam's Lanham Act claim for lack of standing. *Id.* at 11–13. In doing so, the Court detailed the purposes of the Lanham Act and noted that in order to have standing to bring suit, a plaintiff must show that its interests fall within the "zone of interests

protected" by the Lanham Act and that those injuries were proximately caused by the actions of the defendant. *Id.* Given the record, the Court found that Marjam could not "demonstrate that it has suffered the type of injury protected by the Lanham Act." *Id.* at 13. Indeed, the Court held:

> [t]his is not the typical false advertisement case, where a competitor makes false or misleading statements to induce consumers to switch allegiance from one company to the other. It is also not a case where a non-competitor suffered injuries resulting from disparaging comments about its product. Instead, this is precisely the type of case that the Supreme Court has ruled is not covered by the Lanham Act: "a business misled by a supplier into purchasing an inferior product."

*Id.* (citing *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 131 (2014)).[4]

Next, the Court dismissed Marjam's common law fraud claim because it held that fraud related claims were barred under the economic loss doctrine. *Id.* at 14. Specifically, the Court held that because Marjam's cause of action for fraud relied on the exact allegations contained in its breach of warranties claim and the damages Marjam alleged were purely economic, Marjam's claim was barred by the economic loss doctrine. *Id.* The Court found that there were genuine issues of fact for the jury on the breach of contract and breach of warranties claims, and therefore, Counts III, IV, V, and VII were set for jury trial. *Id.* at 17.

As to Marjam's Motion for Summary Judgement, the Court granted its motion in part, dismissing Pliteq's counterclaims for tortious interference with contracts (Counterclaim I) and copyright infringement (Counterclaim VI). *Id.* Specifically, the Court found that Pliteq's evidence supports a claim for tortious interference of business relationships but not a claim for tortious interference of contracts. *Id.* The Court dismissed Pliteq's copyright infringement claim finding that Pliteq had not offered sufficient evidence to create an issue of fact on its copyright claim. *Id.*

---

[4] The Court noted that unlike Marjam's claim, Pliteq's Lanham Act claim did have standing because the alleged damages Pliteq suffered were at a time when the two companies were competitors. *Id.* at 17, n. 10.

at 22.  Specifically, the Court found that Pliteq had not offered any affidavit, email, or anything but conjecture to show that Marjam created or distributed the allegedly infringing work.  *Id.*

The Court, however, denied Marjam's motion with respect to Pliteq's Lanham Act claim. The Court noted that as to that claim Pliteq had offered evidence to show that there was an issue of fact as to whether Marjam had made statements for the purpose of influencing others to buy Pliteq's products.  As such, Pliteq's claims for tortious interference with business relations (Counterclaim II); violation of the Lanham Act (Counterclaim III); and common law unfair competition (Counterclaim IV) were set for trial.[5]

### D.  The Trial

Trial began on April 30, 2018 and lasted eight days.  Of note, the evidence at trial showed that the range of thickness of the GenieMat products was not only consistent with industry practice but it was within Pliteq's reported tolerances and had no practical effect on their performance.  In addition, Pliteq also presented evidence that no customer ever made a warranty claim or sought to return any of its purchased GenieMats.

At the close of the evidence, Pliteq and Marjam each moved for judgment as a matter of law under Rule 50(a).  Pliteq argued that Marjam had not presented sufficient evidence to support either a breach of warranty or a breach of contract claim related to the Met 3 Project.  The Court agreed and entered judgment as a matter of law against Marjam on those claims.

Marjam argued that Pliteq had not presented sufficient evidence to prove causation and damages on its counterclaims, however, the Court disagreed, denied Marjam's motion, and submitted Pliteq's claims to the jury.  The jury began deliberating on May 8, 2018.

---

[5] Pliteq voluntarily dropped its counterclaim for breach of contract (Counterclaim V) before trial.

The following day, May 9, 2018, the jury returned a verdict finding liability against Marjam on all three counterclaims.  ECF No. [286].  The verdict form specifically asked the jury to respond as to whether Pliteq had proved, by a preponderance of the evidence, that (1) Marjam tortiously interfered with Pliteq's prospective business relationship with Kast Construction Company; (2) Marjam falsely advertised in violation of the Lanham Act; and (3) Marjam committed common law unfair competition.  The jury responded in the affirmative as to each.  As to the damages, the verdict form did not provide separate entries where the jury could make individual findings for damages as to each project that Pliteq was claiming damages.  Instead, the verdict form provided one single entry for damages proximately caused by Marjam, which the jury was to determine only if they had answered yes to any of the first three question in the verdict form.  *See* ECF No. [286].  The jury awarded Pliteq compensatory damages in the amount of $310,000.00 and granted Pliteq's claim for punitive damages against Marjam in the amount of $800,000.00.  *Id.*

Final Judgement was entered on May 18, 2018.  ECF No. [291].  On May 31, 2018, Marjam filed a motion to stay the execution of the Final Judgment, ECF No. [300], pending its post-trial motions and posting of a supersedeas bond.  On June 6, 2018, the Court approved Marjam's proposed bond and granted Marjam's motion to stay the execution of the Final Judgment pending the outcome of Marjam's post-trial motions and/or a timely notice of appeal.  ECF No. [305].

Marjam then filed a motion for judgment as a matter of law under Rule 50(b), "and/or alternatively" for a new trial under rule 59.  ECF No. [309].  Marjam stated four grounds for such relief: (1) that Pliteq did not present sufficient evidence of causation to establish damages, (2) that the Court improperly excluded the testimony of Diana Manning Yankee, an employee of Kast,[6]

---

[6] Kast is a construction company that Pliteq was doing business with.  Pliteq and Kast were under negotiations for three projects—Aurora Seaside, One St. Pete, and 100 Las Olas ("Kast Projects").

10

(3) that the Court refused to admit the in-person testimony of Zach Young, one of Kast's vice presidents, and (4) that the Court did not allow Marjam to call its acoustical sound expert, Bennett Brooks.  The Court denied Marjam's motion.  Thereafter, Marjam filed a notice of appeal.

### E.  The Appeal

On September 4, 2018, Marjam filed its Notice of Appeal.  ECF No. [334].  Specifically, Marjam appealed four issues.  First, Marjam challenged the District Court's order denying Marjam's Rule 50 and/or Rule 59 motions which were based on Pliteq's failure to establish causation and damages on its counterclaims.  Second, they argued that the District Court had erred by refusing to permit critical facts and expert witness testimony during the trial that would have served to impeach and rebut Pliteq's claims.  Third, Marjam challenged several evidentiary rulings. Finally, Marjam argued that the Court also erred in denying a motion to exclude prejudicial evidence not produced by Pliteq in discovery.  (Appellant Br. at 14).  In response, Pliteq argued that Marjam's Rule 50 motion for judgment as a matter of law should be denied for several reasons. First, Pliteq contends that Marjam's claim against Pliteq, that the GenieMats were thinner than labeled, failed on the merits for lack of proof.  Second, Pliteq contends that Marjam's numerous retaliatory, false, and defamatory communications to Pliteq's customers were intentionally targeted to hurt Pliteq's business, they did in fact hurt Pliteq's business, and, therefore, warranted punitive damages.  As such, Pliteq argued that the record contained abundant evidence to support the jury's verdict, and the District Court correctly denied Marjam's Rule 50 motion under Fed. R. Civ. P. 50.  (Appellee Br. at 23).  In addition, Pliteq contends that Marjam's Rule 59 motion for new trial should also be denied because (1) Marjam did not show that the jury's verdict was against the great weight of the evidence, and (2) Marjam did not show that the District Court abused its discretion in making its routine evidentiary rulings or that such rulings prejudiced Marjam.  *Id.*

On July 7, 2020, the Eleventh Circuit affirmed the District Court's Order denying Marjam's Motion for judgment as a matter of law and/or a new trial and affirming the jury's verdict and damages award.  ECF No. [358].  First, the Eleventh Circuit Court held that the District Court did not err in denying Marjam's Rule 50 Motion.  *Id.* at 7.  Marjam's argument hinged on the fact that the District Court improperly admitted inadmissible hearsay regarding the 100 Las Olas Project— which was only one of the three Kast Projects that Pliteq alleged it lost due to Marjam's misrepresentations.  *Id.* at 7–8.  However, the Eleventh Circuit rejected Marjam's argument because it noted that, even if the District Court did err in admitting the 100 Las Olas hearsay, such error was harmless because the jury awarded lump-sum damages after hearing the testimony on the three Kast Projects and being asked whether Marjam was liable to Pliteq based on any of the three causes of action related to any of the three Kast Projects.  *Id.* at 10.  In other words, because Marjam failed to show that the jury's award ($310,000.00) was specifically based on the 100 Las Olas project, the Eleventh Circuit held that Marjam was not entitled to judgment as a matter of law.  *Id.*  Moreover, the Eleventh Circuit was also unpersuaded by Marjam's objection to the email from Mr. Young, in which Kast noted it would avoid using Pliteq products until the dispute with Marjam was "sorted out."  *Id.* at 11.  The Eleventh Circuit noted that (1) Marjam had no objection to the admission of such evidence, (2) Marjam did not suffer prejudice as to the admission of such evidence, and (3) Mr. Young's unobjected-to email was "the sole evidence" supporting Pliteq's damages claim.  *Id.* at 11–12.

Next, the Eleventh Circuit found that the District Court did not err by denying Marjam's Rule 59 Motion.  Marjam argued that the District Court made evidentiary errors which entitled Marjam to judgment as a matter of law.  First, Marjam argued that the District Court erred in excluding the in-person testimony of Mr. Young.  *Id.* at 13.  The Eleventh Circuit was unpersuaded

because Marjam failed to show prejudice. *Id.* at 14. Indeed, the Eleventh Circuit noted that Mr. Young's deposition was admitted as testimony and Marjam never argued that, had Mr. Young testified in-person, he would have said anything different than what he testified to in his deposition. *Id.* Second, Marjam argues that the District Court erred by excluding Ms. Yankee's testimony. *Id.* at 15. The Eleventh Circuit, again, was unpersuaded, finding that Marjam's own failure to discover Ms. Yankee's testimony after being provided with a significant amount of discovery and several discovery extensions is not an error by the District Court. *Id.* at 16. Third, Marjam argued that the District Court abused its discretion by prohibiting Marjam from calling Mr. Brooks as a Rebuttal Expert. *Id.* at 17.

The Eleventh Circuit found Marjam's argument without merit. *Id.* The Eleventh Circuit noted that Marjam made a strategic error in litigating its case, and its failure to name Mr. Brooks as an expert witness cannot be blamed on the District Court. *Id.* Marjam's last argument is that the District Court made several other erroneous evidentiary rulings. The Eleventh Circuit categorized Marjam's purported challenges into two categories: (1) those that were raised without legal argument, and (2) those challenges to Mr. Downey's testimony, statements made in Pliteq's counsel's closing arguments, and a jury instruction. *Id.* at 18. The Eleventh Circuit found that Marjam waived its ability to challenge the rulings in the first category. *Id.* As to the challenges in the second category, the Eleventh Circuit held that (1) Mr. Downey's testimony was admissible because, as long held by the Eleventh Circuit, a business owner may offer lay witness opinions based on his/her particularized knowledge garnered from years of experience in the field, *id.* at 19; (2) Marjam failed to show how it was prejudiced by Pliteq's counsel in closing arguments, *id.* at 20; and (3) the challenged jury instruction which stated "clear and convincing evidence" did not

require reversal because Marjam did not object to it at the District Court level and the error was not so fundamental as to result in a miscarriage of justice, *id.*

## II.   PLITEQ'S MOTION FOR ATTORNEYS' FEES FOR THE DISTRICT COURT PROCEEDINGS

On July 13, 2018 Pliteq filed its Motion for Attorneys' Fees under both the Lanham Act, 15 U.S.C. § 1051 *et seq.* and the FDUTPA.  ECF No. [317].  It later, at the direction of the undersigned, filed a motion listing any other attorneys' fees in connection with the District Court proceedings, the instant fee petition, and its attorneys' fees in connection with its appeal. Specifically, Pliteq is seeking a determination that, as the prevailing party against Marjam's FDUTPA and Lanham Act claims, as well as its own Lanham Act claim against Marjam, it is entitled to an award of reasonable attorneys' fees under Fla. Stat. § 501.2105 and 15 U.S.C. § 1117(a), respectively.  ECF No. [317] at 4.

In support of its request for its attorneys' fees under FDUTPA, Pliteq argues that several equitable factors, set forth by the Eleventh Circuit, weigh in its favor.  *Id.* at 5.  Specifically, as it relates to the equitable factors, Pliteq argues that Marjam had no legal basis for pleading its claim under FDUTPA; Marjam is a billion-dollar company that can satisfy a fee award; the imposition of a fee award would deter other groundless suits; and Marjam acted in bad faith in litigating its FDUTPA claim.  *Id.* at 5–6.

In support of its request for attorneys' fees under the Lanham Act, Pliteq argues that it is entitled to its fees under 15 U.S.C. § 1117(a) because Marjam's Lanham Act claim is "exceptional."  *Id.* at 6.  Pliteq argues that Marjam's Lanham Act claim was exceptional because it satisfied the standard set out by the Supreme Court.  Specifically, Pliteq contends that Marjam's Lanham Act claim was exceptional because it was (1) substantively weak and (2) litigated in an unreasonable manner.  *Id.* at 6–10.  Pliteq argues that it is entitled to its attorneys' fees for its own

Lanham Act claim for similar reasons.  Specifically, Pliteq argues that Marjam's defense of Pliteq's own Lanham Act claim was substantively weak and unreasonable.  *Id.*

In total, Pliteq is requesting $2,135,926.80.  ECF Nos. [317] (requesting of $2,050,019.30), [368] (requesting an additional $85,907.50).  Pliteq argues that this fee already represents a $15,100.00 reduction for its copyright infringement counterclaim that was ultimately dismissed. *Id.* at 11, 15.  Although Pliteq contends that the fees expended on Marjam's breach of warranty and contract claims are inexorably intertwined and should be awarded, it does suggest that a 15% reduction would be acceptable in order to account for those tasks not related to the FDUTPA and Lanham Act claims.  *Id.* at 16.

On August 27, 2018, Marjam filed its Response in Opposition to Pliteq's Motion for Attorneys' Fees.  ECF No. [332].  Marjam argued that Pliteq is not entitled to an award of statutory fees because Pliteq has failed to meet its burden under either FDUTPA or the Lanham Act.  *Id.* at 1.  Specifically, Marjam argues that Pliteq is not entitled to its attorneys' fees under FDUTPA because, even though Pliteq prevailed on that claim, Pliteq failed to meet its burden of establishing that the several equitable factors weigh in its favor.  *Id.* at 16.  In addition, Marjam argues that even if Pliteq did meet its burden, the Court should still refrain from exercising its discretion to award fees due to Marjam's good faith and Pliteq's own bad conduct.  *Id.* at 15–17.  Marjam also argues that Pliteq cannot meet its burden to establish that this is an "exceptional case" under the Lanham Act because Marjam's litigation position was substantively strong.  *Id.* at 13. Specifically, Marjam argues that its claims were not baseless because it had objective reasons to believe that (1) Pliteq directed URB to cut the GenieMats thinner than labeled, (2) the GenieMats that Marjam sold to its customers had been manufactured by Pliteq, (3) professional testing established that

Pliteq's GenieMats failed to attenuate noise on the Met 3 Project in Miami, and (4) Marjam lost sales at the Met 3 Project due to that failure. *Id.*

**A. Pliteq Is Entitled To Its Attorneys' Fees and Costs Under FDUTPA.**

In a FDUTPA action, "[t]he trial judge may award the prevailing party the sum of the reasonable costs incurred in the action plus a reasonable legal fee for the hours actually spent on the case as sworn to in an affidavit." § 501.2105(3), Fla. Stat. (2018). It is well-settled that a party can be prevailing under the statute either by successfully asserting a FDUTPA claim or by successfully defending against one. *Diamond Aircraft Indus., Inc. v. Horowitch*, 107 So. 3d 362, 369 (Fla. 2013) (by invoking FDUTPA, a party "expose[s] [itself] to both the benefits and the possible consequences of that act's provisions."); *Chow v. Chak Yam Chau*, 640 F. App'x 834, 838–39 (11th Cir. 2015) (finding that, "'by definition defendants prevail by demonstrating the inapplicability of [FDUTPA] to their actions.'") (quoting *M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 30 F.3d 113, 115 (11th Cir. 1994)).

The award of attorneys' fees and costs to a prevailing party, however, is still a matter of a court's discretion. *Procaps S.A. v. Patheon Inc.*, No. 12-24356-CIV, 2017 WL 3536917, at *1 (S.D. Fla. Aug. 17, 2017) ("Both sides agree that FDUTPA gives the trial court broad discretion to award (or not award) fees to a prevailing party"); *Humane Soc. of Broward County, Inc. v. Florida Humane Soc.*, 951 So. 2d 966, 969 (Fla. 4th DCA 2007) (noting that "the legislature gave trial courts the discretion to award prevailing party attorney fees to both plaintiff and defendants under the same standard."). Indeed, once a court determines that a party has prevailed, the court must then turn to whether that party should be awarded its attorneys' fees and costs. In determining whether to award a prevailing party its attorneys' fees and costs, there are various equitable factors that a court may consider. *See Humane Soc. of Broward County*, 951 So. 2d at 971; *see also Chow*

*v. Chak Yam Chau*, 640 F. App'x at 839.  In *Chow v. Chak Yam Chau*, the Eleventh Circuit listed several of these factors, including: (1) the scope and history of the litigation, (2) the ability of the opposing party to satisfy an award of fees, (3) whether an award of fees against the opposing party would deter others from acting in similar circumstances, (4) the merits of the respective positions—including the degree of the opposing party's culpability or bad faith, (5) whether the claim brought was not in subjective bad faith but frivolous, unreasonable, groundless, (6) whether the defense raised a defense mainly to frustrate or stall, and (7) whether the claim brought was to resolve a significant legal question under FDUTPA law.  *Id*; *see Humane Soc. of Broward County*, 951 So. 2d at 971; *see also Procaps S.A.*, 2017 WL 3536917, at *11.

Here, there is no dispute that Pliteq is the prevailing party given that Marjam's FDUTPA claim was dismissed at summary judgment for lack of standing.  ECF No. [317] at 5.  Indeed, Marjam does not dispute Pliteq's prevailing party status—Marjam only argues that Pliteq has failed to establish that the several equitable factors weigh in favor of granting Pliteq its attorneys' fees and costs.  ECF No. [332] at 16.  As such, the Court turns to the equitable factors.

Pliteq argues that the balance of factors decisively weighs in its favor.  First, it argues that Marjam had no legal basis for pleading its claims for injunctive relief or lost profits under FDUTPA but did so anyway.  ECF No. [317] at 5.  Indeed, Pliteq contends that Marjam only abandoned its actual claims under FDUTPA "when faced with Pliteq's meritorious summary judgment motion."  *Id.*  Second, Pliteq argues that, because Marjam is a billion-dollar company, it can satisfy a fee award.  *Id.* at 5–6.  Third, Pliteq contends that imposing attorneys' fees on Marjam would deter other groundless suits.  *Id.* at 6.  Finally, Pliteq argues that Marjam acted in bad faith, as further evinced through the jury's punitive damages award.  *Id.*

Marjam argues that Pliteq failed to meet its burden in demonstrating that the equitable factors weigh in Pliteq's favor.  ECF No. [332].  Marjam argues that it brought and prosecuted claims in good-faith, while it was Pliteq "who engaged in vexatious, hide-the-ball litigation tactics, and who knowingly pressed patently frivolous claims to the verdict."  *Id.* at 1–2.  Marjam further argues that neither the scope nor the history of litigation warrants an award of fees against Marjam because all its claims were "straight forward" and went from the Complaint to trial in two and a half years.  *Id.* at 17.  Marjam also argues that an award of fees in this case would not deter other parties from acting under similar circumstances because Marjam pursued non-frivolous claims, even if it ultimately did not prevail on such claims.  *Id.*  Finally, Marjam contends that, even if Pliteq were able to meet several of the equitable factors, this Court should still decide against awarding Pliteq its attorneys' fees due to Pliteq's improper discovery conduct and its pursuit of patently frivolous claims.  *Id.*

Upon review of the Parties' briefs and the procedural history of this case, the undersigned finds that the equitable factors weigh in Pliteq's favor.  Given that the first equitable factor (the scope and history of the litigation), the fourth equitable factor (the merits of the respective positions—including the degree of the opposing party's culpability or bad faith), and the fifth equitable factor (whether the claim brought was not in subjective bad faith but frivolous, unreasonable, groundless) are all factually related in this case, the undersigned will address them together as they are all addressed by a review of the procedural history.

Applying these three factors to the case at hand, each weigh in Pliteq's favor.  First, the Court considers Marjam's pre-suit actions.  The evidence showed that upon Pliteq's cancellation of the Sales Agreement with Marjam, Marjam threatened Pliteq with "extreme and unpleasant" behavior by sending letters to Pliteq's customers that accused Pliteq and URB of intentionally

committing fraud and deceptive trade practices.  ECF No. [358] at 2.  Marjam even engaged in what it described as a "'Blitzkrieg' attack on Pliteq" by sending a copy of Marjam's demand letters to Pliteq's customers "indicating that Marjam had 'ceased selling GenieMat products' because of 'recent information about illegal activity….'"  *Id.* at 3.  Indeed, when Marjam tried to justify its actions by claiming it sent those demand letters because of its purported concern about its potential liability, this Court was unpersuaded and found that Marjam's argument was contradicted "by its own admission that it continued to sell Pliteq's products even after it learned of the alleged mislabeling issues."  ECF No. [247] at 20.

Moving now to the FDUTPA claim as plead, the matter was dismissed at summary judgment by the Court.  A ruling that Marjam appears to have accepted as it was not the subject of its appeal.  The Court's dismissal came as Marjam abandoned its claim for damages and, instead, attempted to proceed only on the lost profits it claimed arose out of ZOM's cancellation of the order relating to the Met 3 Project.  The fact that Marjam abandoned its damages calculation is, of course, not a minor detail.  Specifically, Marjam's FDUTPA claim asserted that it had suffered: (1) actual damages of $320,000.00 for "the imputed differences in the relative prices applicable to the varying misrepresented thicknesses of the [GenieMats] it ha[d] purchased from Pliteq"; (2) $50,000.00 for the unsaleable inventory of GenieMats; and (3) $87,040.00 in lost profits from the Met 3 Project.  ECF No. [247] at 8.

As to the first set of damages, Marjam was never able to show that the variances on the thickness of the GenieMats were material.  This failure is astounding given that the gravamen of Marjam's FDUTPA claim was that Pliteq was shaving off thickness from its GenieMats.  Indeed, not only was Marjam unable to prove that this was happening, but the evidence also showed that, to the extent that there were variations, such variations were within the industry standard.

Moreover, Marjam was unable to show any damages from Pliteq's GenieMats.  Instead, the evidence showed that the variations in thickness was consistent with industry practice.  ECF No. [348] at 115–17, 124–25.  In fact, the evidence showed that the alleged variance in thickness could not be detected by the human ear.  *Id.* at 132–33.  Indeed, his point was only further supported at trial when Pliteq presented evidence there was no customer dissatisfaction or return of the GenieMats.  *Id.* at 136–37; *see also* ECF Nos. [349] at 24–25; [358] at 5 n.1.

Moreover, Pliteq's GenieMats were neither mislabeled nor cut thinner than specified. Indeed, it is undisputed that Pliteq's labels listed the GenieMats using "sheet standard tolerances" indicating that a thickness of +/-10% was appropriate.  ECF No. [163] ¶ 71; *see* ECF No. [294–1] at 308.  Marjam itself admitted that Pliteq's data sheets and product specification sheets listed the thickness of the GenieMats in "nominal" value, meaning that the actual thickness of the product varies.  *Id.* ¶ 46.  Indeed, even the document that Marjam relies on in its Complaint specifically states that "all listed thicknesses are nominal in imperial measure."  ECF No. [1] at 22.  Marjam failed to offer any evidence that Pliteq's GenieMats varied beyond the stated tolerances.

Second, Marjam's claim that it had suffered $50,000.00 in actual damages from unsaleable GenieMats was baseless.  As Marjam also admitted during discovery, Marjam had disposed of all its GenieMats.  ECF No. [247] at 21 n.11.  Marjam advised that it had lost track of all Pliteq's GenieMats, including those that were the subject of this litigation, which Marjam had previously represented were being maintained in its inventory.  ECF No. [164] at 32, 73.  Subsequently, when James Metcalf, Marjam's Litigation manager, was asked again about the GenieMats, he testified that "some of the product that was in question was actually sold after the date."  *Id.* at 32.

Marjam's claim that it suffered $87,040.00 in damages for lost profits from the Met 3 Project was baseless.  ECF No. [219–10] at 149–51.  As noted by Pliteq, the only reason that

Marjam did not and could not sell to the Met 3 Project is because Pliteq had already terminated the Sales Agreement, thereby cutting of Marjam's supply to Pliteq's GenieMats. Indeed, Marjam's contention that it had received a delivery of 256,000 square feet of GenieMats for the Met 3 Project was unsupported by the record. *Id.* at 152.

At summary judgment, the District Court was only left with Marjam's claim for damages resulting from the loss in profits from the Met 3 project. However, consequential damages are not available under FDUTPA. ECF No. [247] at 10. The Court noted that Marjam's claim requested injunctive relief, which was unavailable to Marjam because it had failed to provide any evidence showing a threat of future harm. *Id.* at 11. Based on the foregoing, the Court finds that the first, fourth, and fifth equitable factors weigh in favor of Pliteq.

Addressing the second equitable factor, the undersigned notes that Marjam is a billion-dollar company, as it is one of the largest building materials suppliers in the United States. ECF No. [1] at 5. As such, the Court finds this factor weighs in Pliteq's favor because there is no dispute that Marjam can afford to satisfy a fee award imposed against it. *Id.*

The third factor also weighs in Pliteq's favor for the reason discussed above. Indeed, given the history of the matter and the lack of critical evidence that existed in pursuing the matter, an award could serve to deter others from filing similar claims under FDUTPA.

Finally, the sixth equitable factor to consider is whether Pliteq raised a defense to frustrate or stall the litigation. This factor "has no bearing on this case," because "Defendant was the prevailing party, not the losing party." *Sodikart USA v. Geodis Wilson USA, Inc.*, No. 14-CV-22461, 2014 WL 6968073 at *5 (S.D. Fla. Dec. 9, 2014). Finally, this case was not brought to resolve any significant legal question under FDUTPA. *See Humane Soc'y of Broward Cty., Inc.,*

951 So. 2d 966 at 972 ("This was not a test case with broad application; it was a business dispute involving two litigants under narrow circumstances.").

Based on the foregoing, the undersigned finds that the equitable factors weigh in favor of Pliteq, and as such, Pliteq is entitled to its attorneys' fees under FDUTPA. Marjam, faced with Pliteq's decision to terminate their Sales Agreement, set out to undermine Pliteq's reputation and business all the while having no evidence that Pliteq was either deliberately or knowingly selling a product that fell below the standards it claimed; having no evidence that any variation was material or fell below any industry standard; and having in fact suffered no losses as a result of Pliteq's conduct. Marjam's conduct clearly merits this award of attorneys' fees from the filing of the Complaint until the date of the Court's Order on summary judgment, April 23, 2018.

### B. Pliteq Is Also Entitled To Its Attorneys' Fees Under The Lanham Act.

The Lanham Act permits an award of reasonable attorneys' fees to the prevailing party in "exceptional" cases. 15 U.S.C. § 1117(a). In 2014, the Supreme Court established the framework for determining what constitutes an "exceptional" case. *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553 (2014). In *Octane Fitness*, the Supreme Court found that the phrase "exceptional case" in the Patent Act's fee-shifting provision should be interpreted in accordance with its ordinary meaning to include "uncommon," "rare," or "not ordinary." *Id.* The Supreme Court determined that "an exceptional case" is one that "stands out from the others" either based on (1) the "substantive strength of a party's litigating position (considering both the governing law and the facts of the case)" or (2) the "unreasonable manner in which the case was litigated." *Id.* at 554. Whether a case is "exceptional" should be determined on a case-by-case exercise of discretion, considering the "totality of the circumstances" and using a nonexclusive list of factors, including "'frivolousness, motivation, objective unreasonableness (both in the factual

and legal components of the case), and the need in particular circumstances to advance considerations of compensation and deterrence.'" *Id.* at 554 n.6 (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994)). The Supreme Court also lowered the requisite evidentiary standard for proving an "exceptional" case from clear and convincing evidence to a preponderance of evidence. *See Id.* at 557. The Eleventh Circuit has explicitly held that the exceptional case standard from the Patent Act, as articulated by the Supreme Court in *Octane Fitness*, applies to cases brought under the Lanham Act. *Tobinick v. Novella*, 884 F.3d 1110, 1113 (11th Cir. 2018). As such, the *Octane Fitness* analysis applies to the matter at hand.

Applying *Octane Fitness* to the case at bar, the undersigned must determine whether the case "stands out from others with respect to the substantive strength of a party's litigation position…." 572 U.S. at 545. "There is no precise rule or formula for determining whether a Lanham Act case is 'exceptional' based on its lack of substantive strength." *FCOA, LLC v. Foremost Title & Escrow Servs., LLC*, No. 17-23971-CIV, 2019 WL 7790856, at *3 (S.D. Fla. Oct. 17, 2019) (quoting *Octane Fitness*, 572 U.S. at 554). However, "some courts have awarded fees when a claim was found to be objectively baseless." *Id.*; *see, e.g., Fla. Int'l Univ. Bd. of Tr. v. Fla. Nat'l Univ., Inc.*, No. 13-21604-CIV, 2017 WL 3610583, at *4 (S.D. Fla. Aug. 11, 2017) (listing cases using the "objectively baseless" standard), *report and recommendation adopted*, No. 13-CV-21604, 2018 WL 4409885 (S.D. Fla. June 25, 2018). "Other courts have awarded fees where a plaintiff offered "extremely weak arguments" to establish that its marks were protectable." *FCOA, LLC*, 2019 WL 7790856, at *3; *see Donut Joe's, Inc. v. Interveston Food Servs., LLC*, 116 F. Supp. 3d 1290, 1294 (N.D. Ala. 2015) (granting defendant fees where plaintiff made no attempt either to argue or present any evidence at summary judgment that its marks had secondary meaning and were protectable). By contrast, some courts—including courts in this District—have declined

to award fees where a plaintiff's overall case was at least colorable. *See FCOA, LLC*, 2019 WL 7790856, at *3 (declining to award fees where "[p]laintiff pursued this case vigorously, presented colorable arguments, and relied on expert evidence in a viable attempt to establish a likelihood of confusion."); *Hard Rock Cafe Int'l USA, Inc. v. RockStar Hotels, Inc.*, 17-CV-62013, 2019 WL 3412155, at *6 (S.D. Fla. May 20, 2019), *report and recommendation adopted,* 17-CV-62013, 2019 WL 3408888 (S.D. Fla. June 4, 2019) (declining to award fees where plaintiff's "overall case was at least colorable."); *Plant Food Systems, Inc.*, *v. Agrosource, Inc.*, 16-CV-80326, 2017 WL 4155356, at *6 (S.D. Fla. July 19, 2017), *report and recommendation adopted sub nom. Plant Food Sys., Inc. v. AgroSource, Inc.*, 16-80326-CIV, 2017 WL 4155354 (S.D. Fla. Sept. 19, 2017) (declining to award fees where the losing party's position during preliminary injunction hearing was not "frivolous or completely unsupported by the evidence"); *Fla. Van Rentals Inc. v. Auto Mobility Sales, Inc.*, 2015 WL 4887550, at *3 (M.D. Fla. Aug. 17, 2015) ("[A]lthough the totality of the evidence supporting the validity of [the] marks was weak, [p]laintiffs' overall case was at least colorable," and was not objectively unreasonable or frivolous).

Pliteq argues that this case should be considered an "exceptional" case under the Lanham Act not only because Marjam's claim was weak, but also because Marjam litigated its claim in an unreasonable manner. ECF No. [317] at 7–8. First, Pliteq argues that, because Marjam could not establish standing to brings its Lanham Act claim, such claim was substantively weak. *Id.* at 7. Second, Marjam argues that its case is also substantively weak due to the "uncontradicted evidence that [Marjam] never had received any [GenieMats] from URB." *Id.* Indeed, Pliteq contends that Marjam's entire case relied on the premise that Marjam received GenieMats manufactured by URB—which lacked any evidential support. *Id.* Third, Pliteq argues that Marjam's claim was also substantively weak because Marjam failed to present any evidence to support its claim that

Pliteq's GenieMats were thinner than specified.  *Id.* at 8.  In addition, Pliteq also contends that Marjam litigated its claim in an unreasonable manner.  *Id.*  Pliteq also relies on a set of factors cited by this Court in *Fla. Int'l Univ. Bd. Of Trustees v. Fla. Nat'l Univ., Inc.*, 2017 WL 3610583 at *4.  Specifically, Pliteq contends that Marjam satisfied those factors because (1) Marjam failed to conduct any pre-filing investigation of its own; (2) Marjam maintained legal positions that were directly and clearly contradicted by the evidence and continued to litigate until this Court dismissed its claim; and (3) Marjam persisted in prosecuting claims that it knew were falsely pled. ECF No. [317] at 8–9.

Marjam argues that this case should not be classified as an "exceptional case" under the *Octane Fitness* standard because "Marjam's claims were at least colorable, even if they ultimately did not convince a majority of the jurors."  ECF No. [332] at 13.  Marjam contends that the "documents produced, and testimony adduced in discovery" provide some support to Marjam's claims.  *Id.*  First, the GenieMats that Marjam sold to its customers had been manufactured by URB.  *Id.* at 13.  Marjam relied on Pliteq's admission that it had provided Marjam with some GenieMats manufactured by URB.  *Id.* at 4.  Second, Marjam contends that it had reason to believe that Pliteq directed URB to cut the GenieMats thinner than labeled.  *Id.*  Marjam relied on purchase orders from Pliteq to URB that requested GenieMats eleven millimeters in thickness to be labeled as twelve millimeters in thickness.  *Id.* at 6.  Third, Marjam contends that Professional testing established that Pliteq's GenieMats failed to attenuate noise on the Met 3 Project in Miami.  *Id.* at 13.  Marjam relies on an email to Paul Downey stating that two test results showed that GenieMats that were a half-inch in thickness were outperformed by a product that was an eighth inch in thickness.  *Id.* at 2; *see* ECF No. [292–1] at 247–48.  Finally, Marjam argues that it lost sales at the Met 3 Project due to the GenieMats underperformance.  *Id.* at 13.

The undersigned finds that the Lanham Act claims in this case were exceptional given that Marjam's litigating position, both in the prosecution of its claim as well as the defense of Pliteq's claim, were not well-founded on either the facts or the law.  First, Marjam's claim was dismissed for lack of standing.  ECF No. [247] at 13.  Marjam argues that the Court's *sua sponte* dismissal of its claim on standing grounds "in no way means that Marjam should have known its claims were weak."  ECF No. [332] at 13.  The undersigned is unpersuaded.  The dismissal on standing grounds was, in great part, due to Marjam's withdrawal of its claim for actual damages.  Indeed, after two years of discovery, Marjam had to withdraw its claim for any actual damages from its suit leaving it only with the losses allegedly related to the Met 3 Project.  Up against that backdrop, one decidedly different than the one that was originally plead, the Court found that the matter was "precisely the type of case that the Supreme Court has ruled is not covered by the Lanham Act: 'a business misled by a supplier into purchasing an inferior product.'"  *Id.* at 13 (quoting *Lexmark*, 572 U.S. at 131.  As such, Marjam's claim clearly fell under the type of case that the Supreme Court declined to provide relief for under the Lanham Act.

Second, Marjam's claims were equally weak on the evidence.  Marjam's Lanham Act claim alleged that Pliteq and URB intentionally engaged in fraudulent conduct by providing false and misleading descriptions of its GenieMats.  ECF No. [1] at 9.  However, Marjam failed to provide any substantive evidence to support such allegation.  Notably, as Pliteq correctly points out, Marjam's entire Lanham Act claim relied on Marjam receiving GenieMats from URB, yet Marjam could not provide any evidence to support such allegation.  As the evidence presented at trial would later confirm, Marjam only received GenieMats from Pliteq's German manufacturer named Kraiburg—whose product quality Marjam never challenged.  ECF No. [190–1] at 2–3; *see* ECF No. [187] at 5.  Indeed, the weakness of Marjam's claim is further demonstrated by the fact that

even Marjam's own photographs of its inventory captured German wording on its GenieMats, further indicating that Marjam never received GenieMats manufactured by URB.  ECF No. [353] at 32–33.

Moreover, Marjam also failed to present evidence to substantiate its claim that Pliteq's GenieMats were thinner than labeled.  First, Marjam's product manager, James Metcalf, was the only person that allegedly measured samples of Pliteq's GenieMats; but there were no witnesses to his observed measurement; he did not ensure that the calibration device was measuring accurately; he admitted he was not an expert in measuring products such as GenieMats; and he was not aware of any industry standards for measuring products such as GenieMats.  ECF No. [219] Exh. K. (James Metcalf Depo.).  Second, Marjam relies on purchase orders between URB and Pliteq that seem to depict Pliteq requesting twelve-millimeter GenieMats cut at eleven millimeters.  ECF No. [332] at 6.  However, Marjam's reliance on these purchase orders, without further investigation, renders Marjam's claim entirely unreasonable.  Indeed, further investigation on Marjam's part would have revealed that (1) Pliteq's GenieMat labels properly accounted for a +/-10% in thickness of the GenieMats, and (2) even if Pliteq's labels did not account for such variances, Pliteq's conduct was still well within the industry standard.  ECF Nos. [358] at 4 n.1; [348] at 115–17; [294–1] at 308.  Had Marjam conducted a reasonable investigation, it would have realized the underlying weakness of its Lanham Act claim.

Third, Marjam's allegation that it suffered financial harm because it could not sell "mislabeled" GenieMats for the Met 3 Project was also baseless.  As noted by Pliteq, the only reason that Marjam did not and could not sell to the Met 3 Project was because Pliteq had already terminated the Sales Agreement, thereby cutting off Marjam's supply to Pliteq's GenieMats.  Indeed, Marjam's contention that it had received a delivery of 256,000 square feet of GenieMats

for the Met 3 Project is wholly unsupported by the record.  ECF No. [219–10] at 152.  Moreover, as the record also reflects, Marjam did in fact sell all of its GenieMats, thereby negating its allegation that it incurred financial harm.  Indeed, as Marjam admitted—and this Court noted— Marjam "untraceabl[y] dispos[ed] of those mats," ECF No. [247] at 21 n.11, and Marjam did not provide any evidence that any of its customers requested a refund for the GenieMats.

In addition, the undersigned finds that Marjam's Lanham Act claim is also "exceptional" because it litigated the case in an unreasonable manner.  In *Fla. Int'l Univ. Bd. Of Trustees*, this Court provided the following factors to consider in determining whether a party's conduct was unreasonable:

1. Establishing that the plaintiff failed to conduct an adequate pre-filing investigation or exercise due diligence before filing suit;

2. showing the plaintiff should have known its claim was meritless and/or lacked substantive strength;

3. evidencing the plaintiff-initiated litigation to extract settlements from defendants who want to avoid costly litigation;

4. showing a party proceeded in bad faith (noting that bad faith is no longer required to support an award of fees but finding the plaintiff's position was not reasonable); and

5. litigation misconduct

2017 WL 3610583 at *4.

First, as discussed above, Marjam failed to conduct an adequate pre-filing investigation or exercise due diligence before filing its Lanham Act claim.  Specifically, Marjam's Lanham Act claim relied on the premise that Marjam received mislabeled GenieMats that were manufactured by URB.  ECF No. [1] at 9.  However, as the evidence indicated and would later confirm at trail— Marjam never received GenieMats from URB, but, instead, the GenieMats that Marjam received were manufactured by one of Pliteq's German manufacturers known as Kraiburg.  An adequate

investigation by Marjam would have revealed such a fact.  Notably, Kraiburg was Pliteq's primary manufacturer for GenieMats, and Pliteq would only use URB on an "as-needed basis" to provide for additional GenieMats for large orders.   ECF No. [190–1] at 3.   Indeed, Marjam's own photographs of its GenieMat inventory captured German wording on its GenieMats, indicating that Marjam only received GenieMats from Kraiburg—whose product quality Marjam never challenged.  ECF No. [353] at 32–33.  Moreover, an adequate pre-filing investigation would have also revealed that Pliteq and URB did not fraudulently advertise its GenieMats thinner than labeled.  Marjam relied on purchase orders between URB and Pliteq that seem to depict Pliteq requesting twelve-millimeter GenieMats cut at eleven millimeters.  ECF No. [332].  However, through further investigation, Marjam would have realized that Pliteq's GenieMats properly accounted for a +/-10% in thickness of the GenieMats and that Pliteq's variance was well within industry standards.   Indeed, even Pliteq's measuring guide, which Marjam relied on in its Complaint, specifically states that "all listed thicknesses are nominal in imperial measure," meaning that the actual thickness of the GenieMats vary.  ECF No. [1] at 22.  Indeed, the nominal thickness of the GenieMats is further confirmed in Laura Lim's[7] deposition, where she states that "nominal" signifies an "approximate thickness."  ECF No. [292–1] at 260.

Second, Marjam knew or should have known that its Lanham Act claim was substantively weak.  Notably, Marjam's Lanham Act claim alleged that Marjam suffered a total of $457,040.00 in damages, but just before this Court was to rule on the parties' motions for summary judgment, Marjam unilaterally abandoned $370,000.00 worth of its alleged claim for damages.  ECF No. [247] at 7.  Marjam's abandonment of more than eighty percent of its Lanham Act claim for

---

[7] Laura Lim was an employee at Pliteq who was responsible for invoicing, processing, and shipping Pliteq's product orders to its customers.  ECF No. [292-1] at 252–53.

damages indicates that Marjam knew, or should have known, the substantive weakness in its claim. Indeed, there is nothing in the record that suggests that this decision was brought upon by any late breaking discovery.

Moreover, Marjam should have also known the substantive weakness of its remaining claim for $87,040.00 in damages. Indeed, Marjam claimed that it suffered $87,040.00 in damages due to the lost profits from the Met 3 Project. However, as the evidence revealed, Marjam never suffered any damages as a result of the Met 3 Project because Marjam never purchased any GenieMats from Pliteq for the Met 3 Project. Indeed, as Metcalf states in his August 14, 2017 deposition, Marjam cancelled the order for GenieMats from Pliteq; Marjam never received any GenieMats from Pliteq for the Met 3 Project; and ZOM never returned any GenieMats to Marjam. ECF No. [219] Exh. K. at 149–51. In fact, Marjam's claim that ZOM cancelled its purchase order with Marjam due to the GenieMat's alleged inadequacies is further belied by the fact that after Pliteq cancelled the Sales Agreement with Marjam, ZOM continued to purchase Pliteq's GenieMats. *Id.* at 121–22.

Marjam brought claims it had failed to adequately investigate from a factual perspective leaving it to withdraw most of its claim before summary judgement. At that stage, what was left was a claim that the Court found was clearly not the type that was covered by the Lanham Act. The lack of investigation, the lack of damages, and the legal impediment to bringing the case of action as a Lanham Act claim is sufficient to support this finding.

Likewise, Marjam's defense of Pliteq's Lanham Act counterclaim was also substantively weak and many times contradicted by Marjam's own evidentiary admissions. ECF No. [317] at 9. Pliteq supports its position by referring to this Court's Order on summary judgment, ECF No. [247] at 20, where the Court held that Marjam's defense to Pliteq's Lanham Act counterclaim was

"contradicted by Marjam's own admission."  *See* ECF No. [317] at 9.  Notably, given that the thrust of Pliteq's counterclaim alleges that Marjam fraudulently misrepresented Pliteq's products and business practices, Marjam's defense to Pliteq's counterclaim is, in effect, asserted through Marjam's own Lanham Act claim.  In other words, the overall strength of Marjam's defense, then, depends on the strength of Marjam's own claim.  Indeed, if Marjam's Lanham Act claim that Pliteq was fraudulently misrepresenting the thickness of its GenieMats was substantively strong, then the strength of its claim would, in effect, serve as a substantively strong defense against Pliteq's counterclaim.  However, given that the undersigned has already determined that Marjam's Lanham Act claim was substantively weak, and Marjam has provided this Court with no alternative defense, the undersigned must also find that Marjam's defense to Pliteq's Lanham Act counterclaim is substantively weak.

Marjam fails to specifically provide the Court with any direct argument as to why its defense of Pliteq's Lanham Act counterclaim was not substantively weak; instead, based on the undersigned's interpretation, Marjam seems to argue that the strength of its own Lanham Act claim is, in function, its defense to Pliteq's counterclaim.  ECF No. [332].  Indeed, Marjam's only direct argument in support of the strength of its defense against Pliteq's counterclaim is that the jury's punitive damages award against Marjam should have no bearing on the substantive strength of its case.  *Id.* at 14.  Indeed, many of its arguments re-argue the same points that the Court and the jury already found unpersuasive, yet Marjam proceeds to argue as if summary judgment and the verdict are of no moment.

As to Marjam's argument that a jury award of punitive damages should "have no bearing on the 'substantive strength' of Marjam's claims or defenses for determining 'exceptionality,' the Court is unpersuaded.  *Id.*  Marjam relies on a district court case in Oregon, where the court

31

exercised its discretion not to award attorneys' fees despite there being an award of punitive damages against defendant. *Adidas Am., Inc. v. Payless Shoesource, Inc.*, 2009 WL 302246, at *1 (D. Or. Feb. 9, 2009). Marjam's reliance on this case is misplaced. Although Marjam cites to *Adidas* to support its argument that an award of punitive damages should have "no bearing" on the substantive strength of a case, *Adidas* does not stand for such proposition. Indeed, in that case, the court clearly noted that an award of attorneys' fees is subject to equitable considerations. *Adidas*, 2009 WL 302246, at *1. The court held that "after carefully considering the jury's findings and my own view of the evidence, I conclude that although the question is a close one, this is not an exceptional case which supports an award of attorney fees." *Id.* As such, and contrary to Marjam's assertion, the court clearly considered the punitive damages although it ultimately concluded that it was not sufficient to make the case exceptional. Here, the Court also, and well within its discretion, factors the jury's award of punitive damages into its analysis.

Although the award of punitive damages is not dispositive, the Court finds it persuasive as to determining whether the conduct of the party was such that it can be defined as exceptional. Here, of course, the question was not a close one. Marjam lacked evidence to support its basic claim as well as its defense that the GenieMats were improperly cut thinner than labeled and that such variance in thickness was material to the effectiveness of the GenieMat and, consequently, to Marjam's business. On none of those issues did Marjam come close to presenting evidence to adequately support its claims or defenses. Based on the foregoing, the undersigned finds that Pliteq's Lanham Act counterclaim is "exceptional" under the *Octane Fitness* standard.

### C. The Reasonable Attorneys' Fees For the District Court Proceedings is $1,452,430.22.

Finding that Pliteq is entitled to its reasonable attorneys' fees under FDUTPA and the Lanham Act, the undersigned will now determine the reasonable amount. As noted above, Pliteq is requesting a total of $2,135,926.80. ECF Nos. [368], [371].

The Eleventh Circuit has adopted the lodestar method to determine the reasonableness of an award of attorneys' fees. *Norman v. Hous. Auth. of City of Montgomery*, 836 F.2d 1292, 1299 (11th Cir. 1988); *see also Domond v. PeopleNetwork APS*, 750 F. App'x 844, 847 (11th Cir. 2018). To determine the lodestar amount, a court must ascertain a reasonable hourly rate and multiply it by the number of hours an attorney reasonably expended on the litigation. *Norman*, 836 F.2d at 1299. Where the time or fees claimed appear excessive, or there is a lack of support for the fees claimed, "the court may make the award on its own experience." *Id.* at 1303. The burden of establishing that the fee request is reasonable rests with the fee applicant who must submit evidence regarding the number of hours expended and the hourly rate claimed. *Id.* Evidence in support of the fee applicant's request requires "sufficient particularity so that the district court can assess the time claimed for each activity." *Id.* The party seeking fees must supply the Court with "'specific and detailed evidence' in an organized fashion." *Machado v. DaVittorio, LLC*, No. 09–23069–CIV, 2010 WL 2949618, at *1 (S.D. Fla. July 26, 2010) (quoting *Norman*, 836 F.2d at 1303). Notably, courts are not permitted "to be generous with the money of others, and it is as much the duty of courts to see that excessive fees and expenses are not awarded as it is to see that an adequate amount is awarded." *Am. Civil Liberties Union of Ga. v. Barnes*, 168 F.3d 423, 428 (11th Cir. 1999). Courts need not become "green-eyeshade accountants." *Fox v. Vice*, 563 U.S. 826, 838 (2011). Instead, the essential goal for a court is to "do rough justice, not to achieve auditing perfection." *Id.*

33

### 1. Counsel's Hourly Rates Are Reasonable.

A reasonable hourly rate is defined as the "prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." *Norman*, 836 F.2d at 1299. Under a fee-shifting statute, a prevailing party is entitled only to have the losing party pay for an attorney with reasonable expertise at the market rate, not for the most experienced attorney. *See Am. Civil Liberties Union of Ga.*, 168 F.3d at 437. The relevant legal community for purposes of determining the reasonable hourly rate for an attorney's service is "the place where the case is filed." *Cullens v. Ga. Dep't of Transp.*, 29 F.3d 1489, 1494 (11th Cir. 1994). The fee applicant bears the burden of submitting satisfactory evidence to establish that the requested rates accurately reflect the prevailing market rate. *Norman*, 836 F.2d at 1299. Proof of the market rate may include direct evidence from other legal practitioners in the relevant legal community familiar with the type of legal service provided and the prevailing market rate for such work. *Id.*

In determining reasonable South Florida hourly rates, a court may consider certain factors, including "the attorney's customary fee, the skill required to perform the legal services, the attorney's experience, reputation and ability, the time constraints involved, preclusion of other employment, contingency, the undesirability of the case, the attorney's relationship to the client, and awards in similar cases." *Mallory v. Harkness*, 923 F. Supp. 1546, 1555 (S.D. Fla. 1996) (citing factors articulated in *Johnson v. Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974)). In the end, however, the Court remains an expert on the issue of attorneys' fees and "may consider its own knowledge and experience concerning reasonable and proper fees." *Norman*, 836 F.2d at 1303 (quoting *Campbell v. Green*, 112 F.2d 143, 144 (5th Cir. 1940)).

Local Rule 7.3(a) states that "[i]f a party objects to an hourly rate, its counsel must submit an affidavit giving its firm's hourly rates for the matter and include any contingency, partial contingency, or other arrangements that could change the effective hourly rate." Marjam presented the affidavits of Mr. Lawrence J. Sharon who avers that he charged $350.00 an hour, that his partner, Mr. Schwartz, billed at $325.00 an hour, and that the senior partner, Mr. Lebensfeld, who drafted the complaint and provided some other assistance, billed at $395.00 an hour. ECF No. [332–8]. He also states than an associate of the firm billed at $300.00 an hour. *Id.* Marjam also provided the Affidavit of Stephanie Reed Traband from the firm of Levine Kellogg Lehman Schneider & Grossman who avers that she bills at $300.00 an hour, that an associate at the firm bills at $250.00 an hour, and that their paralegal bills at $150.00 an hour. ECF No. [332–9]. Marjam also argues that its blended rate is lower than the blended rate of Pliteq's lawyers; however, this matter was not billed using a blended rate by counsel on either side and so the blended rate argument is not particularly helpful. Although the Court considers the rates of Marjam's counsel, those rates appear low for this market and for the matter at hand. Marjam did not provide any other information about its counsel and so the Court is not able to compare the experience of counsel with that of Pliteq's, although as noted, the rates are much lower than what this Court would deem reasonable for this kind of commercial litigation.

As such, the Court turns to the records provided by Pliteq. The Court has carefully reviewed the supporting documentation provided as to each firm that represented Pliteq in order to make a determination as to whether the hourly rates of Pliteq's counsel is reasonable.[8] Brinks

---

[8] The undersigned notes that Pliteq submitted the affidavit of Harry R. Schafer, from the firm of Kenny Nachwalter, P.A., on the issue of reasonable rates and reasonable number of hours expended on the matter. ECF No. [317–8]. Marjam also provided the affidavit of Glen H. Waldman as their expert on these issues. ECF No. [332–7]. The Court reviewed and considered

Gilson & Lione ("Brinks Gilson") served as primary counsel in the case from its inception in November 2015 through May of 2017, when Coffey Burlington appeared.  *See* ECF Nos. [75], [76].  Thereafter, Coffey Burlington assumed an active role in the case through the remainder of discovery and trial, with Brinks Gilson formally moving to withdraw in March 2018.  ECF No. [211].  In late 2017, Gabriel Groisman, a partner at Coffey Burlington, left the firm but continued his active role in the case from his own firm, Groisman Law, PLLC, entering another appearance, now as co-counsel for Pliteq, on December 27, 2017.  ECF No. [158].

The records reflect a total of twenty-one attorneys from the three different law firms, represented Pliteq.  The number of lawyers alone, however, is deceptive as many of these lawyers appear to have been involved in discrete tasks and were not integral parts of the litigation.  Indeed, the undersigned's calculations show that roughly $200,000 of legal work[9] was done by twenty-one different timekeepers who each had less than 150 hours on the file.  Indeed, fifteen timekeepers had less than fifty hours billed on the file.  Instead, it was seven timekeepers who did the vast majority of the work, one of those timekeepers being a support staff member at Coffey Burlington with a billable rate of $125.00.  In short, although approximately 4,752.40 hours were billed (before the request for additional fees) on the file, 3,362.00 of those hours were billed by only six lawyers.[10]  The additional request for fees fares the same, with two lawyers (Mr. Kaplan and Mr. Zach) accounting for 119 of the 183.7 hours billed.  *See* ECF No. [368] at 2.

---

their affidavits, although as noted above, the Court remains an expert on this issue and considers its own knowledge and experience concerning reasonable fees.

[9] This estimate is only a rough one given that both Coffey Burlington and Brinks Gilson provided a courtesy discount to Pliteq.  *See* ECF No. [317] at 11, n.3, 5.

[10] The undersigned arrives at this number by adding the hours worked by attorneys David J. Zack, Juan Hernandez, Kevin C. Kaplan, Jon Beaupre, Jennifer J. Theis, and Gabriel Groisman.  ECF No. [317–1] at 2–4.

That said, and to be sure, the number of lawyers involved in this case is more than the Court deems reasonable for purposes of the request; however, the Court will consider this fact in determining the number of hours that are reasonable.  As to the rates, the Court has reviewed the billing records to ascertain the type of work performed, as well as the qualifications of each counsel involved.  As to the rates charged to Pliteq, the Court rules as follows:

**Brinks Gilson & Lione:** Nine attorneys and seven paralegals at Brinks Gilson billed time to this matter at one point or another.  ECF Nos. [317–1] at 3; [317–10].  However, there were three lawyers—two partners and one associate—whose hours (1,335.40) amounted to seventy six percent of the total hours billed (1,758.60), and whose value ($709,536.50) represented eighty three percent of the of the total amount billed ($855,533.50 before the courtesy discount).  *Id.*  In total, the firm billed $797,083.80 which includes the courtesy discount of $58,449.70.  The hourly partner rates ranged from $485.00 to $755.00[11], and the hourly associate rates ranged from $120.00 to $445.00.  The Court specifically notes the qualifications of the three lawyers whose time comprised the vast majority of the time billed by this firm:

(1) Jon Beaupre graduated magna cum laude from the University of Wisconsin Law School in 2003; he is a shareholder specializing in various areas including IP and he billed Pliteq at an hourly rate of $485.00 and $545.00.

(2) Jeffery A. Handelman graduated from Georgetown University Law center in 1981.  Mr. Handelman is admitted to practice in various courts and represents brands such as American Airlines, The Coca-Cola Company, Little Caesars, and General Mills.  Mr. Handelman is a shareholder at Brinks Gilson and billed Pliteq at an hourly rate of $710.00 to $755.00.

(3) Jennifer J. Theis graduated from the University of Michigan Law School in 2006.  Ms. Theis is admitted to practice law in various courts and focuses on trademark and patent prosecution.  Ms. Theis is an associate at Brinks Gilson and billed Pliteq at an hourly rate of $380.00 to $445.00

[11] One attorney billed at the $650.00 to $795.00 rate, James Sobieraj.  However, he only billed 66.75 hours.  Although the Court finds this rate to be high for the market, any discount for his time is adequately addressed in the Court's reduction of the reasonable number of hours.

The Court finds that the rates of Mr. Beaupre and Ms. Theis are reasonable given their experience, the roles they played in the case, the complexity of the case and the market rate for sophisticated commercial litigators. Indeed, the Eleventh Circuit has clearly stated, "agreed-upon billing rate[s] [are] a strong indication of [ ] reasonable rate[s]." *Tire Kingdom, Inc.*, 253 F.3d at 1337; ECF No. [137] at 9. Here, the undersigned finds no reason to depart from the presumed reasonableness of the agreed-upon rates, especially given that the rates charged by Pliteq's attorneys are within the range set out in other cases in this District. *See Suzuki Motor Corp. v. Juijiang Hison Motor Boat Mfg. Co.*, No. 12-CV-20626, 2013 WL 4516042, at *2 (S.D. Fla. Aug. 21, 2013) (finding, in a Lanham Act case, hourly rates of $425.00 to $495.00 reasonable, for attorneys with over twenty years of experience); *Domond v. PeopleNetwork APS*, No. 16-24026-CIV-MORENO, 2017 WL 5642463, at *3 (S.D. Fla. Nov. 14, 2017), *aff'd*, 750 F. App'x 844 (11th Cir. 2018) (affirming district court's finding that, in an "exceptional" case brought pursuant to the Lanham Act, attorneys' hourly rates between $645.00 and $675.00 were reasonable in light of evidence about Miami rates and in light of counsel's skill, experience, and reputation); *Tobinick v. Novella*, 2018 WL 6978637 at *4–5 (S.D. Fla. Nov. 20, 2018), *report and recommendation adopted,* 2018 WL 6978629 (S.D. Fla. Dec. 6, 2018) (awarding a partner a rate of $650.00 per hour and a senior associate $400.00 per hour in a trademark case); *CBRE, Inc. v. Capital Commercial Real Estate Group, Inc.*, 19-61235-CIV, 2019 WL 7708503, at *2 (S.D. Fla. Oct. 10, 2019), *report and recommendation adopted*, 19-CIV-61235-RAR, 2019 WL 7708499 (S.D. Fla. Oct. 28, 2019) (finding that an hourly rate of $585.00).

The rate for Mr. Handelman, however, is higher than reasonable for the South Florida market. A more reasonable rate would be $650.00 an hour. However, because of the varying hourly rate during the life of the matter and the discount that was already provided, the Court will

not reduce the award at this juncture as any reduction the Court would make would be significantly less than the reduction the firm already provided to Pliteq.

**Coffey Burlington:** Ten attorneys and two paralegals at Coffey Burlington billed time to this matter at one point or another.  However, there were three partners and one Practice Support attorney, whose hours (2,169.3) amounted to eighty six percent of the total hours billed (2,516.9), and whose value ($986,880.00) represented eighty nine percent of the of the total amount billed ($1,104,037.50 before the courtesy discount).  In total, the firm billed $1,064,774.50, which reflects a courtesy discount of $39,263.00.  The hourly partner rates ranged from $500.00 to $750.00,[12] and the hourly associate rates ranged from $250.00 to $400.00.  The Court specifically notes the qualifications of the partners whose time comprised the vast majority of the time billed by this firm:

(1) David Zack graduated from the University of Michigan Law School in 1996.  Mr. Zack is admitted to practice law in Florida and California.  Mr. Zack represents clients in litigation involving banking, contracts, corporate governance, business torts, class actions, and intellectual property.  Mr. Zack is a shareholder at Coffey Burlington and has billed Pliteq at an hourly rate of $475.00.

(2) Kevin Kaplan graduated from Duke University School of Law with high honors in 1989.  Mr. Kaplan has extensive trial and appellate court experience in commercial litigation.  Mr. Kaplan has litigated matters ranging from aircraft finance, banking and partnership disputes, to trademark and copyright, construction defect and contract claims. Mr. Kaplan is currently the President of Coffey Burlington and billed Pliteq at an hourly rate of $625.00.

(3) Gabriel Groisman graduated from the American University-Washington College of Law.  Mr. Groisman has over a decade of legal experience, and was former shareholder at Coffey Burlington, until he started his own firm at Groisman Law PLLC.  While Mr. Groisman was a shareholder at Coffey Burlington, he billed Pliteq at an hourly rate of $500.00.

---

[12] The Court notes that only one lawyer, Robert K. Burlington, billed at the $750.00 rate; however, Mr. Burlington billed less than ten hours to the file.  The Court declines to find that the rate is not reasonable given Mr. Burlington's significant experience, and the firm provided a courtesy discount well in excess of Mr. Burlington's fees.

The Court finds that the rates for these lawyers, for the reasons noted above, and given their experience, the market rates, their role in the matter, and the complexity of the case, are reasonable.

**Groisman Law Firm:** Mr. Groisman left Coffey Burlington to form his own firm and continued to bill his time at a rate of $500.00 an hour which the Court has already determined is reasonable.  He also worked with an associate at his new firm, Danit Darmon, who graduated from the University of Miami School of Law in 2013, and billed Pliteq at an hourly rate of $236.00. The Court finds that the rate for this associate given her experience, the market rates, her role in the matter, and the complexity of the case, is reasonable.

In short, the Court finds that the rate of $485.00 to $650.00 an hour for an experienced partner is reasonable for this kind of case which involved sophisticated commercial litigation issues, such as the Lanham Act.  The range of $250.00 to $400.00 is also reasonable for an associate, as well as a rate or $125.00 for a paralegal.

### 2. The Award Should Be Reduced By Fifteen Percent For Claims Unrelated To FDUTPA And Lanham Act.

Pliteq argues that the fees incurred for the prosecution of those individual claims for which they did not prevail are so intertwined with the FDUTPA and Lanham Act claims that allocation for those fees is neither feasible nor appropriate.  ECF No. [317] at 12–14.  Specifically, Pliteq argues that the case involved a common set of facts such that the fees related to their counterclaims for tortious interference, unfair competition, and breach of contract are inextricably intertwined. As evidence of this, Pliteq cites to the jury verdict itself which, although asking the jury to find liability as to each of the three remaining counts, nevertheless sought one number as to compensatory damages.

To be sure, the facts underlying the non-FDUTPA and non-Lanham Act counts were intertwined with two central factual areas: (1) the thickness of the GenieMats, and (2) the effect of

the statements made by Marjam regarding Pliteq.  Although Pliteq dropped its breach of contract

claim, and the Court dismissed its tortious interference with contracts claim, the Court agrees that

the facts are fairly intertwined with those for which recovery is allowed.

However, Pliteq itself proposed an allocation, at least by percentage, for the Court's

consideration.  The recommendation is fifteen percent.  Pliteq notes that such a reduction would

also account for some of the time that was spent on the breach of contract claim that they dismissed.

The Court finds that some reduction is warranted not only given the dismissed contract claim but

given that only three counts actually reached the jury.  The Court will reduce the fee by fifteen

percent for those intertwined causes of actions for which a recovery of attorneys' fees is not

available under the law.

### 3. The Award Should Be Reduced By Twenty Percent To Account For The Number Of Law Firms And Lawyers That Were Involved In Representing Pliteq, As Well As The Limited Recovery As Compared To The Amount Requested By Pliteq.

Marjam argues that the attorneys' fees should be further reduced for a variety of reasons

arguing that the lodestar amount should not exceed $786,750.  ECF No. [332] at 12.  In support of

its reduction, Marjam relied on the opinion of its expert, Glen H. Waldman.  ECF No. [332-7].

Although claiming that the list is "non-exhaustive," Marjam provided the following fourteen

categories or objections to the time entries:

1. Overstaffing of attorneys at depositions, court proceedings and trial;

2. Time preparing for depositions never taken and witnesses not called at trial;

3. Time on unsuccessful motion practice (e.g., spoliation/sanctions against Marjam);

4. Excessive time spent on unsuccessful mediation (almost 120 entries);

5. Entries related to "linguist expert" completely unrelated to action;

6. Time devoted to tasks resulting from hide-the-ball discovery tactics (e.g., letters rogatory/Laura Lim in Canada);

41

7. Time spent to re-designate documents improperly cloaked as AEO (initially 90% of documents produced by Brinks Gilson were AEO);

8. Document management duplication by Brinks Gilson and Coffey Burlington;

9. Nebulous/vague/duplicative entries relating to attorney conferences, meetings, strategy, next steps, emails, calls, etc.;

10. Non-Compensable time spent on *pro hac vice* motions and related entries;

11. Time spent in connection with non-compensable trial consultants (Gervelino);

12. Time spent on litigation not pursued (e.g., order to show cause never filed);

13. Discrete, non-compensable claims/causes of action (e.g. tortious interference, copyright, breach of contract, breach of warranty);

14. Duplicative/excessive work

ECF No. [332] at 11. The Court has reviewed the billing records, Marjam's annotations on those records and the affidavit of its expert and finds that only a twenty percent reduction is warranted.

First, several objections address Marjam's objections to time entries involving matters that were ultimately unsuccessful, preparing for depositions that were not ultimately taken or that were of witnesses not called for trial (2, 3, 4, and 12). However, the fact that some issues were considered and either not pursued or that certain motions proved unsuccessful does not persuade the court to reduce the fee. If there was a large and discrete issue that was wholly unrelated to the success of the claim the Court would consider it but that it's not the case here. The ebb and flow of complex litigation necessarily includes work on issues that ultimately may prove unsuccessful or that are left unpursued altogether. Barring that being a significant amount of time, the Court is not inclined to discount the attorneys' fees for this reason.

Second, Marjam challenges time spent on matters for which the costs are not recoverable (10, 11), but the Court does not find that the attorneys' fees are similarly unrecoverable for that reason.

Third, Marjam complains of nebulous time entries (9), and block billing. Although block billing is disfavored, the Court finds that the billing records are sufficiently clear not only as to the substance of the time entered but also sufficiently detailed so that the court can ascertain the reasonableness of the entry. Indeed, the Court finds the billing records to be detailed and do provide sufficient information for the Court to make determinations as to the reasonableness of the time spent.

Fourth, the Court will not reduce any time based on Marjam's' characterization that h time was spend to re-designate documents that were "improperly" designated as attorney's eyes only or to what they describe as 'hide the ball discovery tactics" (6, 7). These conclusory attacks on the time billed are not supported by the undersigned's review of the record.

Fifth, the time for the linguistic expert appears to be an error. ECF No. [317-4] at 136 However, one error amounting to 3.5 hours (and less than $1500) in years' worth of bills is not a reason to discount the fee. That amount, of course, should not be paid, but it alone is not a basis to reduce the fee.

Sixth, the Court has already discounted the award by fifteen percent to account for claims for which recovery is not appropriate.

Seventh, there are several objections that more closely address the issue of multiple lawyers and multiple law firms (1, 8, 14). Here the Court does believe that a reduction is warranted. Even taking into account the core group of lawyers on the file was much smaller (i.e., three at Brinks Gilson, three at Coffey Burlington), there were five partners who were actively involved in the

43

litigation (Mr. Zack, Mr. Groisman, Mr. Kaplan, Mr. Beaupre, and Mr. Handelman).  The overlap between Brinks Gilson and Coffey Burlington for a time period, the coordination required to take on the matter from another firm, and then the number of partners that ultimately remained involved require some reduction.  Although the Court notes the high caliber of Pliteq's counsel, the Court must consider what is reasonable for Marjam to pay.  In addition, as the Court noted above, there were some partners who were  billing at a rate in excess of $650.00 and so a reduction

Finally, the Court considers that Pliteq Sought $1.6 million in damages and 5 million in punitive damages at trial and yet the jury only awarded $310,000 in damages and $800,000 in punitive damages. ECF Nos. [332] at 20; [353] at 35, 37; [286].  Although the recovery was still significant, it was only a portion of what was sought by Pliteq at trial.  The Court did not find this persuasive in determining whether the case was exceptional, but it does find that a reduction in attorneys' fees is appropriate on this ground.

For the reasons noted above, the Court finds that a twenty percent reduction adequately addresses the Court's concerns.  The calculation on the fees, therefore, is as follows: the total amount was $2,135,926.80, that number is reduced by fifteen percent to account for the claims for which Pliteq is not entitled to recover, and then that number is reduced by twenty percent to account for the high number of lawyers and firms involved and the size of the recovery as compared to what was sough at trial.  The final amount of attorney's fees, therefore, is $1,452,430.22.

III.     PLITEQ'S BILL OF COSTS

Pliteq seeks an award of costs for: (1) $54,926.67, pursuant to 28 U.S.C. § 1920, ECF Nos. [308] (requesting $35,417.89 in costs), [368] (requesting $19,508.38 in additional costs); and (2) an additional $166,101.30 in litigation expenses that Pliteq contends are recoverable pursuant to FDUTPA, ECF No. [317] at 17.  The Court will address each category in turn.

### A.  Pliteq may recover $31,510.67 In Taxable Costs Under 28 U.S.C. § 1920.

A prevailing party may recover costs as a matter of course unless the court or an applicable statute directs otherwise.  Fed. R. Civ. P. 54(d)(1).  Under Rule 54(d)(1), the presumption is in favor of awarding costs.  *Arcadian Fertilizer, L.P. v. MPW Indus. Servs., Inc.*, 249 F.3d 1293, 1296 (11th Cir. 2001) (citation omitted).  Such costs may not, however, exceed those permitted by 28 U.S.C. § 1920.  *Maris Distrib. Co. v. Anheuser–Busch, Inc.*, 302 F.3d 1207, 1225 (11th Cir. 2002) (citation omitted).  In turn, 28 U.S.C. § 1920, provides the categories that may be taxed as costs:

(1) Fees of the clerk and marshal;

(2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;

(3) Fees and disbursements for printing and witnesses;

(4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;

(5) Docket fees under section 1923 of this title;

(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses and costs of special interpretation services under section 1828 of this title.

Under this provision, Pliteq seeks to recover $54,926.67 for the following costs:

| DESCRIPTION | AMOUNT |
|---|---|
| Service Fees | $1,905.00 |
| Witness Fees | $254.40 |
| *Pro Hac* Vice | $300.00 |
| Hearing Transcripts | $2,359.85 |
| Deposition Transcripts | $17,445.55 |
| Deposition Videotapes | $7,457.50 |
| Westlaw Research | $2,092.50 |
| Pacer | $116.90 |
| Federal Express | $58.03 |
| Exhibits | $77.50 |
| Mediation | $4,679.90 |
| Expert Fees | $10,334.00 |
| Printing/photocopying | $7,425.54 |
| Cloud-Based Document Review | $420.00 |
|  | TOTAL: $54,926.67 |

Pliteq's request is supported by a declaration from counsel, Kevin Kaplan, ECF No. [308–1], and invoices from law firms or vendors, ECF No. [368–1].  For the reasons noted below, Pliteq is to recover $31,511.67 in taxable costs under 28 U.S.C. § 1920.

### 1.  Service Fees, Witness Fees and *Pro Hac Vice* Fees

Pursuant to 28 U.S.C. § 1920, a court is authorized to tax "[f]ees of the clerk and marshal." The Eleventh Circuit has held that a private party may recover its service fees, despite using a private process server.  *See U.S. E.E.O.C. v. W&O, Inc.*, 213 F.3d 600, 624 (11th Cir. 2000). However, such costs are recoverable so long as the amount does not exceed the amount charged by the U.S. Marshal.  *Id.*  The U.S. Marshals' fee schedule provides that the amount charged by U.S. Marshals for service of process is $65.00 per hour.  *See* 28 CFR § 0.114(a)(3).

Marjam argues that Pliteq's request of $1,905.00 for service of process fees are not recoverable, or, alternatively, should be limited to $455.00 because the request is beyond the $65.00 rate permitted by the U.S. Marshals Service and Pliteq has not provided justification for

such request.  ECF No. [311] at 3–4.  Marjam argues that Pliteq used a private company located in Illinois to arrange service in Florida, despite Pliteq having local counsel in Florida who could have arranged service through a local process service.  *Id.* at 3 n.1.  The undersigned finds Marjam's argument persuasive.  Although the undersigned finds that Pliteq has provided invoices for its service fees, the undersigned does not find $1,905.00 reasonable.  As such, the undersigned recommends that Pliteq recover only $455.00 in service fees.

Next, the undersigned also recommends that Pliteq's request of $254.40 in witness fees be reduced, and Pliteq's request of $300.00 in *pro hac vice* fees be denied.  First, as to Pliteq's request for witness fees, the undersigned finds that $254.40 in fees for two witnesses is beyond the normal statutory award of $40.00 pursuant to 28 U.S.C. § 1821(b).  *See Morrison v. Reichhold Chemicals, Inc.*, 97 F.3d 460, 463 (11th Cir. 1996) ("A witness who appears before a federal court 'or before any person authorized to take his deposition pursuant to any rule or order of a court of the United States' is entitled to fees and allowances, including 'an attendance fee of $40 per day for each day's attendance.'") (quoting 28 U.S.C. § 1821(a)(1), (b)).  Although Pliteq has provided invoices detailing its requested witness fees, Pliteq has not provided any justification for its relatively high request.  As such, the undersigned recommends that Pliteq recover only $80.00 in witness fees.

Finally, as to Pliteq's request for $300.00 in *pro hac vice* fees, the undersigned finds that those costs are not recoverable.  "Although the Eleventh Circuit has not issued a published opinion directly on point, but it has, in an unpublished decision, affirmed a district court's refusal to tax *pro hac vice* costs."  *Daniel-Rivera v. Everglades Coll.*, 16-60044-CIV, 2017 WL 5197509, at *6 (S.D. Fla. June 16, 2017), *report and recommendation adopted*, 0:16-CV-60044-WPD, 2017 WL 5197949 (S.D. Fla. June 30, 2017) (citing *Eagle Ins. v. Johnson*, 162 F.3d 98 (11th Cir. 1998),

*affirming Eagle Ins. v. Johnson*, 982 F. Supp. 1456 (M.D. Ala. 1997)).  As such, the undersigned, here, finds that Pliteq's *pro hac vice* fees are not taxable costs.

### 2. Hearing Transcripts, Deposition Transcripts and Deposition Videotapes

Section 1920(2) allows a prevailing party to recover "[f]ees for printed or electronically recorded transcripts necessarily obtained for use in the case."  Pliteq seeks to recover $2,359.85 for hearing transcripts, $17,445.55 for deposition transcripts, and $7,457.50 for deposition videotapes.  "Hearing transcript costs are taxable when reasonably obtained 'in preparation for additional argument and/or motion practice.'"  *Luka v. City of Orlando*, No. 6:07-cv-841-ORL-22GJK, 2011 WL 4837263, at *7 (M.D. Fla. Sept. 23, 2011), *report and recommendation adopted*, 2011 WL 4836229 (M.D. Fla. Oct. 12, 2011) (quoting *U.S. Fire Ins. Co. v. Mikes*, No. 8:04-cv-2783-T-23TBM, 2008 WL 61602, at *3 (M.D. Fla. Mar. 3, 2008)).  The cost of a deposition transcript is taxable when a prevailing party reasonably believed that the deposition was wholly or partially necessary to the case.  *See HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 6:14-cv-004-ORL-40KRS, 2018 WL 1863778, at *11 (M.D. Fla. Mar. 26, 2018), *report and recommendation adopted*, 6:14-cv-2004-ORL-40KRS, 2018 WL 1863779 (M.D. Fla. Apr. 13, 2018).

Here, the undersigned finds that Pliteq's costs for its hearing transcripts, deposition transcripts, and its deposition videotapes were all reasonably necessary for Pliteq to effectively litigate this case.  This matter was vigorously litigated and ultimately tried to a jury such that the Court finds that these costs were reasonable both in terms of the need for the transcripts and the amount paid for them.  Indeed, Pliteq has provided documentation, including invoices, to support its request for these costs.  As such, the undersigned recommends that Pliteq recover $2,359.85 for hearing transcripts, $17,445.55 for deposition transcripts, and $7,457.50 for deposition videotapes.

### 3.   Westlaw Research, Pacer, Federal Express and Exhibits

Pliteq requests $2,092.50 for Westlaw research, $116.90 for Pacer fees, $58.03 for Federal Express, and $77.50 for costs associated with the production of exhibits.  Generally, copying and computerized legal research, including Pacer fees are not recoverable under U.S.C. § 1920.  *See Doria v. Class Action Services, LLC*, 261 F.R.D. 678, 686 (S.D. Fla. 2009) (finding that photocopying, legal research, and pacer fees are not recoverable as costs under U.S.C. § 1920); *see also Duckworth v. Whisenant*, 97 F.3d 1393, 1399 (11th Cir.1996) (finding that copying and computer legal research are not recoverable under U.S.C. § 1920).  As such, the undersigned finds that Pliteq's request of $2,092.50 for costs associated with Westlaw research and $116.90 for costs associated with Pacer fees are not taxable costs and, therefore, unrecoverable.

The undersigned also finds that Pliteq's request of $58.03 for Federal Express and $77.50 for exhibit costs are not recoverable.  First, federal express charges are not taxable under Section 1920.  *Organizacion Miss Am. Latina, Inc. v. Urquidi*, 16-CV-22225, 2018 WL 1876736, at *4 (S.D. Fla. Mar. 7, 2018) (finding that plaintiff's request for its federal express charges were not recoverable under § 1920).  Second, although U.S.C. § 1920(4) allows for "[f]ees for exemplification and the costs of making copies where the copies are necessarily obtained for use in the case," the Court finds that Pliteq's description does not adequately explain the type of exhibits it is requesting costs for.  As such the undersigned is unable to determine whether such exhibits were necessarily obtained for use in the case, and, therefore, the undersigned finds that Pliteq's request of $77.50 for exhibits is not recoverable.

### 4.   Mediation Fees

Pliteq requests $4,679.50 in mediation fees under Section 1920.  Mediation expenses are not recoverable under Section 1920.  *Incarcerated Entm't, LLC v. Cox*, 18-21991-CIV, 2019 WL

8989846, at *1 (S.D. Fla. Nov. 4, 2019).  As such, the undersigned finds that Pliteq's request for mediation fees should be denied as they are not recoverable.

## 5.  Expert Fees

Pliteq requests $10,334.00 in expert fees under Section 1920.[13]  ECF No. [368–1] at 10–11.  Marjam argues that Pliteq should not be able to recover its expert fees because Pliteq's expert, Harry Schafer, Esq., merely opined on the reasonableness of Pliteq's attorneys' fees, and expert fees are not recoverable under Section 1920.  ECF No. [370] at 4–5.  The undersigned agrees.  This Court finds that these are not taxable costs under Section 1920 and, therefore, unrecoverable.  As the Court noted in *Fla. Int'l Univ. Bd. Of Trustees v. Fla. Nat'l Univ., Inc.*, 2017 WL 3610583 at *8, expert fees are usually non-taxable, absent showing of vexatious conduct, fraud on the court or abuse of the judicial process.  Indeed, "costs" is a term of art that generally does not include expert fees.  *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 297 (2006).  As such, the Court finds that Pliteq's request for expert fees are not recoverable as taxable costs.

## 6.  Printing/Photocopying, and Cloud Based Document Review

Pliteq requests $7,425.54 for printing/photocopying costs, and $420.00 for Cloud Based Document Review.  As to the printing cost, the amount appears as part of the firm's billing records without much detail.  Indeed, as Marjam correctly notes, the invoices representing Pliteq's printing costs are not sufficiently described.  ECF No. [311] at 10.  Pliteq's photocopying expenses and printing expenses are listed in bulk and provide no further specification as to the number of copies that were made, the rate at which the copies were being charged, or the purpose for which the

---

[13] Pliteq's invoice of October 31, 2018, represents that Pliteq incurred $5,134.50 in expenses for the professional services of Kenny Nachwalter, and, again, incurred another $5,199.50 in expenses for Kenny Nachwalter's professional services during month of November 2018.  ECF No. [368–1] at 10–11.

copies were made.  As such, the undersigned finds that, although printing/photocopies are generally recoverable, "[t]he party moving for [printing/photocopying costs] must present evidence 'regarding the documents copied including their use or intended use.'"  *Monelus v. Tocodrian, Inc.*, 609 F. Supp. 2d 1328, 1335 (S.D. Fla. Apr. 23, 2009) (quoting *Cullens v. Georgia Dept. of Trans.*, 29 F.3d 1489, 1494 (11th Cir.1994)).  Given that Pliteq has not sufficiently described its printing/photocopying costs, and the printing/photocopying costs appear to have been made in-house, the Court finds that a reduction is warranted.  Marjam requests a reduction of 50% and the Court agrees that such reduction is warranted.  As such, the undersigned finds that Pliteq should recover $3,712.77.  As for Pliteq's request of $420.00 for cloud-based document review, the undersigned finds that such costs are not taxable under Section 1920.[14]

## B.  Under FDUTPA, Pliteq Should Be Awarded Its Litigation Expenses of $5,200.00

In addition to the costs under Section 1920, Pliteq seeks an award of $166,101.30 for costs that, although not recoverable under Section 1920, it argues are recoverable as expenses under FDUTPA.  FDUTPA specifically provides that the prevailing party, after the exhaustion of all appeals, may receive his or her reasonable attorneys' fees and costs from the non-prevailing party.  Fla. Stat. § 501.2105(3); *Altair S.R.L. v. His Wind, LLC*, No. 5:15–cv–329–OC–30PRL, 2016 WL 1728931, at *4 (M.D. Fla. April 29, 2016) (citing *Chow*, 640 Fed. App'x. at 836 n.4).  Litigation expenses are recoverable if they are reasonable and related to the litigation.  *See Altair S.R.L.*, 2016 WL 1728931, at *4–5 (reviewing prevailing party's proposed litigation expenses to determine

---

[14] The undersigned recognizes that some of Pliteq's requested costs—though not recoverable under Section 1920—may be recoverable as non-taxable costs under its FDUTPA claim.  However, Pliteq did not make that argument.  Nevertheless, the Court finds that the costs that were not available under Section 1920 should not be awarded under FDUTPA either because they were not reasonable, or the Court could not readily identify if they were related to the FDUTPA causes of action.

whether they were related to the litigation and reasonable).  Although Marjam disputes that Pliteq

is entitled to fees or costs under FDUTPA, it does not dispute that FDUTPA permits the recovery

of costs in addition to those normally taxable under 28 U.S.C. § 1920.  As such, the issue for the

Court is whether the requested expenses were related to the litigation and reasonable.  The

litigation expenses sought by Pliteq are as follows:

| DESCRIPTION | AMOUNT |
| --- | --- |
| Expert Witness Fees | $156,825.29 |
| Mediation Expenses | $5,200.00 |
| Travel Expenses | $4,076.01 |
| | TOTAL: $166,101.30 |

*See* ECF No. [317] at 17.  In its Motion for Attorneys' Fees, Pliteq contends that the above costs

are reasonable in its defense of Marjam's FDUTPA claim.  *Id.*  Pliteq also submitted supporting

documentation substantiating its costs.  ECF Nos. [317–13] Exh. M; [317–4] Exh. D; [317–2] Exh.

B.  Specifically, Pliteq seeks expert witness expenses for the firm of damages expert, W. Todd

Schoettelkotte, including: (1) $38,625.00 for professional fees incurred during May 1, 2017

through May 31, 2017, ECF No. [317–13] at 3; (2) $22,350.00 for professional fees incurred during

June 1, 2017 through June 30, 2017, *id.* at 6; (3) $6,587.50 for professional fees incurred during

July 1, 2017 through July 31, 2017, *id.* at 9; (4) $23,800.00 for professional fees incurred during

August 1, 2017 through August 31, 2017, *id.* at 12; (5) $30,900.00 for professional fees incurred

during March 1, 2018 through March 31, 2018, *id.* at 15; and (6) $34,563.15 for professional fees

incurred during April 1, 2018 through May 4, 2018, *id.* at 18.  Pliteq reduced the fees incurred

during April through May 2018 by $32,824.35 to reflect the summary judgment date on the FDUTPA claim. *Id; see* ECF No. [317] at 17 n.11.

Marjam argues that the fees incurred by the damage's expert should not be awarded because the expert's opinions did not address any substantive aspect of FDUTPA. ECF No. [370] at 5 n.3. Specifically, Marjam contends that the expert merely opined upon the damages to Pliteq's affirmative claims and Pliteq did not assert any FDUTPA claims. *Id.* Pliteq did, however, remove the fees associated with the trial where it was clear that no FDUTPA claim was being litigated. However, the record does not explain why the fees that are being sought were related to the FDUTPA defense, especially since it was the same expert used to prosecute the Lanham Act and the other claims. The invoices for the expert are also not sufficiently detailed. On this record, the undersigned simply cannot conclude that all the fees were related to the FDUTPA claim nor can it conclude that they were reasonable. As such, the Court will reject this request.

As to the mediation, Pliteq is requesting $2,500.00 for the cost of the mediator incurred on June 30, 2017, ECF No. [317–4] at 148, and $2,700.00 for further costs associated with mediation services, ECF No. [317–2] at 34. The record shows that the mediation was ordered by the Court at a time where the FDUTPA claims were still at issue. The Court finds it reasonable to award this cost.

Finally, Pliteq is also requesting travel expenses, including: (1) $1,352.56 in travel expenses for Jeffery Handelman[15] to travel to West Palm Beach, Florida to conduct the deposition of two witnesses, ECF No. [317–4] at 139; (2) $1,129.10 for travel expenses of Jefferey Handelman to travel to Philadelphia, Pennsylvania to conduct the deposition of Ray Horan, *id.* at 148; (3) $759.67 for travel expenses of Jefferey Handelman to travel to Miami, Florida to

---

[15] Jefferey Handelman is an attorney for Brinks Gilson. ECF No. [317–10] at 16.

participate in mediation, *id*; (4) $92.05 for travel expenses of Jon Beaupre to travel to West Palm Beach, Florida to attend the depositions of Jim Metcalf and Marc Reiss, and Discovery Hearings, *id*. at 171; and (4) $742.63 for travel expenses of Jon Beaupre to travel to Miami, Florida for depositions of Todd Schoettelkotte, *id.* at 174. [16]  The Court does not find it reasonable to award fees for a lawyer from Chicago to travel to attend Court hearings, depositions, or other meetings relating to this case when the case was filed in Miami and there appears to be no reason why counsel from Miami could not have been hired from the start of the case.  Of course, Pliteq is free to hire its counsel of choice, but it cannot expect its fees to be paid by the opposing party even if it has prevailed.  At best, the travel expenses for the deposition of Mr. Horan in Pennsylvania could be considered, but again, the materials submitted aren't sufficiently detailed to support a finding that they were reasonable.

## IV.   PLITEQ's REQUEST FOR APPELLATE FEES

Pliteq argues that it is entitled to $127,937.50 in appellate attorneys' fees under the Lanham Act because Marjam's appeal was exceptional.  ECF Nos. [368] at 3; [368–2] at 14.  Pliteq argues that Marjam's appeal is exceptional for the same reasons Marjam's Lanham Act claim was exceptional at the District Court level.  ECF No. [368–2] at 14.  In addition to those arguments already discussed above, Pliteq also argues that Marjam's appeal is exceptional because Marjam's appeal merely "raised dilatory attacks based on side issues" and "made numerous groundless arguments."  *Id.* at 17.  In short, Pliteq argues that "Marjam's misconduct from the inception of

---

[16] Pliteq requests $1352.56 in travel expenses in taking the deposition of Todd Schoettelkotte. ECF No. [317] at 17 n.12.  However, upon review of the corresponding invoice, the travel expense recorded was actually only $742.63.  ECF No. [317–4] at 174.  As such, the undersigned will reduce the award to reflect the amount on the invoice.

this action to the present, including the pursuit of [its] baseless appeal, entitled Pliteq to its attorneys' fees…." *Id.* at 19.

In response, Marjam argues that Pliteq is not entitled to its appellate attorneys' fees because Marjam's appeal did not relate to the parties' respective Lanham Act claim.  ECF No. [370–1] at 14.  Specifically, Marjam argues that its appeal "centered around the Trial Court's rulings as they related to its defense of Pliteq's counterclaims, and specifically, Pliteq's failure to prove causation and damages arising from Marjam's alleged *tortious interference*."  *Id.*  In short, Marjam argues that the issues brought on appeal "had nothing to do with the Lanham Act."  *Id.* at 15.

The Eleventh Circuit has not yet opined on the standard for awarding fees to the prevailing party on appeal in Lanham Act cases.  However, different standards have been adopted by other circuits.  For instance, the First Circuit Court of Appeals has rejected the argument that "whenever a case is deemed exceptional at the trial court level, attorneys' fees should automatically be awarded for the appeal."  *Tamko Roofing Products, Inc. v. Ideal Roofing Co., Ltd.*, 294 F.3d 227, 230 (1st Cir. 2002).  Instead, the First Circuit has found a middle ground, listing several factors that may indicate whether an appeal is "exceptional."  *Id.*  Specifically, the First Circuit factors examined: "(1) whether the appeal was on issues different from those that caused the trial court to find the case 'exceptional'; (2) the relative strength or weakness of the appellate issues; and (3) the extent to which the appeal can be said to have prolonged, without adequate justification, a particularly bad 'exceptional case.'"  *Id*; *see also Fla. Int'l Univ. Bd. of Trustees*, 2017 WL 3610581, at *3.  The Ninth Circuit has also opined on this issue, finding that attorneys' fees on appeal were not appropriate where the appeal was entirely reasonable and raised important legal questions.  *See U-Haul International, Inc. v. Jartran, Inc.*, 793 F.2d 1034 (9th Cir. 1986).

Here, although the undersigned found no difficulty in concluding that the Lanham Act case at the District Court level was exceptional based on the factors that must be considered under the prevailing law, the question on the appeal is a much closer one.  After careful consideration of the appellate briefs and the Eleventh Circuit's Opinion, the undersigned finds that the appeal was not exceptional.  First, the appeal did not address Marjam's Lanham Act claims.  Indeed, those were dismissed at summary judgment and the Court's Order on summary judgment was not appealed. The only connection to the Lanham Act case at the appellate level was Pliteq's claim.  There, the appeal centered around evidentiary issues relating to the sufficiency of the verdict's decision as to damages.  That is not to say that the issue did not concern the Lanham Act, as one cannot so cleanly separate the issues in this case, but the evidentiary issues did not address the Court's findings that the case was exceptional given the lack of any meaningful defense.

The Court finds Pliteq's own brief to be instructive.  Pliteq, in describing the arguments that Marjam was raising, described Marjam's appeal as challenging only two things: (1) "the factual basis for Pliteq's damages claims," and (2) the "several evidentiary rulings by the District Court."  ECF No. [368–2] at 8.  Indeed, on appeal, Marjam challenged the District Court's admission of two sets of documents that helped Pliteq prove causation and damages.  ECF No. [358].  Marjam also challenged a series of evidentiary rulings.  As such, the Eleventh Circuit's Opinion primarily addressed whether the District Court erred in: (1) the exclusion of witness testimony, (2) the admission of inadmissible hearsay, (3) the District Court's refusal to allow Marjam to call its rebuttal expert, and (4) making several other rulings, including the admissibility of Paul Downey's testimony, statements made in Pliteq's closing arguments, and jury instructions. *Id.*  Although Pliteq argues that the issues raised on appeal are so inextricably intertwined that they involve the Lanham Act, the undersigned is unpersuaded, as the question is not whether they

involved the Lanham Act as much as whether they involved those issues that made the case exceptional.

Second, although Marjam's appeal was weak, the Court finds that it was colorable. As noted in *Florida Int'l Univ. Bd. of Trustees*, the test is not whether a party's claim is rejected by a court, but, instead, whether the party's claim was at least colorable. 13-21604-CIV, 2017 WL 3610583, at *4; *see also Fla. Van Rentals, Inc. v. Auto Mobility Sales, Inc.,* Case No. 8:13-cv-1732-T-36EAJ, 2015 WL 4887550 at *3 (M.D. Fla. Aug. 17, 2015) (finding that "although the totality of the evidence supporting the validity of these marks was weak, [p]laintiffs' overall case was at least colorable."). The fact that Marjam's appeal was rejected does not warrant a finding of exceptionality.

Perhaps the most persuasive point, however, is the two-year delay that Marjam's appeal caused. ECF Nos. [291], [334], [358], [367]. The question now is whether it prolonged a "particularly bad 'exceptional case'" without adequate justification. *Tamko Roofing Products, Inc.*, 294 F.3d 227 at 230. The Court cannot find that the appeal was merely to delay the case. As noted above, although weak, some of the evidentiary issues were colorable. Indeed, although the Eleventh Circuit dispensed with every point raised, there is nothing in the opinion itself or in the Court's assessment of the appeal that would lead the Court to find that there was not an adequate justification. *Id.* As such, the undersigned recommends that Pliteq's request for appellate fees under the Lanham Act be denied.

## V.      RECOMMENDATION

In accordance with the foregoing Report and Recommendation, the undersigned hereby RECOMMENDS that Pliteq's Motions, ECF Nos. [307],[308], [317], [368], be **GRANTED in part** and **DENIED in part**.  Pliteq should be awarded a total of **$ 1,452,430.22** in attorneys' fees and $36,710.67 in costs.

## VI.     OBJECTIONS

A party shall serve and file written objections, if any, to this Report and Recommendation within **TEN (10) DAYS** of the filing of this Report and Recommendation.  Because the Court heard oral argument specifically addressing the matters presented here, ECF No. [373], the undersigned finds that ten days is sufficient time for the parties to file their objections.  Failure to timely file objections will bar a *de novo* determination by the District Judge of anything in this Recommendation and shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions."  11th Cir. R. 3-1 (2016); 28 U.S.C. § 636(b)(1)(C); *see also Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191–92 (11th Cir. 2020).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 5th day of March, 2021.

_____
**JACQUELINE BECERRA**
**UNITED STATES MAGISTRATE JUDGE**